## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

MULTIPLE ENERGY TECHNOLOGIES, LLC,

Plaintiff,

v.

UNDER ARMOUR, INC.,

Defendant.

_____

Case Number: 2:20-cv-664

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Multiple Energy Technologies, LLC ("MET"), by its attorneys, White and Williams, LLP, as and for its complaint against Defendant Under Armour, Inc. ("Under Armour") herein, alleges as follows:

### INTRODUCTION

1.     This is an action seeking injunctive relief and to recover damages arising from Under Armour's ongoing breaches of its contractual, statutory and common law duties owed to MET, including without limitation, its breach of the 2014 Confidential Disclosure Agreement with MET; its misappropriation of MET's trade secrets, confidential and proprietary information to compete unfairly and wrongfully with MET; its false advertising; its violations of the Sherman and Lanham Acts; and its tortious interference with MET's economic relationships, all of which have had the effect of  severely damaging MET's business.

### JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1125(a) and 15 U.S.C. §1 et. seq. because this action arises under the laws of the United States.  This Court has supplemental jurisdiction over all state-law claims pursuant to 28 U.S.C. § 1367 and 28 U.S.C. § 1338(b).

3.      Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), because this district is MET's principal place of business where it created and maintains its trade secrets and many of the events giving rise to MET's claims occurred in this district, including the harm suffered by MET.

## THE PARTIES

4.      MET is a Delaware limited liability company with its principal place of business at 470 Johnson Road, Suite 220, Meadow Pointe Plaza, Washington, PA 15301.

5.      Upon information and belief, Defendant Under Armour is a corporation organized and existing under the laws of the State of Maryland with its principal place of business in Maryland.

## BACKGROUND

6.      Dr. Shannon Vissman began operating MET in May 2012.  Over the next few years, Dr. Vissman and his team took part in the development of, and tested, a bioceramic powder branded as "Redwave$^{TM}$."

7.      MET sells its bioceramic powder to manufacturers, who spray the powder onto their garments, sheets, and other textiles and then, in turn, sell those products, which include the printed Redwave$^{TM}$ mark, to consumers. MET developed its Redwave$^{TM}$ product particularly for application by contract manufacturers for ultimate sale to the public.

8.      MET has also sold garments, sleeves and other products containing its bioceramic powder, which include the printed Redwave$^{TM}$ or Biopower mark, directly to consumers.

9.      Under Armour sells activewear and sleepwear products directly to consumers. This includes the sale of products containing a competing bioceramic product known as Celliant, which is manufactured by Hologenix, LLC ("Hologenix").  Under Armour advertises these

products separately from their other product offers and as helping to promote recovery, especially for athletes.

A.    **Finished Textiles Containing Recovery Enhancing Bioceramics**

10.    In recent years there has been growing consumer demand for sleepwear, bed sheets, and other finished textiles containing recovery enhancing bioceramics ("FTCREB"). These products contain bioceramics that can either be sprayed or printed on textiles or onto the fabric themselves.  The textiles are then used to create sleepwear, bed sheets, and other products.

11.    FTCREB are distinct and separate from other finished textile products.  Unlike other pajamas and bed sheets, these products are designed and manufactured to use infrared technology to improve muscle recovery in athletes – a characteristic strongly advertised by Under Armour.

12.    Notably, NFL quarterback Tom Brady has been largely responsible for the growth and popularity of the FTCREB market.  In or around 2017, Mr. Brady started using FTCREB incorporating Plaintiff's bioceramic technology and spoke publicly about the benefits of the FTCREB with MET's bioceramic technology and as a result potentially increased consumer demand for FTCREB.

13.    FTCREB are consistently priced higher than traditional textiles that do not contain bioceramics.

14.    Upon information and belief, consumers who seek to purchase FTCREB do not consider traditional textiles that do not contain bioceramics to be reasonably interchangeable. Therefore, consumers who seek to purchase FTCREB would not respond to a small but significant and non-transitory increase in price of FTCREB by switching to traditional textiles that do not contain bioceramics.

15.     Under Armour has become the market leader in the FTCREB market and markets these products are separate and distinct from their textiles that do not contain biocerarmics.

16.     Upon information and belief, Under Armour is responsible for over 60% of sales in the market for FTCREB in the United States and Under Armour has power over price in the FTCREB market in the United States.

**B.      MET's Protection of Its Trade Secrets**

17.     In connection with the development of the Redwave^TM business, MET built a substantial patent portfolio and strongly protects its patents, processes, and formulations at considerable cost.

18.     MET does not share its formulation or application process for its Redwave^TM powder without protecting itself first with non-disclosure agreements and other protective documents.

