# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MULTIPLE ENERGY TECHNOLOGIES, LLC,<br>    Plaintiff,<br><br>v.<br><br>UNDER ARMOUR, INC.,<br>    Defendant. | 2:20-CV-664-NR |

## MEMORANDUM ORDER

**J. Nicholas Ranjan, United States District Judge**

    Defendant Under Armour, Inc. moves to dismiss Plaintiff Multiple Energy Technologies, LLC's second amended complaint in this antitrust case. ECF 64. The Court previously dismissed MET's antitrust claim based on its failure to allege that it was a "direct competitor" of Under Armour, as well as its failure to adequately define the relevant market for antitrust purposes. ECF 54; ECF 55. MET then amended its complaint, and Under Armour responded by filing the pending motion to dismiss.

    This time around, Under Armour renews only one of its arguments. ECF 65, pp. 9-15. That is, Under Armour says that MET has once again failed to adequately define the market in which Under Armour allegedly engaged in anticompetitive behavior. *Id.* Applying the familiar standard of Rule 12(b)(6), the Court will grant the motion, and once again dismiss MET's complaint. That said, for the reasons discussed below, the Court also finds that granting leave to amend is not yet futile, and so will provide MET with one last chance to amend its complaint.

    Much like its first amended complaint, MET's second amended complaint defines the relevant market as consisting of all "clothing containing recovery enhancing bioceramics," or "CCREB." ECF 58, ¶ 8. More specifically, MET adds that

the CCREB market "consists of clothing such as activewear, tank tops or sleeveless shirts, t-shirts, long sleeve shirts, shorts, pants, leggings, joggers, sweatpants, sleeves, pajamas[,] and sleepwear." *Id.* at ¶ 14. According to MET, this clothing is "distinct and separate from other kinds of clothing," in that it is advertised by sellers and bought by consumers for its alleged "muscle recovery and performance" benefits. *Id.* at ¶ 15. As a result, CCREB "are consistently priced higher than traditional clothing that do not contain bioceramics," and "consumers who seek to purchase CCREB do not consider traditional clothing that does not contain bioceramics to be reasonably interchangeable." *Id.* at ¶¶ 17, 18.

When the Court dismissed MET's last complaint, it explained that MET's allegations had left it "unclear what clothing or type of clothing" was part of the market and, also, that MET had pled "nothing about the cross-elasticity of demand of the products in the relevant market[.]" *Multiple Energy Techs., LLC v. Under Armour, Inc.*, No. 20-664, 2021 WL 807722, at *2 (W.D. Pa. Mar. 3, 2021) (Ranjan, J.). Under Armour now argues that these same flaws remain. According to Under Armour, the products MET has identified as part of the market are not "reasonably interchangeable." ECF 72, pp. 6-11. What's more, Under Armour suggests that MET has still alleged nothing about the "elasticity" of products *within* the market—*i.e.*, that an increase in the price for one CCREB product necessarily increases demand for other like products in that market. *Id.*

The Court agrees that MET's allegations still fall short. MET's burden at this stage is to plausibly plead that *high* elasticity exists between all products *within* the alleged market—not just that CCREB has *low* elasticity with clothing products that *do not* incorporate bioceramics. In antitrust law, "[t]he relevant product market is defined as those commodities reasonably interchangeable by consumers for the same purposes." *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991) (cleaned up). Thus, products in an antitrust product market are "characterized by a

cross-elasticity of demand," meaning "the rise in the price of a good *within a relevant product market* would tend to create a greater demand for *other like goods in that market*." *Id.* (cleaned up) (emphasis added).

Put another way, the relevant question here is whether MET has plausibly pled that consumers consider all the products in the alleged market to be "reasonably interchangeable" with the other products in that market. *Id.* As a result, MET misses the mark when it alleges and argues only that consumers do not consider CCREB to be interchangeable with non-CCREB clothing, and fails to also allege that consumers *do* consider products within the CCREB market to be interchangeable with each other. MET also remains vague about what products are in the market—alleging only that the market consists of clothing "such as" the list of examples provided. ECF 58, ¶ 14.[1]

To survive dismissal, then, MET needed to do two things: First, it needed to say what products are in the market, with enough specificity to put Under Armour on notice of at least the rough bounds of the market.[2] Second, and more importantly, it needed to allege that consumers consider the products in the market to be "reasonably interchangeable" *with the other products in the market*. That is what the Court meant, in its first opinion, when it said that MET had pled nothing about "cross-elasticity of demand" in the CCREB market. *Multiple Energy Techs., LLC*, No.

---

[1] MET has alleged with some precision that Under Armour "is responsible for over 60% of sales in the market for CCREB in the United States[.]" ECF 58, ¶ 20. The Court sees no reason why MET should not be able to specify the types of clothing it considered when calculating or estimating this number. If discovery reveals that other types of clothing belong in the CCREB market, MET can always seek leave to amend its complaint to include them.

[2] This does not mean MET needs to provide excessive detail about the products in the market. It only needs to clearly identify what categories of clothing the market contains, rather than obscuring the market by providing only examples of types of clothing the market "includes."

