**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

_____

MULTIPLE ENERGY TECHNOLOGIES, LLC,          2:20-cv-664

                                Plaintiff,          Judge J. Nicholas Ranjan

              v.                                **THIRD AMENDED COMPLAINT**

UNDER ARMOUR, INC.,

                                Defendant.          **JURY TRIAL DEMANDED**

_____

Plaintiff, Multiple Energy Technologies, LLC ("MET"), by its attorneys, White and Williams LLP, as and for its Third Amended Complaint against Defendant Under Armour, Inc. ("Under Armour") herein, alleges as follows:

## INTRODUCTION

1.      This is an action seeking injunctive relief and to recover damages arising from Under Armour's ongoing breaches of its contractual, statutory and common law duties owed to MET, including without limitation, its breach of the 2014 Confidential Disclosure Agreement with MET; its misappropriation of MET's trade secrets, confidential and proprietary information to compete unfairly and wrongfully with MET; its false advertising; its violations of the Sherman and Lanham Acts; and its tortious interference with MET's economic relationships, all of which have had the effect of severely damaging MET's business.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331, and 15 U.S.C. § 1125(a) and 15 U.S.C. §1 et. seq. because this action arises under the laws of the United States. This Court also has subject matter jurisdiction under 28 U.S.C. §1332, because there is complete diversity of citizenship between the parties and the amount in

controversy exceeds $75,000, exclusive of interest and costs. Plaintiff is a citizen of Pennsylvania, California and Brazil, insofar as it is a Delaware LLC whose members are citizens of Pennsylvania, California and Brazil, and Defendant is a citizen of Maryland, insofar as it is a corporation organized and existing under the laws of the State of Maryland with its principal place of business in that State. The Court also has supplemental jurisdiction over all state-law claims pursuant to 28 U.S.C. § 1367 and 28 U.S.C. § 1338(b).

3.      Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), because this district is MET's principal place of business where it created and maintains its trade secrets and many of the events giving rise to MET's claims occurred in this district, including the harm suffered by MET.

## THE PARTIES

4.      MET is a Delaware limited liability company with its principal place of business at 470 Johnson Road, Suite 220, Meadow Pointe Plaza, Washington, PA 15301.

5.      MET has four members: three individuals, Shannon Vissman, who is a U.S. citizen residing in Pennsylvania, Stu Williams who is a U.S. citizen residing in Pennsylvania and Fransisco Cidral, Ph.D, who is a citizen of Brazil residing in Florida and one professional corporation, Wilson Sonsini Goodrich & Rosati, P.C., which is incorporated in California with its principal place of business in California.

6.      Upon information and belief, Defendant Under Armour is a corporation organized and existing under the laws of the State of Maryland with its principal place of business in Maryland.

-2-

## INTRODUCTION

7.      Dr. Shannon Vissman began operating MET in May 2012. Over the next few years, Dr. Vissman and his team took part in the development of, and tested, a bioceramic powder branded originally as Biopower and later in or around 2014 as "Redwave$^{TM}$," and began incorporating the powder into clothing for sale.

8.      In recent years, there has been growing consumer demand for finished textiles containing recovery enhancing bioceramics, such as the Redwave product developed and sold by MET. These products contain bioceramics that can either be sprayed or printed on textiles or onto the fabric themselves. The textiles are then used to create clothing, activewear, sleepwear and other products. The vast majority of these textiles are clothing containing recovery enhancing bioceramics ("CCREB") – a market where Under Armour is the undisputed dominant player.

9.      As described in more detail herein, MET competes directly with Under Armour in the CCREB market in different ways. MET manufactures CCREB that are sold directly to consumers and intermediaries. Those sales have gone on since MET's inception, and continue to this day, and the finished products sold by MET compete directly with sales of CCREB that Under Armour makes to consumers or to intermediaries. MET also enters into licensing and partnership agreements with other parties regarding the development of CCREB. Under these agreements, MET is not a mere product supplier.  Rather, MET acts as a partner who works together with another party on development, design, marketing, and sale of CCREB. Indeed, MET previously worked with Under Armour for over two years on the development, design, marketing, and sale of Under Armour's CCREB product line. In this regard, MET also competes directly with Under Armour, which likewise partners with other parties in the design, development, marketing, and sale of CCREB.

10.     As discussed in detail below, MET has been grievously injured by Under Armour's conduct.  This includes Under Armour's false advertising of its CCREB, and its domination of that market, which has arisen as a result of the pattern of anti-competitive practices, in which it has engaged. The false advertising and anti-competitive practices have been intended to destroy MET's ability to compete in the market, and therefore have severely harmed competition in the CCREB market.

**BACKGROUND**

11.     MET sells its bioceramic powder to manufacturers, who spray or print the powder onto their clothing, garments, activewear, sheets, and other textiles and then, in turn, sell those products, which include the printed Redwave$^{TM}$ mark, to consumers. MET developed its Redwave$^{TM}$ product particularly for application by contract intermediaries for ultimate sale to the public. MET has developed a patent portfolio and proprietary processes that enable it to integrate its bioceramics into textiles for sale. Thus, MET is a significant innovator in this market.

12.     MET also sells finished clothing, including activewear, shorts, shirts and pants, as well as sleeves and other products containing its bioceramic powder, which include the printed Redwave$^{TM}$ or Biopower mark, directly to consumers and intermediaries.  Over the years, MET has made such sales through various outlets.

13.     Under Armour sells clothing that includes activewear, shorts, shirts, pants and sleepwear products directly to consumers, as well as to intermediaries for sale through various retail outlets. This includes the sale of products containing a competing bioceramic product known as Celliant, which is manufactured by Hologenix, LLC ("Hologenix"). Under Armour advertises these products separately from their other product offerings, and markets them as helping to promote recovery, especially for athletes. Upon information and belief, in conjunction with its

partners, Under Armour has likewise developed patented processes for the integration of bioceramics into CCREB.

### A.      Clothing Containing Recovery Enhancing Bioceramics

14.      The CCREB market consists of tank tops, sleeveless shirts, t-shirts, long sleeve shirts, shorts, pants, leggings, joggers, sweatpants, sleeves, pajamas and sleepwear containing recovery-enhancing bioceramics.