19.     MET's application process is proprietary to MET.

**C.      Under Armour & MET**

20.     On October 14, 2014, Under Armour executed a "Mutual Non-Disclosure Agreement" with MET (the "NDA").

21.     The NDA provided, *inter alia,* that "'Confidential Information' shall mean all information of any kind whatsoever (including without limitation information related to the Company's bioceramic technology, patent, copyright, trade secret and other proprietary information, data, compilations, formulae, models, patent disclosures and applications, procedures, processes, projections, protocols, results of experimentation and testing, specifications, strategies and techniques, and business information and objectives), and all tangible and intangible embodiments thereof of any kind whatsoever (including without limitation, apparatus, compositions, products, documents, drawings, machinery, patent

applications, records, report(s)), which is disclosed by [MET] to [Under Armour] or is obtained by [Under Armour] through observation or examination of the foregoing."

22.     Pursuant to the terms of the NDA, Under Armour agreed not to share any of the Confidential Information with any third-party and acknowledged that MET is the owner and licensor of the Confidential Information.

23.     On January 15, 2015, Under Armour and MET entered into a Material Transfer Agreement whereby MET gave specified materials to Under Armour for the sole purpose of conducting a specified evaluation and not for any commercial or other purpose (the "2015 Agreement"). The 2015 Agreement further stated that "[u]nless expressly contemplated as part of the Evaluation, [Under Armour] shall not analyze, characterize, reverse engineer or otherwise derive the structure of any Materials." The agreement was specifically related to Under Armour's development of FTCREB utilizing Redwave.

24.     The 2015 Agreement also stated in relevant part that "[a]ll oral and written information relating to the Materials or the Evaluation to be performed with the Materials ("Confidential Information") will be the proprietary and confidential information of [MET]. [Under Armour] agrees to hold all Confidential Information in confidence and not to disclose Confidential Information to any third party or use it for any purpose except for the conduct of the Evaluation."

25.     MET shared with Under Armour the application process for spraying or "printing" its powder onto material as well as the concentration mix and the science behind its products, which was protected by the terms of the NDA.

26.     Under Armour manufactured its FTCREB products, which it promoted as recovery wear, using MET's patented formula of bioceramic powder branded Redwave$^{TM}$ and its spray application.

27.     Under Armour and MET agreed that Under Armour's products would contain the phrase "powered by Redwave$^{TM}$", reflecting the importance of the brand to their business.  At the time, these "powered by Redwave$^{TM}$" recovery wear products were Under Armour's first and only FTCREB products.

**D.     Under Armour Announces Partnership With Redwave$^{TM}$**

28.     In order to allow Under Armour to launch its initial FTCREB products at the 2017 CES conference (formerly the "International Electronics Show") in Las Vegas, Nevada, MET provided it with an initial supply of its bioceramic powder upon receiving assurances from Under Armour that the supply contract would be forthcoming.

29.     In early January 2017, Under Armour introduced its initial FTCREB products—specifically, athlete recovery sleepwear—that it manufactured using Redwave$^{TM}$ powder at the CES conference. The introduction at CES generated significant publicity.

30.     Under Armour quickly sold out of the FTCREB products containing the Redwave$^{TM}$ powder and requested additional supply. MET provided a second supply of its Redwave$^{TM}$ powder for use by Under Armour.

31.     On April 7, 2017, Under Armour and MET entered into a short-term exclusive supply agreement (the "Short-Term Agreement") where MET provided another supply of its Redwave$^{TM}$ powder for the purpose of producing FTCREB products. The Short-Term Agreement continued through June 2, 2017.

32.     Under Armour's and MET's exclusivity, which was included in the Short-Term Agreement, was to remain in effect until either of the parties executed a superseding agreement

-6-

or one party provided notice to the other that it desired to end the exclusivity. Significantly, MET entering into a contract with Under Armour that would allow Under Armour to be the exclusive manufacturer of sleepwear incorporating Redwave$^{TM}$ powder would eliminate MET as a direct competitor to Under Armour. It also would prevent Under Armour's competitors in the space – such as Nike, New Balance and Adidas – from utilizing Redwave$^{TM}$ powder.

### E.    Under Armour Abandons MET in Favor of Hologenix

33.    Upon information and belief, at the time that MET was supplying Redwave$^{TM}$ bioceramic powder to Under Armour and Under Armour was under a non-disclosure agreement and an agreement to exclusively work with MET, Under Armour violated both the non-disclosure agreement and exclusivity agreement by entering into discussions and ultimately entering into a supply agreement with Hologenix.

34.    Upon information and belief, Under Armour and Hologenix planned to promote Under Armour FTCREB products containing Hologenix bioceramic materials as technologically superior to products containing MET's bioceramic powder by falsely and deceptively claiming Hologenix had approvals from the Food and Drug Administration.