20-664, 2021 WL 807722, at *2. Because MET did neither of these things, dismissal is once again required.

The tougher question is whether MET deserves another chance to amend. MET's previous failure to correct the same deficiencies favors dismissal. But after careful consideration, the Court finds that, for three reasons, allowing MET to amend again would not yet be futile.

First, the Court is mindful that the bar MET must clear is not a high one. In most antitrust cases, "proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (citation omitted); *Premier Comp Sols. LLC v. UPMC*, 163 F. Supp. 3d 268, 278 (W.D. Pa. 2016) (Cercone, J.) ("Definition of the relevant product market often requires a deeply fact-intensive inquiry, and courts are hesitant to grant motions to dismiss for failure to plead a relevant market definition." (cleaned up)). Thus, MET does not have to define the market with precision just yet—it only has to plead "enough factual matter (taken as true) to suggest that" it is "plausible" that the identified products comprise a single market. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Second, it is notable that MET's failure to correct its complaint seems to stem mostly from its misunderstanding of the appropriate legal standard. MET's briefing suggests that it believes the "cross-elasticity" requirement is satisfied by allegations that consumers do not consider products within the market to be interchangeable with products outside the market, rather than by allegations that all the products *within* the market are reasonably interchangeable. The Court has now clarified that standard and what it expects MET to allege.

Third, and most importantly, the Court will allow amendment because MET's arguments allude to a possible definition of the relevant market that could be enough to survive dismissal. MET's "theory of the case" seems to be that consumers who

purchase products in the CCREB market are driven chiefly by the bioceramics contained within the clothing, rather than by the secondary consideration of what type of clothing contains those bioceramics. *See, e.g.*, ECF 58, ¶¶ 8, 15-18, 74; *see also* ECF 71, p. 12 (arguing that the "most critical component of the products in this market" is "the recovery enhancing bioceramics that are infused into these products").

If that is true, it is at least plausible that a consumer who wants to buy a bioceramic t-shirt, but finds them out-of-stock or overpriced, is more likely to purchase another type of bioceramic clothing (*e.g.*, a headband or a tank-top) than to purchase a t-shirt that lacks bioceramics. *Cf. Am. Needle, Inc. v. New Orleans Louisiana Saints*, 385 F. Supp. 2d 687, 694 (N.D. Ill. 2005) ("[A] significant segment of the market for NFL-branded headwear and apparel is purchasing the team logo. If a store sold out of hats carrying the Chicago Bears logo, these individuals would not necessarily find caps carrying logos for Spongebob, the University of Michigan, or even the Chicago Bulls to be reasonable substitutes. More likely, they would purchase a different item of apparel, such as a T-shirt or sweatshirt, or even a non-apparel item like a mug or key chain that carries the Bears logo. The product for these consumers is the trademarked logo.").

Put another way, the price and demand of bioceramic t-shirts could, in fact, be highly elastic with the price and demand of bioceramic wristbands, tank-tops, and all other types of CCREB clothing. "A cluster of products," such as these, "can comprise a relevant product market if the cluster is itself an object of consumer demand." *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 918 (7th Cir. 2020) (cleaned up); *see also Weiss v. York Hosp.*, 745 F.2d 786, 826 (3d Cir. 1984) ("Where, however, several goods or services are generally offered by the same providers, it is

not unreasonable for a jury to conclude that the market for antitrust purposes includes all of those goods or services." (citations omitted)).[3]

Of course, that may or may not be true of the products here. MET has not yet even alleged it. But for now, it seems possible, based on its arguments to date, that MET can, if given another chance, allege a cluster of CCREB items that are "reasonably interchangeable" with one another, despite differences such as clothing type, so that grouping those products in a single market merely "reflects commercial realities." *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966).

While the Court will once again grant Under Armour's motion to dismiss, it will also give MET leave to amend its complaint one last time, if it has a factual basis to do so. As noted above, to survive dismissal, MET must identify all the clothing types that it believes to comprise the relevant market, and then allege that all those products are highly elastic with all other clothing within that market.

## CONCLUSION

For all the reasons discussed above, Under Armour's motion to dismiss the second amended complaint is **GRANTED**. MET must file any amended complaint by **July 9, 2021**.

DATE: June 29, 2021

/s/ *J. Nicholas Ranjan*
United States District Judge

---

[3] For this same reason, the Court is not convinced by Under Armour's apparent contention that, to satisfy the "reasonable interchangeability" requirement, the relevant market must be subdivided to account for every consumer trait, such as gender or age, or for all product traits, such as clothing types or sizes. *See, e.g.*, ECF 72, pp. 7-8; ECF 65, p. 2. Instead, the pertinent question is whether the products in the market share the important traits that drive consumers to shop only within the alleged market, rather than considering products outside of it to be reasonable substitutes. *See, e.g.*, *Am. Needle, Inc.*, 385 F. Supp. 2d at 694; *Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1107 (N.D. Cal. 2013) (concluding that plaintiff had adequately pled antitrust market consisting of all "apparel" bearing NFL-related logos, because "a reason why the apparel products at issue may be deemed valuable and relevant to consumers is in their bearing of NFL-related logos and trademarks.").