15.      CCREB are distinct and separate from other kinds of clothing. Unlike traditional clothing, these products are designed and manufactured to use infrared technology to improve muscle recovery and performance – a characteristic that has been aggressively advertised by Under Armour.

16.      Notably, NFL quarterback Tom Brady has been largely responsible for the growth and popularity of the CCREB market. In or around 2014, Mr. Brady started using CCREB incorporating Plaintiff's bioceramic technology and spoke publicly about the benefits of the CCREB with MET's bioceramic technology and as a result increased consumer demand for CCREB. Thereafter, Mr. Brady introduced Plaintiff to Under Armour to discuss a collaboration.

17.      CCREB are consistently priced higher than traditional clothing that does not contain bioceramics. This reflects the separate and unique market of which these products are a part.  In fact, Under Armour advertises and promotes its recovery products separately with an emphasis on the bicoeramics contained in all of these products and their effects on performance and recovery.

18.      Upon information and belief, consumers who seek to purchase CCREB do not consider traditional clothing that does not contain bioceramics to be reasonably interchangeable. Therefore, consumers who seek to purchase CCREB would not respond to a small but significant

and non-transitory increase in price of CCREB by switching to traditional clothing that does not contain bioceramics. As a result, there is low cross-elasticity between CCREB products, and clothing that does not contain recovery enhancing bioceramics.

19.     Conversely, there is high cross-elasticity between and among products within the CCREB market.  Consumers view these products as reasonably interchangeable with each other. For example, consumers interested in purchasing a t-shirt containing recovery-enhancing bioceramics, but unable to do so for whatever reason, would likely choose to purchase another article of clothing containing recovery-enhancing bioceramics, given that the primary reason for purchasing CCREB products – and paying the higher price that entails -- is to acquire the benefits of the recovery-enhancing bioceramics.

20.     In fact, the interchangeability of these products is demonstrated by the science underlying the technology.  Not only do all of these products contain bioceramics and therefore promote recovery, but many different products within the market promote recovery in the same regions or locations of the body. Indeed, wearing a product that contains recovery-enhancing bioceramics on one part of your body will provide benefits for the whole body. For example, if you wear a t-shirt containing recovery enhancing bioceramics, the entire body will realize certain benefits from the technology. Therefore, a consumer seeking to realize the benefits of recovery enhancing bioceramics but unable to purchase a particular product, will purchase another product in the CCREB market. For this reason as well, an increase in the price of one CCREB product will not cause a consumer to purchase traditional clothing.  Rather, if such consumer were to look to purchase another product, it would be another product in the CCREB market.

21.     The interchangeability of products within the CCREB market is also demonstrated by the fact that Under Armour aggressively promotes CCREB as a unique cluster and collection

-6-

of products that are distinct from other clothing that Under Armour sells.  It is also evidenced by certain reviews of these products offered by consumers, which noted that the products were purchased to access the technology utilized by bioceramics, and at least one purchaser of sleepwear indicating that she also used the sleep shirt as a regular top.

22.     As a result of the above, CCREB constitutes a cluster of items that are reasonably interchangeable with one another, and their inclusion in the same market reflects the commercial reality of how these products are marketed and sold, and of the consumer demand for them that exists.

23.     Under Armour has become the market leader in the CCREB market and again markets these products as separate and distinct from their clothing that does not contain bioceramics.

24.     Upon information and belief, Under Armour is responsible for over 60% of sales in the market for CCREB in the United States, and perhaps as much as 80% or more, and, as discussed in more detail below, Under Armour has considerable market power and therefore power over price in the CCREB market in the United States.

**B.     MET and Under Armour are Direct Competitors in the CCREB Market**

25.     MET and Under Armour are director competitors in the CCREB market. In fact, MET competes with Under Armour in this market in at least three different ways.

26.     First, MET and Under Armour both sell finished CCREB products to intermediaries and consumers. MET sells t-shirts, long-sleeve shirts, leggings, tights, pants, wristbands, and sleeves infused with its bioceramic powder to both intermediaries and consumers. According to its website, Under Armour likewise sells shorts, pants, shirts, and sleeves leggings, and sleepwear,

among other CCREB directly to consumers, and also sells these products to intermediaries for sale to consumers.

27.     MET began selling finished products no later than 2014 and continues to sell finished products presently. It most recently sold pants, shirts and sleeves earlier this year.

28.     In its infancy, MET created an e-commerce store to use to sell finished products to consumers and intermediaries. MET abandoned the e-commerce store and stopped making online sales while it focused on the Under Armour relationship.

29.     After abandoning the e-commerce store, MET continued to sell finished products to intermediaries and consumers and has endeavored to increase those sales. For example, MET took steps to sell its finished products via Amazon. Whether on the e-commerce store, through Amazon or directly from MET, sales of finished CCREB products began no later than 2014 and continued through 2015, 2016, 2017, 2018, 2019, 2020, and 2021.

30.     Once again, Under Armour likewise sells to consumers, through its website, as well as, to intermediaries and retail channels as noted in its 2020 Annual Report:

> We sell our apparel, footwear and accessories in North America through our wholesale and direct-to-consumer channels…
>
> Our direct-to-consumer sales are generated through our brand and factory house stores and e-commerce website…. Consumers can purchase our products directly from our e-commerce website, www.underarmour.com.
>
> In addition, we earn licensing revenue in North America based on our licensees' sale of collegiate apparel and accessories, as well as sales of other licensed products. . . .

31.     Under Armour has acknowledged that its competition has come from a wide variety of sources, and not just large brands. In its 2020 Annual Report, Under Armour stated

> The market for performance apparel, footwear and accessories is highly competitive and includes many new competitors as well as increased competition from established companies expanding their production and marketing of performance products. Our competitors include, among others, Nike, Adidas, Puma and lululemon athletica, some of which are large apparel and footwear companies

with strong worldwide brand recognition and significantly greater resources than us. . . .We also compete with other manufacturers, including those specializing in performance apparel and footwear, and private label offerings of certain retailers, including some of our retail customers.