35.    On July 25, 2017, Hologenix announced in a press release that "U.S. Food and Drug Administration has determined Celliant products are medical devices and general wellness products . . . because they temporarily promote increased local blood flow at the site of the application in healthy individuals[,]" and it started promoting Celliant on social media and in the press as "FDA approved." This statement was false.

36.    In the ensuing days and months, Under Armour carried the same and similar messaging on its website and began promoting its products containing Hologenix's bioceramic materials as FDA approved or determined and superior to products containing Redwave$^{TM}$ that were denoted by language stating "not a medical device" as well as selling it at a higher price

-7-

than its products containing Redwave$^{TM}$.  Under Armour's statements regarding FTCREB products containing Hologenix were untrue, harmed MET's business, and intentionally deceived consumers into believing that FTCREB products containing Hologenix were superior to FTCREB products containing Redwave$^{TM}$.  The deceptive statement's harm was magnified by the "not a medical device statement" on FTCREB products containing Redwave$^{TM}$.  While that statement was true, when juxtaposed with the deceptive statement that FTCREB products containing Hologenix were medical devices, Under Armour anticompetitive and deceptive advertising deceived consumers in concluding that FTCREB products containing Hologenix were clinically proven and FDA-validated to be superior than FTCREB products containing Redwave$^{TM}$.  Notably, Under Armour does not feel compelled to clarify that any of their other textile products are not medical devices.

37.     By letter dated July 31, 2017, Under Armour informed MET that it was terminating the exclusivity provision of the parties' Short-Term Agreement.

38.     MET subsequently discovered that Hologenix entered into an exclusive deal with Under Armour for the supply of its Celliant bioceramic material.

39.     Hologenix promoted Under Armour's products on Celliant.com where it also promoted Celliant with the false and misleading statements described above.

40.     Under Armour promotes its products on underarmour.com where it also promotes Celliant with the false and misleading statements described above.

41.     Upon information and belief, Under Armour has done so intentionally, knowing these statements were false and misleading.

**F.  Under Armour Strong Arms Other Manufacturers into Boycotting MET**

42.     Not content with just its false and deceptive advertising campaign, Under Armour set out to use its market power to further harm, and ultimately destroy, MET.  Specifically,

-8-

Under Armour strong-armed MET's other existing and prospective business partners into refusing to do business with MET or lose Under Armour existing or future business.  As a result, MET found itself foreclosed from the FTCREB marketplace.

**1.      Under Armour Interferes with MET's Relationship with American Textile Company**

43.      Upon information and belief, American Textile Company ("American Textile") is in the business of manufacturing bedding products. MET and American Textile had contracted to create bedding that incorporated Redwave$^{TM}$ powder.

44.      MET's relationship with American Textile began in 2015. Thereafter, MET entered into a series of contracts with American Textile. This included a Jun 3, 2015 Material Transfer Agreement and a May 4, 2016 Evaluation and Supply Agreement.

45.      The Evaluation and Supply Agreement granted American Textile an option to incorporate Redwave$^{TM}$ powder into its products and therefore develop FTCREB products.

46.      Under Armour expressed interest in expanding its products with MET into recovery bedsheets and pet beds. MET advised Under Armour that MET already had a business relationship with American Textile and that MET was about to extend an option to utilize its powder with American Textile. MET specifically asked Under Armour about its interest in recovery bedsheets and pet beds before it extended its agreement with American Textile. Despite its earlier expression of interest, Under Armour indicated that it did not want to proceed.

47.      American Textile exercised its option on April 3, 2017. The Evaluation and Supply Agreement had an initial term of 18 months after American Textile received the Redwave$^{TM}$ powder, and subsequently would renew for successive one-year periods unless either party terminated by written notice.

48.     Approximately three weeks after American Textile exercised its option with MET, Under Armour informed MET it wanted to manufacture recovery bedsheets.

49.     As more fully described below, Under Armour ordered American Textile to stop doing business with MET. American Textile acquiesced to Under Armour's demand because they could not risk upsetting a company as powerful as Under Armour and losing out on the prospect of doing business with them.

**2.      Under Armour Interferes With MET's Relationship with Milliken**

50.     MET had been in discussions with Milliken to use its bioceramic powder in its planned FTCREB product lines, including but not limited to work clothing, uniforms, scrubs and sportswear as well as other products.

51.     As negotiations between MET and Milliken concluded in the anticipated execution of an agreement, Milliken ceased all communications with MET.

52.     MET was recently informed by a Milliken representative that communications with MET ceased because Under Armour informed Milliken that if Milliken worked with MET, Under Armour would not work with Milliken.