32.     Secondly, MET competes with Under Armour through relationships MET has long sought to establish with professional athletes. MET seeks to negotiate agreements with professional athletes whereby it sells finished products to those athletes who in turn brand the finished products with their names and sell those products through retail channels as "Powered by Redwave." MET is currently in negotiations for such a partnership, to compete with Under Armour's CCREB products "powered by Celliant," and has had discussions with other retired professional athletes about such relationships as well.

33.     Under Armour likewise utilizes professional athletes to sell its products. Most notably in the CCREB market, Under Armour utilizes Tom Brady as a spokesperson.

34.     Finally, MET competes with Under Armour through its development of licensing agreements and partnerships with textile manufacturers and brands whereby such other companies will manufacture and sell finished products containing MET's Redwave powder, and denoted as "powered by Redwave," and MET will participate in the design, development, marketing and sale of these products, utilizing MET's patented formula and proprietary processes. These in turn will compete with Under Armour's finished products, denoted as "powered by Celliant."

**C.     MET's Protection of Its Trade Secrets**

35.     In connection with the development of the Redwave$^{TM}$ business, MET built a substantial patent portfolio and strongly protects its patents, processes, and formulations at considerable cost.

36.     MET does not share its formulation or application process for its Redwave™ powder without protecting itself first with non-disclosure agreements and other protective documents.

37.     MET's application process is proprietary to MET.

**D.     The Business Relationship Between Under Armour & MET**

38.     On October 14, 2014, Under Armour executed a "Mutual Non-Disclosure Agreement" with MET (the "NDA").

39.     The NDA provided, *inter alia*, that "'Confidential Information' shall mean all information of any kind whatsoever (including without limitation information related to the Company's bioceramic technology, patent, copyright, trade secret and other proprietary information, data, compilations, formulae, models, patent disclosures and applications, procedures, processes, projections, protocols, results of experimentation and testing, specifications, strategies and techniques, and business information and objectives), and all tangible and intangible embodiments thereof of any kind whatsoever (including without limitation, apparatus, compositions, products, documents, drawings, machinery, patent applications, records, report(s)), which is disclosed by [MET] to [Under Armour] or is obtained by [Under Armour] through observation or examination of the foregoing."

40.     Pursuant to the terms of the NDA, Under Armour agreed not to share any of the Confidential Information with any third-party and acknowledged that MET is the owner and licensor of the Confidential Information.

41.     On January 15, 2015, Under Armour and MET entered into a Material Transfer Agreement whereby MET gave specified materials to Under Armour for the sole purpose of conducting a specified evaluation and not for any commercial or other purpose (the "2015 Agreement"). The 2015 Agreement further stated that "[u]nless expressly contemplated as part of

the Evaluation, [Under Armour] shall not analyze, characterize, reverse engineer or otherwise derive the structure of any Materials." The agreement was specifically related to Under Armour's development of CCREB utilizing Redwave.

42.    The 2015 Agreement also stated in relevant part that "[a]ll oral and written information relating to the Materials or the Evaluation to be performed with the Materials ("Confidential Information") will be the proprietary and confidential information of [MET]. [Under Armour] agrees to hold all Confidential Information in confidence and not to disclose Confidential Information to any third party or use it for any purpose except for the conduct of the Evaluation."

43.    MET shared with Under Armour the application process for spraying or "printing" its powder onto material as well as the concentration mix and the science behind its products, which was protected by the terms of the NDA.

44.    Under Armour manufactured its CCREB products, which it promoted as recovery wear, using MET's patented formula of bioceramic powder branded Redwave$^{TM}$, its concentration mix and its spray or print application.

45.    Under Armour and MET agreed that Under Armour's products would contain the phrase "powered by Redwave$^{TM}$", reflecting the importance of the Redwave$^{TM}$ brand to Under Armour and the parties' partnership in selling these products. It likewise demonstrated that MET was not a mere "component supplier" to Under Armour, but rather was a partner in Under Armour's effort to build a line of CCREB products.  At the time, these "powered by Redwave$^{TM}$" recovery wear products were Under Armour's first and only CCREB products.

**E.    Under Armour Announces Partnership With Redwave$^{TM}$**

46.    In order to allow Under Armour to launch its initial CCREB products at the 2017 CES conference (formerly the "International Electronics Show") in Las Vegas, Nevada, MET

-11-

provided it with an initial supply of its bioceramic powder upon receiving assurances from Under Armour that the supply contract would be forthcoming.

47. In early January 2017, Under Armour introduced its initial CCREB products specifically, recovery sleepwear that it manufactured using Redwave™ powder at the CES conference. In or around the same time, Under Armour partnered with Tom Brady, who had brought the concept to Under Armour, as the sponsored athlete for its product line powered by Redwave™. The introduction at CES and partnership with Tom Brady generated significant publicity.

48. Under Armour quickly sold out of the CCREB products containing the Redwave™ powder and requested additional supply. MET provided a second supply of its Redwave™ powder for use by Under Armour.

49. On April 7, 2017, Under Armour and MET entered into a short-term exclusive supply agreement (the "Short-Term Agreement") where MET provided another supply of its Redwave™ powder for the purpose of producing CCREB products. The Short-Term Agreement continued through August 20, 2017.

50. Under Armour's and MET's exclusivity, which was included in the Short-Term Agreement, was to remain in effect until either of the parties executed a superseding agreement or one party provided notice to the other that it desired to end the exclusivity. Significantly, MET entering into a contract with Under Armour that would allow Under Armour to be the exclusive manufacturer of sleepwear incorporating Redwave™ powder, which would eliminate MET as a direct competitor to Under Armour for these products. It also would prevent Under Armour's competitors from utilizing Redwave™ powder.

F.    **Under Armour Abandons MET in Favor of Hologenix**

51.    Upon information and belief, at the time that MET was supplying Redwave<sup>TM</sup> bioceramic powder to Under Armour and Under Armour was under a non-disclosure agreement and an agreement to exclusively work with MET, Under Armour violated both the non-disclosure agreement and exclusivity agreement by entering into discussions and ultimately entering into a supply agreement with Hologenix.

52.    Upon information and belief, Under Armour and Hologenix planned to promote Under Armour CCREB products containing Hologenix's bioceramic product as technologically superior to products containing MET's bioceramic product by falsely and deceptively claiming that Hologenix had approval from the Food and Drug Administration (the "FDA").