**3.      Under Armour Interferes With MET's Relationship with TB12**

53.     MET had also been in discussions with TB12 to develop and manufacture FTCREB products containing MET's Redwave$^{TM}$ powder, including but not limited to sleepwear, bedding and recovery sleeves as well as other products.

54.     TB12 was a part of the negotiations and plans between MET and Under Armour to develop products containing Redwave$^{TM}$ powder.

-10-

55.     A TB12 representative informed MET that it did not have any control over Under Armour's decision and it had to work with the Under Armour brand for recovery products and whoever they chose to use to supply the bioceramic powder because it was a pure volume game.

### G.     Under Armour Destroys MET's Redwave<sup>TM</sup> Business and Injures Competition in the FTCREB Market

56.     Upon information and belief, Under Armour engaged in a systematic and multi-faceted anticompetitive scheme to destroy MET's Redwave$^{TM}$ business and thereby eliminate a competing product while deceptively and falsely promoting Hologenix's Celliant as FDA approved and determined despite knowing there was no FDA approval or determination. Also upon information and belief, Under Armour's campaign has denigrated and disparaged Redwave$^{TM}$ in the eyes of consumers and other potential MET customers or business partners, thereby crippling MET as a competitor and severely injuring competition in the market for recovery wear.

57.     As part of its scheme, it switched from Redwave to Celliant and its false promotion of products containing Celliant as having FDA determined benefits, including, increased localized circulation, Under Armour continues to display products powered by Redwave$^{TM}$ on its website but notes therein that those products are not "medical devices."

58.     Upon information and belief, Under Armour has continued to do so in an effort to destroy the Redwave$^{TM}$ business, and thereby monopolize the FTCREB market, by contrasting it with products that it wrongfully claimed had FDA approval, as part of a deliberate effort on the part of Under Armour to make the products powered by Redwave$^{TM}$ less desirable to potential purchasers.

59.     Under Armour's conduct deceives consumers into believing that MET products are inferior to Hologenix's "FDA approved" and "FDA determined" products. As a result,

-11-

consumers are deprived of the benefits of competition from MET products in the FTCREB Market.

60.     Moreover, after Under Armour announced its exclusive deal with Hologenix, Under Armour strong armed other textile manufacturers into boycotting MET.  Specifically, Under Amour orchestrated at least American Textile, Milliken and TB12 into boycotting MET. Upon information and belief, Under Armour will strong-arm any other manufacturer MET attempts to work with into joining the boycott.

61.     During a conversation with an American Textile executive about collaborating on FTCREB, MET learned about the boycott.  The American Textile executive explained  that Under Armour insisted that American Textile work with Hologenix instead of MET, and that American Textile could not pass up the opportunity to continue to work with Under Armour.

62.     The American Textile executive also said that Under Armour switched to Hologenix because Under Armour intended to adopt the FDA approval campaign without restriction because, among other things, Under Armour would be indemnified by Hologenix.

63.     On July 31, 2018, American Textile sent a termination notice to MET, stating that the Evaluation and Supply Agreement would be terminated on October 3, 2018.

64.     Similarly, an executive from Milliken, Inc., which had been doing business with MET, also informed MET that Milliken had  been told by Under Armour that, if it wished to do business with Under Armour, it needed to stop utilizing Redwave$^{TM}$ , and start using Celliant instead.

65.     The same was true for TB12 who also had informed MET that it could no longer continue to do business with MET on recovery products if Under Armour was no longer working with MET.

-12-

66.     MET's prospects of finding any customers for its patented formula of bioceramic powder branded Redwave™ is impaired so long as Under Armour's false and misleading claims continue, and as long as Under Armour continues to pressure other companies to stop doing business with MET.

67.     Upon information and belief, Under Armour's false advertising campaign and efforts to undermine MET and its product have hurt competition in the market for recovery wear.

68.     On June 3, 2019, Hologenix was "preliminarily enjoined from making any statement in any forum including but not limited to statements: (1) on its website, (2) on a social media platform, or (3) to any member of the press, that states that the Food and Drug Administration has 'approved' Hologenix's product Celliant for any use."

69.     By order dated March 10, 2020, the injunction was made permanent stating:

> IT IS THEREFORE ORDERED that Defendant, whether acting directly or through any affiliate, subsidiary, agent, heir or representative is permanently enjoined from: making any statement in any forum or communication including but not limited to statements 1) on any website; 2) on an social media platform; or 3) to any member of the press or persons attempting to influence the opinions or decisions of others, that a) states or suggests that the Food and Drug Administration ("FDA") has "approved" Hologenix's product Celliant for any use or any reason; b) states or suggests that the FDA has made a "determination" as to whether Celliant provides any benefits, whether those benefits are categorized as medical benefits or "general wellness" benefits; or c) states or suggests that Celliant products are better than products containing plaintiff's bioceramics because of any approval given by or determination made by the FDA.