53.    On July 25, 2017, Hologenix announced in a press release that "Celliant-engineered products are the first of their kind that the FDA has designated as medical devices" and "Our technology can be used in everyday products – t-shirts, clothing, bedding, even airplane seats – to create an increase in local blood flow thereby increasing energy, boosting performance and speeding muscle recovery." Thereafter, it started promoting Celliant on social media and in the press as "FDA approved." This statement was false.

54.    In the ensuing days and months, Under Armour carried the same and similar messaging on its website and began promoting its products containing Hologenix's bioceramic materials as FDA approved or determined and superior to products containing Redwave<sup>TM</sup> that were denoted by language stating "not intended as a medical device" as well as selling it at a higher price than its products containing Redwave<sup>TM</sup>. Under Armour's statements regarding CCREB products containing Hologenix were untrue, harmed MET's business, and intentionally deceived consumers into believing that CCREB products containing Hologenix were superior to CCREB products containing Redwave<sup>TM</sup>. The deceptive statement's harm was magnified by the "not

intended as a medical device statement" on CCREB products containing Redwave[TM]. While that statement was true, when juxtaposed with the deceptive statement suggesting that CCREB products containing Hologenix were medical devices, Under Armour's anticompetitive and deceptive advertising deceived consumers into concluding that CCREB products containing Hologenix were clinically proven and FDA-validated to be superior than CCREB products containing Redwave[TM]. Notably, Under Armour does not feel compelled to clarify that any of their other textile products are not medical devices.

55.     By letter dated July 31, 2017, Under Armour informed MET that it was terminating the exclusivity provision of the parties' Short-Term Agreement.

56.     MET subsequently discovered that Hologenix entered into an exclusive deal with Under Armour for the supply of its Celliant bioceramic product.

57.     Hologenix promoted Under Armour's products on Celliant.com where it also promoted Celliant with the false and misleading statements described above.

58.     Under Armour promotes its products on underarmour.com, where it has also promotes Celliant with the false and misleading statements described above.

59.     Upon information and belief, Under Armour has done so intentionally, knowing these statements were false and misleading.

**G.     Under Armour Strong Arms Other Manufacturers into Boycotting MET**

60.     Not content with just its false and deceptive advertising campaign, Under Armour set out to use its market power to further harm, and ultimately destroy, MET. Specifically, Under Armour strong-armed MET's other existing and prospective business partners into refusing to do business with MET or lose any Under Armour existing or future business. As a result, MET found itself largely foreclosed from the CCREB marketplace.

1.     **Under Armour Interferes with MET's Relationship with American Textile Company**

61.     Upon information and belief, American Textile Company ("American Textile") is in the business of manufacturing bedding products. MET and American Textile had contracted to create bedding that incorporated Redwave$^{TM}$ powder.

62.     MET's relationship with American Textile began in 2015. Thereafter, MET entered into a series of contracts with American Textile. This included a June 3, 2015 Material Transfer Agreement and a May 4, 2016 Evaluation and Supply Agreement.

63.     The Evaluation and Supply Agreement granted American Textile an option to incorporate Redwave$^{TM}$ powder into its products and therefore develop recovery bedsheets and pet beds containing bioceramic powder.

64.     Under Armour expressed interest in expanding its products with MET into recovery bedsheets and pet beds. MET advised Under Armour that MET already had a business relationship with American Textile and that MET was about to extend an option to utilize its powder with American Textile. MET specifically asked Under Armour about its interest in recovery bedsheets before it extended its agreement with American Textile. Despite its earlier expression of interest, Under Armour indicated that it did not want to proceed.

65.     American Textile exercised its option on April 3, 2017. The Evaluation and Supply Agreement had an initial term of 18 months after American Textile received the Redwave$^{TM}$ powder, and subsequently would renew for successive one-year periods unless either party terminated by written notice.

66.     Approximately three weeks after American Textile exercised its option with MET, Under Armour informed MET that it wanted to manufacture recovery bedsheets.

67.     As more fully described below, Under Armour ordered American Textile to stop doing business with MET. American Textile acquiesced to Under Armour's demand because it could not risk upsetting a company as powerful as Under Armour and losing out on the prospect of doing business with them to do business with MET.

### 2.      Under Armour Interferes With MET's Relationship with Milliken

68.     MET had been in discussions with Milliken to use its bioceramic powder in its planned CCREB product lines, including but not limited to work clothing, uniforms, scrubs, sportswear as well as other products.

69.     As negotiations between MET and Milliken concluded with the anticipated execution of an agreement, Milliken ceased all communications with MET.

70.     MET was recently informed by a Milliken representative that communications with MET ceased because Under Armour informed Milliken that if Milliken worked with MET, Under Armour would not work with Milliken.

### 3.      Under Armour Interferes With MET's Relationship with TB12

71.     MET had also been in discussions with TB12, Inc. ("TB12") to develop and manufacture CCREB products containing MET's Redwave$^{TM}$ powder, including but not limited to sleepwear, bedding, and recovery sleeves as well as other products.

72.     TB12 was a part of the negotiations and plans between MET and Under Armour to develop products containing Redwave$^{TM}$ powder.

73.     A TB12 representative informed MET that it did not have any control over Under Armour's decision and it had to work with the Under Armour brand for recovery products and whoever it chose to use to supply the bioceramic powder because it was a pure volume game.

### 4.      Under Armour Would Have Interfered With Any Partner

74.     Upon information and belief, in order to extinguish a competitive threat, Under Armour would have interfered or attempted to interfere with any prospective business relationship related to CCREB that MET pursued.

### H.      Under Armour's Domination of the CCREB Market Destroys MET's Redwave™ Business and Injures Competition in the CCREB Market

### 1.      Under Armour's Market Power

75.     Once again, Under Armour dominates the CCREB market, and has used this market power to reduce competition in this market.

76.     Upon information and belief, Under Armour controls at least 60% of the CCREB market, and possibly significantly more.

77.     Prices charged by Under Armour for products in the CCREB market are consistently considerably higher than products sold by other participants in the market. Thus, Under Armour has the ability to raise its prices with little effect on its market share.