**FIRST CLAIM**
**(Lanham Act 15 U.S.C.   1125(a)(1)(B) Violations)**

70.     MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

71.     Under Armour's activities as described above constitute false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

72.     Under Armour has made and, if not enjoined, will continue to make, false and misleading descriptions of fact or representations of fact about the characteristics and qualities of Celliant in commercial advertising or promotion in interstate commerce by and through its website, social media posts, and other marketing and promotional materials.

73.     Under Armour's statements as described herein are commercial advertising about its products containing Celliant.

74.     Under Armour caused its statements about Celliant and its products that incorporate Celliant to travel in interstate commerce.

75.     Under Armour's false and misleading statements have actually deceived and/or have a tendency to deceive a substantial segment of its intended audience. The tendency of Under Armour's statements to deceive is evidenced from the way Celliant has been described in the press and by Under Armour's business partners.

76.     Under Armour's statements about Celliant have influenced and are likely to influence the purchasing decisions of consumers who are shopping for "recovery" garments and textiles to the detriment of MET.

77.     As a result of Under Armour's false advertising for Celliant, MET lost business with at least American Textile, Milliken and TB12 and sales of Under Armour's products powered by Redwave™ have plummeted as a result of Under Armour's misrepresentations.

-14-

78.     But for Under Armour's misrepresentations and deceptive advertising, MET would have continued its long term supply arrangement with American Textile and entered into new contracts with other potential customers, including but not limited to Milliken and TB12.

79.     By reason of the foregoing, Under Armour has intentionally and willfully violated 15 U.S.C. § 1125 (a)(1)(B).

80.     MET's interests here fall within the zone of interests protected by the Lanham Act, insofar as, as a result of UA's false advertising, MET has suffered injury to its commercial interests in the form of lost sales and harm to its reputation. (do we have to include this and flag issue?)

81.     As an actual and proximate result of Under Armour's conduct described herein, MET has suffered monetary damages in an amount to be proven at trial.

82.     Under Armour's aforesaid acts also have caused, and unless restrained and enjoined by this Court, will continue to cause, irreparable damage, loss, and injury to MET in the form of loss of manufacturer and consumer goodwill for which MET has no adequate remedy at law. MET is entitled to an injunction, pursuant to 15 U.S.C. § 1116(a), to prevent Under Armour from continuing to make false and misleading representations, and to correct the false impression left by Under Armour's deception.

83.     MET is entitled, pursuant to 15 U.S.C. § 1117, to recover from Under Armour: (i) Under Armour's profits from its false advertising; (ii) damages MET has sustained due to Under Armour's conduct; and, (iii) the costs of this action.

84.     Because this is an exceptional case involving calculated and willful misconduct by Under Armour, MET is also entitled, pursuant to 15 U.S.C. § 1117(a), to recover (i) up to three times the amount of actual damages and (ii) attorneys' fees.

**SECOND CLAIM**
**(Violations of the Sherman Act, 15 U.S.C § 2)**

85.     MET repeats and realleges each and every allegation of the preceding paragraphs
as if set forth fully herein.

86.     The relevant geographic market is the United States. The relevant product market
is Finished Textiles Containing Recovery Enhancing Bioceramics . Under Armour has monopoly
and/or market power in the relevant market.

87.     Under Armour has ***not*** maintained it monopoly and/or market power in the
relevant markets as a result of superior product, business acumen, or historical accident. Under
Armour has specifically intended, and continues to intend, through its wrongful conduct, to
willfully maintain its monopoly and/or market power, control prices, exclude competitors, harm
consumers, and destroy competition in the relevant market. Through the activities alleged above,
among others, Under Armour has gained, maintained, extended, and attempted to gain monopoly
power in violation of Section 2 of the Sherman Act.

88.     Under Armour has no legitimate business justification for its anticompetitive
conduct.

89.     As a direct and proximate result of Under Armour's unlawful actions, MET has
suffered injury to its business and property. If Under Armour's illegal conduct is not enjoined,
MET will continue to suffer irreparable harm, and the relevant markets will remain distorted and
substantially foreclosed, to the detriment of consumers in the market.