78.     The cross-elasticity of demand between the CCREB market and the market for clothing that does not contain recovery-enhancing bioceramics is extremely low, insofar as clothing that does not contain recovery enhancing bioceramics is not a substitute for clothing that does. Thus, sales of products that do not contain recovery enhancing bioceramics will not respond to increases in price of products containing recovery enhancing bioceramics.

79.     Conversely, there is significant cross-elasticity of demand and interchangeability between products within the CCREB market. Consumers purchase CCREB products for the recovery-enhancing bioceramics contained therein, and, if unable to purchase one particular product, would likely purchase a different CCREB product instead, given that the sole reason for purchasing CCREB products is to obtain the benefits of the recovery enhancing bioceramics.

Consistent with that, Under Armour markets and sells CCREB products as their own, unique category of products.

80.     Upon information and belief, most of the other competitors in the market are far smaller than Under Armour, and therefore lack the financial wherewithal to compete effectively against Under Armour.

81.     Upon information and belief, Under Armour exacerbates the foregoing advantage in a number of ways. First, upon information and belief, Under Armour prohibits Hologenix from licensing Celliant to stronger companies such as Nike and Adidas, in an effort to prevent stronger and better-capitalized companies from entering the CCREB market. In addition, Under Armour uses its size and wealth to aggressively market its CCREB products. This includes through its use of Tom Brady, an athlete under contract with Under Armour, who has become one of the faces of the CCREB market.

### 2.     Under Armour Destroys MET's Redwave™ Business and Injures Competition in the CCREB Market

82.     Upon information and belief, Under Armour engaged in a systematic and multi-faceted anticompetitive scheme to destroy MET's Redwave™ business and thereby eliminate a competing product while deceptively and falsely promoting Hologenix's Celliant as FDA approved and determined despite knowing there was no FDA approval or determination. Also, upon information and belief, Under Armour's campaign has denigrated and disparaged Redwave™ in the eyes of consumers and other potential MET customers or business partners, thereby crippling MET as a competitor and severely injuring competition in the market for recovery wear.

83.     As part of its scheme, Under Armour switched from Redwave to Celliant and its false promotion of products containing Celliant as having FDA determined benefits, including

increased localized circulation. Under Armour continued thereafter to display products powered by Redwave™ on its website but notes therein that those products are not "medical devices."

84.     Upon information and belief, Under Armour continued to do so in an effort to destroy the Redwave™ business, and thereby monopolize the CCREB market, by contrasting it with products that it wrongfully claimed had FDA approval, as part of a deliberate effort on the part of Under Armour to make the products powered by Redwave™ less desirable to potential purchasers.

85.     Under Armour's conduct deceived and continues to deceive consumers into believing that MET products are inferior to Hologenix's "FDA approved" and "FDA determined" products. As a result, consumers are deprived of the benefits of competition from MET products in the CCREB Market.

86.     Moreover, after Under Armour announced its exclusive deal with Hologenix, Under Armour strong armed other textile manufacturers and/or intermediaries into boycotting MET. Specifically, Under Amour orchestrated at least American Textile, Milliken, and TB12 into boycotting MET. Upon information and belief, Under Armour will strong-arm any other manufacturer or intermediary that MET attempts to work with into joining the boycott.

87.     During a conversation with an American Textile executive about collaborating on additional products with Under Armour, MET learned about the boycott. The American Textile executive explained that Under Armour insisted that American Textile work with Hologenix instead of MET, and that American Textile could not pass up the opportunity to continue to work with Under Armour.

88.     The American Textile executive also said that Under Armour switched to Hologenix because Under Armour intended to adopt the FDA approval campaign without restriction because, among other things, Under Armour would be indemnified by Hologenix.

89.     On July 31, 2018, American Textile sent a termination notice to MET, stating that the Evaluation and Supply Agreement would be terminated on October 3, 2018.

90.     Similarly, an executive from Milliken, which had been doing business with MET, also informed MET that Milliken had been told by Under Armour that, if it wished to do business with Under Armour, it needed to stop utilizing Redwave$^{TM}$ , and start using Celliant instead.

91.     The same was true for TB12 who also had informed MET that it could no longer continue to do business with MET on recovery products if Under Armour was no longer working with MET.

92.     MET's prospects of finding any customers for its patented formula of bioceramic powder branded Redwave$^{TM}$ is impaired so long as Under Armour's false and misleading claims continue, and as long as Under Armour continues to pressure other companies to stop doing business with MET.

93.     Upon information and belief, Under Armour's false advertising campaign and efforts to undermine MET and its product have hurt competition in the market for recovery wear.

94.     On June 3, 2019, Hologenix was "preliminarily enjoined from making any statement in any forum including but not limited to statements: (1) on its website, (2) on a social media platform, or (3) to any member of the press, that states that the Food and Drug Administration has 'approved' Hologenix's product Celliant for any use."

95.     By order dated March 10, 2020, the injunction was made permanent stating:

IT IS THEREFORE ORDERED that Defendant, whether acting directly or through any affiliate, subsidiary, agent, heir or representative is permanently enjoined from: making any statement in any forum or communication including but not limited to statements 1) on any website; 2) on an social media platform; or 3) to any member of the press or persons attempting to influence the opinions or decisions of others, that a) states or suggests that the Food and Drug Administration ("FDA") has "approved" Hologenix's product Celliant for any use or any reason; b) states or suggests that the FDA has made a "determination" as to whether Celliant provides any benefits, whether those benefits are categorized as medical benefits or "general wellness" benefits; or c) states or suggests that Celliant products are better than products containing plaintiff's bioceramics because of any approval given by or determination made by the FDA.

### I.  Under Armour' Conduct Left MET Unable to Compete in the CCREB Market

96.     Under Armour's deceptive and anticompetitive conduct left MET financially unable to partner with any other textile manufacturers to develop, design, and sell CCREB.

### FIRST CLAIM
### (Lanham Act 15 U.S.C. 1125(a)(1)(B) Violations)

97.     MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

98.     Under Armour's activities as described above constitute false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

99.     Under Armour has made and, if not enjoined, will continue to make, false and misleading descriptions of fact or representations of fact about the characteristics and qualities of Celliant and products containing Celliant in commercial advertising or promotion in interstate commerce by and through its website, social media posts, and other marketing and promotional materials.