90.     Under Armour has engaged in a systematic and multi-faceted anticompetitive
scheme to monopolize the FTCREB Market.  *First*, Under Armour engaged in an intentionally
deceptive advertising campaign that deprived consumers of the benefits of fair competition from
MET.  Under Armour's false advertising of its sleepwear and other products as containing an

-16-

"FDA approved" bioceramic product that purportedly has been "determined" by the FDA to provide certain health benefits,  and various other similar descriptions in commercial advertising and promotion to describe the nature, characteristics, and qualities of its products, particularly in comparison to MET's products, constitute illegal acts that substantially lessen competition and tend to maintain Under Armour's monopoly over the markets for recovery wear products. Such advertising is clearly false. Celliant was not approved by the FDA for any purpose, and the FDA has not determined that Celliant, or Under Armour products containing Celliant, provide any health benefits.

91.     The persons who are the targets of these advertisements are unsophisticated in the procedures underlying FDA review and approval and have no reason to doubt the claims. The claims have been continuing since at least July of 2017 up through the present. Under Armour's market power and size virtually guarantee that rivals such as MET cannot cure or correct these false statements. Under Armour's false advertising in order to maintain its monopoly position is a violation of Section 2 of the Sherman Act.

92.     *Second*, Under Armour used its market power and leverage to strong-arm other textile manufacturers into boycotting MET.  Specifically, Under Armour pressured other parties not to do business with MET, by asserting that Under Armour would only do business with these parties if they utilized Celliant technology.  This had the effect of preventing MET from doing business with these parties.

93.     All of the above types of conduct, when viewed as a whole, constitute a pattern of repeated, varied, exclusionary practices that has worked violence on the competitive process in the market for recovery sleepwear, threatening to block completely any smaller rival from

entering the market with innovative products. The course of conduct as a whole violates Section 2 of the Sherman Act.

94.     Consumers and competition were harmed by Under Armour's anticompetitive scheme.  As a result of this conduct, consumers have been deprived the benefits of price and innovation competition in the FTCREB market and have thereby paid higher prices for FTCREB products and lost out on competitive-driven innovation in FTCREB products.

95.     There is no legitimate business justification for Under Armour's conduct, and thus, its actions were intended to destroy competition from MET for FTCREB products.

96.     From and after July, 2017, MET has been directly and proximately damaged by losses of sales and profits resulting from Under Armour's false advertising,  and other monopolistic and exclusionary practices. MET seeks damages, treble damages, reasonable attorneys' fees, costs of court, and all other relief available to it under the antitrust laws.

97.     MET will be irreparably harmed if Under Armour's market tainting, false advertising, and on-going boycott tactics are not enjoined. For that reason, MET also seeks injunctive relief.

### THIRD CLAIM
**(Misappropriation of Trade Secrets in violation of 12 Pa. C.S.A. § 5301-5308)**

98.     MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

99.     MET's application process, formulae and composition of its Redwave$^{TM}$ powder are proprietary to MET and constitute legally protectable trade secrets as defined by the Pennsylvania Uniform Trade Secrets act, 12 Pa. C.S.A. §§ 5301-5308.

100.     The confidential business and proprietary information and trade secrets have actual or potential economic value because, both separately and in combination, that information

is not generally known to, and is not readily ascertainable by proper means by others, including MET's competitors.

101.    MET spent substantial sums of money to develop and generate these confidential business and proprietary information and trade secrets and has taken steps that are reasonable and appropriate under the circumstances to maintain their secrecy and confidentiality.

102.    MET was at all times in lawful possession of these trade secrets, and used them exclusively in its lawful business activities.

103.    MET shared its trade secrets concerning its Redwave$^{TM}$ powder with Under Armour pursuant to its NDA and therefore in the course of its confidential relationship with Under Armour.

104.    Upon information and belief, Under Armour took information it learned from MET and used it to assist in the manufacture its recovery products with MET's competitor, Hologenix.

105.    As described in the foregoing paragraphs, Under Armour, knowing that it had access to MET's trade secrets, willfully misappropriated, retained and used MET's trade secrets in violation of 12 Pa. C.S.A. § 5302, *et. seq.*, and has used those trade secrets to divert business away from MET and to Under Armour and Hologenix.

106.    By virtue of the foregoing, MET has suffered and will continue to suffer the loss of confidential business and proprietary information and trade secrets.

107.    The misappropriation and wrongful use of MET's confidential proprietary trade secrets constitutes a violation of the Pennsylvania Uniform Trade Secrets Act.

108.    Under Armour's misappropriation of MET's confidential proprietary trade secrets was undertaken willfully and maliciously.

109.     Under Armour's actions and conduct in misappropriating MET's trade secrets have caused substantial damage and irreparable harm to MET's business.

110.     By reason of Under Armour's wrongful acts and violation of Pennsylvania Uniform Trade Secrets Act, Met is entitled to recover compensatory damages in an amount that cannot be readily ascertained at this time as well as exemplary damages, injunctive relief and attorneys' fees as permitted by 12 Pa. C.S.A. §§ 5304 and 5305.