100.     Under Armour's statements as described herein are commercial advertising about its products containing Celliant.

101.     Under Armour caused its statements about Celliant and its products that incorporate Celliant to travel in interstate commerce.

102.     Under Armour's false and misleading statements have actually deceived and/or have a tendency to deceive a substantial segment of its intended audience. The tendency of Under Armour's statements to deceive is evidenced from the way Celliant has been described in the press and by Under Armour's business partners.

103.     Under Armour's statements about Celliant have influenced and are likely to influence the purchasing decisions of consumers and intermediaries who are shopping for "recovery" garments and textiles, to the detriment of MET.

104.     As a result of Under Armour's false advertising for Celliant, MET lost business with at least American Textile, Milliken and TB12 and sales of Under Armour's products powered by Redwave$^{TM}$ have plummeted as a result of Under Armour's misrepresentations.

105.     Also as a direct and proximate result of Under Armour's false advertising, MET's sales of its competing finished products containing Redwave – such as shirts, shorts, pants, and sleeves – have been severely harmed.

106.     But for Under Armour's misrepresentations and deceptive advertising, MET would have continued its long term supply arrangement with American Textile and entered into new contracts with other potential customers, including but not limited to Milliken and TB12.

107.     By reason of the foregoing, Under Armour has intentionally and willfully violated 15 U.S.C. § 1125 (a)(1)(B).

108.    MET's interests here fall within the zone of interests protected by the Lanham Act, insofar as, as a result of UA's false advertising, MET has suffered injury to its commercial interests in the form of lost sales and harm to its reputation.

109.    As an actual and proximate result of Under Armour's conduct described herein, MET has suffered monetary damages, in the form of lost sales revenue, in an amount to be proven at trial.

110.    Under Armour's aforesaid acts also have caused, and unless restrained and enjoined by this Court, will continue to cause, irreparable damage, loss, and injury to MET in the form of loss of manufacturer and consumer goodwill for which MET has no adequate remedy at law. MET is entitled to an injunction, pursuant to 15 U.S.C. § 1116(a), to prevent Under Armour from continuing to make false and misleading representations, and to correct the false impression left by Under Armour's deception.

111.    MET is entitled, pursuant to 15 U.S.C. § 1117, to recover from Under Armour: (i) Under Armour's profits from its false advertising; (ii) damages MET has sustained due to Under Armour's conduct; and, (iii) the costs of this action.

112.    Because this is an exceptional case involving calculated and willful misconduct by Under Armour, MET is also entitled, pursuant to 15 U.S.C. § 1117(a), to recover (i) up to three times the amount of actual damages; and (ii) attorneys' fees.

## SECOND CLAIM
### (Violations of the Sherman Act, 15 U.S.C § 2)

113.    MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

114.    The relevant geographic market is the United States. The relevant product market is Clothing Containing Recovery Enhancing Bioceramics. Under Armour has monopoly and/or market power in the relevant market.

115.    Under Armour has ***not*** maintained its monopoly and/or market power in the relevant markets as a result of superior product, business acumen, or historical accident. Under Armour has specifically intended, and continues to intend, through its wrongful conduct, to willfully maintain its monopoly and/or market power, control prices, exclude competitors, harm consumers, and destroy competition in the relevant market. Through the activities alleged above, among others, Under Armour has gained, maintained, extended, and attempted to gain monopoly power in violation of Section 2 of the Sherman Act.

116.    Under Armour has no legitimate business justification for its anticompetitive conduct.

117.    As a direct and proximate result of Under Armour's unlawful actions, MET has suffered injury to its business and property. If Under Armour's illegal conduct is not enjoined, MET will continue to suffer irreparable harm, and the relevant markets will remain distorted and substantially foreclosed, to the detriment of consumers in the market.

118.    Under Armour has engaged in a systematic and multi-faceted anticompetitive scheme to monopolize the CCREB Market. *First*, Under Armour engaged in an intentionally deceptive advertising campaign that deprived consumers of the benefits of fair competition. Under Armour's false advertising of its sleepwear and other products as containing an "FDA approved" bioceramic product that purportedly has been "determined" by the FDA to provide certain health benefits, and various other similar descriptions in commercial advertising and promotion to describe the nature, characteristics, and qualities of its products, particularly in comparison to

MET's products, constitute illegal acts that substantially lessen competition and tend to maintain Under Armour's monopoly over the markets for recovery wear products. Such advertising is clearly false. Celliant was not approved by the FDA for any purpose, and the FDA has not determined that Celliant, or Under Armour products containing Celliant, provide any health benefits.

119.    The persons who are the targets of these advertisements are unsophisticated in the procedures underlying FDA review and approval and have no reason to doubt the claims. The claims have been continuing since at least July of 2017 up through the present. Under Armour's market power and size virtually guarantee that rivals such as MET cannot cure or correct these false statements. Under Armour's false advertising in order to maintain its monopoly position is a violation of Section 2 of the Sherman Act.

120.    *Second*, Under Armour used its market power and leverage to strong-arm other clothing manufacturers into boycotting MET. Specifically, Under Armour pressured at least American Textile, Milliken and TB12 not to do business with MET, by asserting that Under Armour would only do business with these parties if they utilized Celliant technology and therefore took advantage of its false advertising campaign. In addition, upon information and belief, Under Armour would have pressured other parties into not partnering with MET for the manufacture of CCREB. This had the effect of preventing MET from doing business with these parties.

121.    Under Armour's anticompetitive scheme had the effect of placing MET in a financial position where they could no longer afford to partner with other manufacturers to make CCREB. As such, Under Armour's anticompetitive scheme functionally eliminated MET as a competitor in the CCREB market to the detriment of consumers and competition.

122.    All of the above types of conduct, when viewed as a whole, constitute a pattern of repeated, varied, exclusionary practices that has worked violence on the competitive process in the market for recovery clothing products, threatening to block completely any smaller rival from entering the market with innovative products. The course of conduct as a whole violates Section 2 of the Sherman Act.