111.     MET lacks an adequate remedy at law to address the substantial irreparable harm that it is suffering and/or it will suffer.

### FOURTH CLAIM
### (Breach of Non-Disclosure Agreement)

112.     MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

113.     MET and Under Armour entered into the NDA, pursuant to which Under Armour agreed, *inter alia*, that it would not share any Confidential Information disclosed to it by MET with any third party.

114.     Upon information and belief, Under Armour used the confidential trade secrets and proprietary information, which constituted Confidential Information under the terms of the NDA and shared the same information with MET's competitor and others, including other manufacturers.

115.     Under Armour's actions are in breach of the terms of the NDA.

116.     As a result of Under Armour's breaches of the NDA, MET has suffered and continues to suffer damages.

23522536v.19

## FIFTH CLAIM
### (Tortious Interference with Contract)

117.   MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

118.   MET had a valid contract with American Textile to incorporate its product into its bedding and other sleep related products.

119.   Under Armour was aware of the contract between MET and American Textile.

120.   Under Armour intentionally and tortiously interfered with MET's existing and prospective contractual relations with American Textile.

121.   Under Armour's actions caused American Textile to end its relationship with MET.

122.   Acting intentionally, without privilege, and with improper motive and purpose, defendant interfered with MET's existing contract and with prospective business opportunities that MET reasonably anticipated developing into new contractual relationships.  Upon information and belief, Under Armour did this by, *inter alia*, pressuring American Textile to terminate its relationship with MET by insisting that American Textile utilize the Celliant technology that Under Armour falsely represented had received FDA approval had been determined by the FDA to promote certain health benefits, thereby disparaging MET's products..

123.   Under Armour's actions, as alleged herein, were committed with reckless indifference to the rights of MET, and with either the specific intent to cause harm to MET, or with reckless disregard to whether such actions would cause harm to MET. Thus, Under Armour's tortious interference with MET's existing and prospective contractual relations warrants an award of punitive damages.

124.    MET has been harmed and damaged by Under Armour's intentional interference with MET's existing contractual relations.

### SIXTH CLAIM
**(Tortious Interference with Prospective Business Expectancies)**

125.    MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

126.    MET had prospective economic relationships with TB12 and Milliken and fully anticipated that it would enter into formal contracts with both companies.

127.    Upon information and belief, Under Armour purposefully made false representations to TB12 about its products containing Celliant, including, *inter alia*, claims that Celliant was FDA approved and that the FDA had determined that Celliant led to certain health benefits, in an effort to convince TB12 to abandon its relationship with MET.

128.    Upon information and belief, Under Armour purposefully made false representations to Milliken about its products, including, *inter alia*, claims that Celliant was FDA approved and that the FDA had determined that Celliant promoted certain health benefits, and told Milliken that if it wanted to do business with Under Armour, it could not do business with MET.

129.    Acting intentionally, without privilege, and with improper motive and purpose, defendant interfered with MET's prospective business opportunities, which MET reasonably anticipated developing into new contractual relationships.

130.    MET has been harmed by Under Armour's intentional interference with MET's existing prospective economic relationships.

**SEVENTH CLAIM**
**(Unjust Enrichment)**

131.     MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

132.     Under Armour wrongfully and improperly has been using MET's trade secrets and other confidential information proprietary to MET. To the extent any such information is not determined to be a trade secret within the meaning of 12 Pa. C.S.A. §5302, such information consists of confidential information proprietary to MET with respect to which MET took reasonable security measures to safeguard.

133.     As demonstrated by the allegations above, by wrongfully using MET's confidential proprietary information for its own benefit and for the purpose of securing an improper competitive advantage against MET, Under Armour has unjustly enriched itself at the expense of MET and should be required to disgorge its unjust enrichment.

**EIGHTH CLAIM**
**(Unfair Competition)**

134.     MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

135.     Under Armour has engaged in unfair competition by diverting business from MET to itself through the wrongful use of confidential information belonging to MET.

136.     Under Armour has also engaged in unfair competition by interfering with MET's existing and prospective contractual relationships.

137.     Under Armour has also engaged in unfair competition by making false and misleading statements about the Celliant technology utilized in Under Armour's products, and false and distorted comparisons with products containing MET's bioceramic product., and by making misrepresentations about the Celliant technology used in Under Armour products.

-23-

138.    Under Armour's actions have been taken with the specific intent to harm and destroy MET, and violate general standards of fairness and social utility.

139.    Under Armour's actions have caused harm and damage to MET, as alleged herein.

**NINTH CLAIM**
**(Conversion)**

140.    MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

141.    Under Armour's actions in misappropriating MET's confidential proprietary information and trade secrets has unlawfully deprived MET of its property rights without consent or lawful justification.