123.    Consumers and competition were harmed by Under Armour's anticompetitive scheme. As a result of this conduct, consumers have been deprived the benefits of price and innovation competition in the CCREB market and have thereby paid higher prices for CCREB products and lost out on competition-driven innovation in CCREB products.

124.    There is no legitimate business justification for Under Armour's conduct, and thus, its actions were intended to destroy competition from MET for CCREB products.

125.    From and after July, 2017, MET has been directly and proximately damaged by losses of sales and profits resulting from Under Armour's false advertising, and other monopolistic and exclusionary practices. MET seeks damages, treble damages, reasonable attorneys' fees, costs of court, and all other relief available to it under the antitrust laws.

126.    MET will be irreparably harmed if Under Armour's market tainting, false advertising, and on-going boycott tactics are not enjoined. For that reason, MET also seeks injunctive relief.

### THIRD CLAIM
### (Misappropriation of Trade Secrets in violation of 12 Pa. C.S.A. § 5301-5308)

127.    MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

128.    MET's application process, formulae and composition of its Redwave[TM] powder are proprietary to MET and constitute legally protectable trade secrets as defined by the Pennsylvania Uniform Trade Secrets act, 12 Pa. C.S.A. §§ 5301-5308.

129.    The confidential business and proprietary information and trade secrets have actual or potential economic value because, both separately and in combination, that information is not generally known to, and is not readily ascertainable by proper means by others, including MET's competitors.

130.    MET spent substantial sums of money to develop and generate these confidential business and proprietary information and trade secrets and has taken steps that are reasonable and appropriate under the circumstances to maintain their secrecy and confidentiality.

131.    MET was at all times in lawful possession of these trade secrets and used them exclusively in its lawful business activities.

132.    MET shared its trade secrets concerning its Redwave[TM] powder with Under Armour pursuant to its NDA and therefore in the course of its confidential relationship with Under Armour.

133.    Upon information and belief, Under Armour took information it learned from MET and used it to assist in the manufacture of its recovery products with MET's competitor, Hologenix.

134.    As described in the foregoing paragraphs, Under Armour, knowing that it had access to MET's trade secrets, willfully misappropriated, retained and used MET's trade secrets in violation of 12 Pa. C.S.A. § 5302, *et. seq.*, and has used those trade secrets to divert business away from MET and to Under Armour and Hologenix.

135.    By virtue of the foregoing, MET has suffered and will continue to suffer the loss of confidential business and proprietary information and trade secrets.

136.    The misappropriation and wrongful use of MET's confidential proprietary trade secrets constitutes a violation of the Pennsylvania Uniform Trade Secrets Act.

137.    Under Armour's misappropriation of MET's confidential proprietary trade secrets was undertaken willfully and maliciously.

138.    Under Armour's actions and conduct in misappropriating MET's trade secrets have caused substantial damage and irreparable harm to MET's business.

139.    By reason of Under Armour's wrongful acts and violation of Pennsylvania Uniform Trade Secrets Act, MET is entitled to recover compensatory damages in an amount that cannot be readily ascertained at this time as well as exemplary damages, injunctive relief and attorneys' fees as permitted by 12 Pa. C.S.A. §§ 5304 and 5305.

140.    MET lacks an adequate remedy at law to address the substantial irreparable harm that it is suffering and/or it will suffer.

**FOURTH CLAIM**
**(Breach of Non-Disclosure Agreement)**

141.    MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

142.    MET and Under Armour entered into the NDA, pursuant to which Under Armour agreed, *inter alia*, that it would not share any Confidential Information disclosed to it by MET with any third party.

143.    Upon information and belief, Under Armour used the confidential trade secrets and proprietary information, which constituted Confidential Information under the terms of the NDA and shared the same information with MET's competitor and others, including other manufacturers.

144.    Under Armour's actions are in breach of the terms of the NDA.

-28-

145.    As a result of Under Armour's breaches of the NDA, MET has suffered and continues to suffer damages.

## FIFTH CLAIM
### (Tortious Interference with Contract)

146.    MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

147.    MET had a valid contract with American Textile to incorporate its product into its bedding and other sleep related products.

148.    Under Armour was aware of the contract between MET and American Textile.

149.    Under Armour intentionally and tortiously interfered with MET's existing and prospective contractual relations with American Textile.

150.    Under Armour's actions caused American Textile to end its relationship with MET.

151.    Acting intentionally, without privilege, and with improper motive and purpose, Under Armour interfered with MET's existing contract and with prospective business opportunities that MET reasonably anticipated developing into new contractual relationships. Upon information and belief, Under Armour did this by, *inter alia*, pressuring American Textile to terminate its relationship with MET by insisting that American Textile utilize the Celliant technology that Under Armour falsely represented had received FDA approval had been determined by the FDA to promote certain health benefits, thereby disparaging MET's products.

152.    Under Armour's actions, as alleged herein, were committed with reckless indifference to the rights of MET, and with either the specific intent to cause harm to MET, or with reckless disregard to whether such actions would cause harm to MET. Thus, Under Armour's tortious interference with MET's existing contractual relations warrants an award of punitive damages.

153.   MET has been harmed and damaged by Under Armour's intentional interference with MET's existing contractual relations.

### SIXTH CLAIM
### (Tortious Interference with Prospective Business Expectancies)

154.   MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

155.   MET had prospective economic relationships with TB12 and Milliken and fully anticipated that it would enter into formal contracts with both companies.

156.   Upon information and belief, Under Armour purposefully made false representations to TB12 about its products containing Celliant, including, *inter alia*, claims that Celliant was FDA approved and that the FDA had determined that Celliant led to certain health benefits, in an effort to convince TB12 to abandon its relationship with MET.

157.   Upon information and belief, Under Armour purposefully made false representations to Milliken about its products, including, *inter alia*, claims that Celliant was FDA approved and that the FDA had determined that Celliant promoted certain health benefits, and told Milliken that if it wanted to do business with Under Armour, it could not do business with MET.

158.   Acting intentionally, without privilege, and with improper motive and purpose, Under Armour interfered with MET's prospective business opportunities, which MET reasonably anticipated developing into new contractual relationships.

159.   MET has been harmed by Under Armour's intentional interference with MET's existing prospective economic relationships.