142.    Under Armour's wrongful actions have harmed and damaged MET.

143.    As a direct result of Under Armour's conduct, MET has suffered and/or will suffer substantial and irreparable harm to its business.

144.    MET has been injured by Under Armour's conversion in an amount that cannot be readily ascertained at this time.

145.    MET lacks an adequate remedy at law to address the substantial irreparable harm that it is suffering and/or will suffer.

**TENTH CLAIM**
**(Accounting)**

146.    MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

147.    MET supplied 3000 kilograms of bioceramic powder to Under Armour pursuant to the parties' April 4, 2017 Letter Agreement.

148.    Upon information and belief, Under Armour did not use all 3000 kilograms of bioceramic powder.

149.    Upon information and belief, Under Armour did not sell all products manufactured containing MET's bioceramic powder.

150.    MET demands an accounting of what Under Armour did with the 3000 kilograms of bioceramic powder as well as sales of its products by Under Armour.

### ELEVENTH CLAIM
### (Injunctive Relief)

151.    MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

152.    MET has demonstrated a likelihood of success on the merits of its claims.

153.    Under Armour had no right to take, attempt to take, or retain for itself the confidential information created, maintained and developed by and at the expense of MET.

154.    Under Armour signed the NDA and thereby gained access to sensitive, confidential, proprietary and trade secret information.

155.    In spite of its contractual, statutory and common law obligations, Under Armour has and is continuing to use MET's confidential, trade secret information to develop a competing product using MET's competitor's powder with MET's application. Thereafter, Under Armour a number of misrepresentations about its products containing the Celliant powder, including that Celliant is FDA approved and that the FDA had determined that Celliant promoted certain medical benefits.

156.    Unless Under Armour is enjoined from making these false representations and false advertising, MET will continue to suffer irreparable harm, including loss of business and reputation, as well as loss of the benefits of its trade secrets, reputation and confidential

information that will result in incalculable financial loss. The irreparable harm that MET will suffer if injunctive relief is denied outweighs the potential harm (if any) to Under Armour if injunctive relief is granted.

157.    MET has no adequate remedy at law.

158.    The injunctive relief that MET requests against Under Armour would merely require it to adhere to the NDA ad to cease and desist from making demonstrably false representations about its products.

159.    It is unjust and inequitable to permit Under Armour to benefit from the deliberate disregard of its contractual and legal obligations.

160.    Indeed, Under Armour recognized injunctive relief is appropriate at the time it signed the NDA, representing specifically that "[a] breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to Company for which there will be no adequate remedy at law, and [MET] shall be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including monetary damages if appropriate)."

161.    For the foregoing reasons, MET is entitled to injunctive relief as set forth herein.

**WHEREFORE**, plaintiff MET prays for the following relief:

1)      Judgment in MET's favor and against Under Armour;

2)      Upon hearing, a preliminary injunction to issue immediately and, upon final hearing or trial, a permanent injunction,

(i)      enjoining and restraining Under Armour from using or disclosing any materials or confidential and proprietary information and trade secrets of MET as

well as enjoining and restraining Under Armour from falsely representing that the FDA has made any determinations concerning the benefits of Celliant;

(ii)    directing Under Armour to immediately return to MET all materials (including any and all copies thereof) concerning MET or its business, including all confidential and proprietary information and trade secrets;

(iii)    directing Under Armour to reimburse MET for all of the costs and expenses, including reasonable attorneys' fees that it incurred in obtaining relief in this action; and

(iv)    ordering any other relief that is just and proper under the circumstances.

3)    An accounting of all bioceramic powder supplied by MET to Under Armour and the products sold containing MET's bioceramic powder;

4)    An accounting of all sums earned by Under Armour from its actions described in this complaint;

5)    Restitution, compensatory and punitive damages;

6)    Treble damages;

7)    Pre- and post- judgment interest;

8)    Costs of suit including reasonable attorney's fees; and

9)    Such other and further relief as the Court deems appropriate.

23522536v.19

## JURY TRIAL DEMAND

Plaintiff, MET, demands a trial by jury as to all claims and all issues so triable.


Dated: May 5, 2020


Thomas Fiddler
WHITE AND WILLIAMS LLP
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103
215-864-7081
fiddlert@whiteandwilliams.com


OF COUNSEL:
Thomas E. Butler
Nicole A. Sullivan
WHITE AND WILLIAMS, LLP
7 Times Square, Suite 2900
New York, NY  10036-6524
212-631-4420
butlert@whiteandwilliams.com
sullivann@whiteandwilliams.com

23522536v.19