### SEVENTH CLAIM
### (Unjust Enrichment)

160.   MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

161.     Under Armour wrongfully and improperly has been using MET's trade secrets and other confidential information proprietary to MET. To the extent any such information is not determined to be a trade secret within the meaning of 12 Pa. C.S.A. § 5302, such information consists of confidential information proprietary to MET with respect to which MET took reasonable security measures to safeguard.

162.     As demonstrated by the allegations above, by wrongfully using MET's confidential proprietary information for its own benefit and for the purpose of securing an improper competitive advantage against MET, Under Armour has unjustly enriched itself at the expense of MET and should be required to disgorge its unjust enrichment.

### EIGHTH CLAIM
### (Unfair Competition)

163.     MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

164.     Under Armour has engaged in unfair competition by diverting business from MET to itself through the wrongful use of confidential information belonging to MET.

165.     Under Armour has also engaged in unfair competition by interfering with MET's existing and prospective contractual relationships.

166.     Under Armour has also engaged in unfair competition by making false and misleading statements about the Celliant product utilized in Under Armour's products, and false and distorted comparisons with products containing MET's bioceramic product, and by making misrepresentations about the Celliant product used in Under Armour products.

167.     Under Armour's actions have been taken with the specific intent to harm and destroy MET, and violate general standards of fairness and social utility.

168.     Under Armour's actions have caused harm and damage to MET, as alleged herein.

## NINTH CLAIM
### (Conversion)

169.    MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

170.    Under Armour's actions in misappropriating MET's confidential proprietary information and trade secrets has unlawfully deprived MET of its property rights without consent or lawful justification.

171.    Under Armour's wrongful actions have harmed and damaged MET.

172.    As a direct result of Under Armour's conduct, MET has suffered and/or will suffer substantial and irreparable harm to its business.

173.    MET has been injured by Under Armour's conversion in an amount that cannot be readily ascertained at this time.

174.    MET lacks an adequate remedy at law to address the substantial irreparable harm that it is suffering and/or will suffer.

## TENTH CLAIM
### (Accounting)

175.    MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

176.    MET supplied 3000 kilograms of bioceramic powder to Under Armour pursuant to the parties' April 4, 2017 Letter Agreement.

177.    Upon information and belief, Under Armour did not use all 3000 kilograms of bioceramic powder.

178.    Upon information and belief, Under Armour did not sell all products manufactured containing MET's bioceramic powder.

179.     MET demands an accounting of what Under Armour did with the 3000 kilograms of bioceramic powder as well as sales of its products by Under Armour.

### ELEVENTH CLAIM
### (Injunctive Relief)

180.     MET repeats and realleges each and every allegation of the preceding paragraphs as if set forth fully herein.

181.     MET has demonstrated a likelihood of success on the merits of its claims

182.     Under Armour had no right to take, attempt to take, or retain for itself the confidential information created, maintained and developed by and at the expense of MET.

183.     Under Armour signed the NDA and thereby gained access to sensitive, confidential, proprietary and trade secret information.

184.     In spite of its contractual, statutory and common law obligations, Under Armour has and is continuing to use MET's confidential, trade secret information to develop a competing product using MET's competitor's powder with MET's application. Thereafter, Under Armour a number of misrepresentations about its products containing the Celliant powder, including that Celliant is FDA approved and that the FDA had determined that Celliant promoted certain medical benefits.

185.     Unless Under Armour is enjoined from making these false representations and false advertising, MET will continue to suffer irreparable harm, including loss of business and reputation, as well as loss of the benefits of its trade secrets, reputation and confidential information that will result in incalculable financial loss. The irreparable harm that MET will suffer if injunctive relief is denied outweighs the potential harm (if any) to Under Armour if injunctive relief is granted.

186.     MET has no adequate remedy at law.

-33-

187.    The injunctive relief that MET requests against Under Armour would merely require it to adhere to the NDA and to cease and desist from making demonstrably false representations about its products.

188.    It is unjust and inequitable to permit Under Armour to benefit from the deliberate disregard of its contractual and legal obligations.

189.    Indeed, Under Armour recognized injunctive relief is appropriate at the time it signed the NDA, representing specifically that "[a] breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to Company for which there will be no adequate remedy at law, and [MET] shall be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including monetary damages if appropriate)."

190.    For the foregoing reasons, MET is entitled to injunctive relief as set forth herein.

**WHEREFORE**, Plaintiff MET prays for the following relief:

1)    Judgment in MET's favor and against Under Armour;

2)    Upon hearing, a preliminary injunction to issue immediately and, upon final hearing or trial, a permanent injunction,

(i)    enjoining and restraining Under Armour from using or disclosing any materials or confidential and proprietary information and trade secrets of MET as well as enjoining and restraining Under Armour from falsely representing that the FDA has made any determinations concerning the benefits of Celliant;

(ii)    directing Under Armour to immediately return to MET all materials (including any and all copies thereof) concerning MET or its business, including all confidential and proprietary information and trade secrets;

-34-

(iii)    directing Under Armour to reimburse MET for all of the costs and expenses, including reasonable attorneys' fees that it incurred in obtaining relief in this action; and

(iv)    ordering any other relief that is just and proper under the circumstances.

3)    An accounting of all bioceramic powder supplied by MET to Under Armour and the products sold containing MET's bioceramic powder;

4)    An accounting of all sums earned by Under Armour from its actions described in this complaint;

5)    Restitution, compensatory and punitive damages;

6)    Treble damages;

7)    Pre- and post- judgment interest;

8)    Costs of suit including reasonable attorney's fees; and

9)    Such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff, MET, demands a trial by jury as to all claims and all issues so triable.

Dated: July 9, 2021

WHITE AND WILLIAMS LLP

Thomas E. Butler (*Pro Hac Admission*)
Nicole A. Sullivan (*Pro Hac Admission*)
WHITE AND WILLIAMS, LLP
7 Times Square, Suite 2900
New York, NY  10036-6524
212-631-4420
butlert@whiteandwilliams.com
sullivann@whiteandwilliams.com

And,

Thomas Fiddler
WHITE AND WILLIAMS LLP

1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103
215-864-7081
fiddlert@whiteandwilliams.com
*Attorneys for Plaintiff Multiple Energy*
*Technologies*