IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MULTIPLE ENERGY TECHNOLOGIES, LLC, <br><br> Plaintiff, <br><br> v. <br><br> UNDER ARMOUR, INC., <br><br> Defendant. | 2:20-CV-664-NR |

### MEMORANDUM OPINION

**J. Nicholas Ranjan, United States District Judge**

Plaintiff Multiple Energy Technologies, LLC brings four claims against Defendant Under Armour, Inc.: violation of the Lanham Act, violation of the Sherman Act, misappropriation of trade secrets; breach of non-disclosure agreement; tortious interference with contract; tortious interference with prospective business expectancies; unjust enrichment; unfair competition; conversion; a claim for an accounting; and a claim for injunctive relief. Following discovery, Under Armour now moves to exclude the expert report of Thomas J. Maronick. ECF 255. After carefully considering the parties' submissions, the Court will grant Under Armour's motion.

### BACKGROUND[1]

MET retained Dr. Thomas J. Maronick, a survey expert who designed "a two-part online consumer study to determine consumers' perceptions of claims Under Armour [made] about Celliant on the landing pages of its website." ECF 256-1, p. 4.[2] Dr. Maronick stated that, under well-established survey principles, "each of the two

---

[1] The Court writes for the parties' benefit, who are familiar with the extensive factual and procedural background, as well as the allegations in the third amended complaint.

[2] Unless otherwise noted, all citations to the record refer to the page number of the ECF filing stamp on the top of each page (rather than the native page number).

- 1 -

parts of the survey had a Test Group and a Control Group[.]" *Id.* at 7.

In Survey 1, the test group was shown actual Under Armour landing pages, one of which contained the statement, "Products powered by Celliant have been determined by the FDA to increase localized circulation, leading to faster recovery[.]" *Id.* at 8. The control group was presented with landing pages that contained the statement, "The FDA has not made a determination about whether products powered by Celliant increase localized circulation leading to faster recovery." *Id.* at 9. The images accompanying these pages were different—the test group saw an image of a woman wearing a jacket, and the control group saw an image of two men wearing jackets. *Id.* at 10-11.

In Survey 2, the test group was shown an image of a woman wearing shorts with the statement, "Products powered by Celliant have been determined by the FDA to increase localized circulation leading to faster recovery." *Id.* at 15. The control group was shown an image of a man wearing a short-sleeved shirt with the language "POWERED BY REDWAVE. Not intended for use as a medical device." *Id.* at 16. At Dr. Maronick's deposition, he recharacterized his opinion related to Survey 2 by stating that it was not a test/control survey. ECF 256-2, 134:15-135:9 ("there's not actually a test and control condition under any of the standards that Shari Diamond or anyone else, myself, would consider it.").

Dr. Maronick concluded based on his two surveys that "Under Armour's claims about increased circulation and faster recovery are Important or Very Important in consumers' decision to buy Under Armour products with either Celliant or Redwave fabric." 256-1, p. 20. Dr. Maronick identified three important findings from his surveys: (1) "a statistically higher percentage of respondents seeing the Under Armour webpage claiming that products 'Powered by Celliant have been determined by the FDA to increase localized circulation, leading to faster recovery' believe the Under Armour products will provide the increased circulation and faster recovery

benefits claimed than do respondents who saw language that 'the FDA had not made a determination whether products made with Celliant increase circulation and lead to faster recovery'"; (2) "a statistically higher percentage of respondents seeing Under Armour's claims made in its webpages for its sleep ware products that the products 'Powered by Celliant have been determined to increase localized circulation, leading to faster recovery' believe they will achieve those benefits than do respondents for Under Armour products seeing claims that the Under Armour products that are 'Powered by Redwave' and 'are not intended for use as a medical device'"; and (3) "in both Study 1 and Study 2, Under Armour's claims about increased circulation and faster recovery are Important or Very Important in consumers' decision to buy Under Armour products with either Celliant or Redwave fabric." *Id.* at 19-20.

After given an opportunity, no party requested an evidentiary hearing and the Court does not believe one is necessary for this motion. *See* Order, ECF 290 (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136, 155 (3d Cir. 2000)). So the motion is ready for disposition.

## LEGAL STANDARD

In considering Under Armour's motion to exclude Dr. Maronick's expert opinion, the Court applies the following standard. An expert witness's testimony is admissible only if (1) the witness is qualified to testify as an expert, (2) the testimony is reliable, and (3) the testimony is relevant. *See UGI Sunbury LLC v. A Permanent Easement*, 949 F.3d 825, 832 (3d Cir. 2020). If any of these three requirements are not satisfied, the expert's testimony is inadmissible under Rule 702 of the Federal Rules of Evidence. *See id.* The proponent of the expert testimony bears the burden to show by a preponderance of the evidence that their expert's opinion is reliable. *See Oddi*, 234 F.3d at 144.

Under Federal Rule of Evidence 702, the Court serves as the "gatekeeper" of expert testimony by "ensuring that an expert's testimony both rests on a reliable

foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). "As gatekeeper, a trial judge has three duties: (1) confirm the witness is a qualified expert; (2) check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is sufficiently tied to the facts of the case, so that it fits the dispute and will assist the trier of fact." *UGI Sunbury*, 949 F.3d at 832 (cleaned up).

Expert testimony must be reliable. *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co.*, 526 U.S. at 141. To be sufficiently reliable, the expert's testimony need not have "the best foundation, or even . . . [be] supported by the best methodology or unassailable research." *UGI Sunbury*, 949 F.3d at 834 (citation omitted). Rather, the testimony must be supported by "good grounds," using a reliable methodology. *See id.* A court considers various factors to determine whether the testimony is supported by "good grounds," including: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." *Id.* (citations omitted).

## **DISCUSSION & ANALYSIS**

Under Armour moves to exclude Dr. Maronick's expert report and testimony regarding the impact of Under Armour's advertising on consumers. ECF 255. Under Armour claims that Dr. Maronick's two surveys are not sufficiently reliable under Rule 702.

I.   **Survey 1.**

As to Survey 1, first, Under Armour argues that Dr. Maronick's survey is flawed because there are material differences in the control image and the test image. ECF 256, p. 6. In Dr. Maronick's survey, the images he used for the control and test groups were very different, with one image showing a woman, and the other image showing two men wearing the product. *Id.* at 7. The two images also included different language that had no bearing on the "FDA determined" language and placed the FDA language in different places on the images. *Id.* at 9. Second, Under Armour argues that the language Dr. Maronick used for the control group was a negative statement of the product rather than testing for the absence of the FDA language, which is the proper procedure for test/control surveys. *Id.* at 10-12. Third, Under Armour argues Dr. Maronick misled survey respondents by using different control language in two different questions that were supposed to use the same control language. *Id.* at 12-13. Fourth, Under Armour argues Dr. Maronick failed to follow basic rules of survey bias by: (1) failing to rotate multiple choice answers for the survey respondents to guard against order bias; (2) failing to take non-response factors into account; (3) using leading questions and thus failing to guard against demand effects; and (4) failing to describe the target population. *Id.* at 13-15.

In response, MET argues that the flaws in Dr. Maronick's study go to the weight, and not the admissibility of his opinions. ECF 272, p. 8. First, MET argues that the differences in the control image do not disqualify the survey because the differences are not material and the respondents saw the necessary text in the images, despite the differences in placement, font, and inclusion of extra text. *Id.* at 8-9. Second, MET argues that Dr. Maronick's use of a negative statement in the control group does not render his report inadmissible because "the central issue being tested was the effect of the statement that the FDA determined that products containing Celliant provide certain health benefits, not the fact that the FDA was

mentioned at all." *Id.* at 9-12. Third, MET argues disputes over the suitability of Dr. Maronick's control image and control claims language go to the weight and not the admissibility of his conclusions. *Id.* at 12-13. Fourth, MET argues that Under Armour's other arguments do not warrant exclusion because: (1) the failure to rotate answers is not a fatal defect; (2) failure to address response rate goes to the weight, not the admissibility; (3) Under Armour's expert agreed that Dr. Maronick's questions were appropriate and not leading, and it is otherwise irrelevant because the survey was testing consumers' understanding and perception of the FDA language, not the language's impact on consumers; (4) Dr. Maronick did sufficiently identify the target population; and (5) grammatical errors do not warrant exclusion. *Id.* at 13-17.

"In the Third Circuit, an admissible survey must comport with the following criteria. (1) a proper universe must be examined and a representative sample must be chosen; (2) the persons conducting the survey must be experts; (3) the data must be properly gathered and accurately reported; (4) the sample design, the questionnaires, and the manner of interviewing must meet the standards of objective surveying and statistical techniques; (5) the survey must be conducted independently of the attorneys involved in the litigation; and (6) the sample designers should be trained and, ideally, unaware of the purposes of the survey or the litigation." *Barry v. DePuy Synthes Prod., Inc.*, No. 17-3003, 2023 WL 4851411, at *5 (E.D. Pa. July 28, 2023) (citing *Pittsburgh Press Club v. United States*, 579 F.2d 751, 758 (3d Cir. 1978)). "Typically, a Court will not exclude a survey unless it is so flawed that it would be completely unhelpful or harmful to the trier of fact." *Merisant Co. v. McNeil Nutritionals, LLC*, 242 F.R.D. 315, 320 (E.D. Pa. 2007). This is because "mere technical flaws" go to the weight, and not the admissibility, of a survey, but "fatal flaws" warrant exclusion under Rule 702. *Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 121 (3d Cir. 2004). Similarly, a survey may be excluded if the danger of undue prejudice far outweighs the probative value of a

survey under Rule 403. *Id.* at 120.

"A proper control should be as similar to the experimental stimulus as possible, because if there are multiple differences between them, it may be impossible to determine which of those differences caused any disparity between the respondents' reactions to them." *In re Elysium Health-ChromaDex Litig.*, No. 17-7394, 2022 WL 421135, at *13 (S.D.N.Y. Feb. 11, 2022). An improper control undermines the reliability of a survey because the lack of a proper control makes it difficult to assess responses. *Pennsylvania State Univ. v. Vintage Brand, LLC*, 715 F. Supp. 3d 602, 628-29 (M.D. Pa. 2024), *clarified on denial of reconsideration*, No. 21-01091, 2024 WL 1416505 (M.D. Pa. Apr. 2, 2024).

Here, the control was improper because the test group saw an image of a woman wearing a jacket, and the control group saw an image of two men wearing jackets. ECF 256-1, pp. 10-11. In addition to the different images, Dr. Maronick also improperly showed the test group language that was not shown to the control group. ECF 256-2, 91:17-93:5. The test group image included the phrase "ALL DAY ALL NIGHT – " and " – RECOVERY[,]" but the control group image did not. *Id.* at 87:22-89:10; ECF 256-1, pp. 35, 38. This is a material difference, as the test group was shown additional recovery-promoting language that could have reinforced or emphasized the FDA's determination. The differences between the control and test images do not follow standard survey procedure, and it was a puzzling decision to use different images and different language.[3] *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 596 (S.D.N.Y. 2007) ("Thus the poor choice of bag is an important factor cutting toward exclusion of the 2004 survey—especially when added to the problematic stimulus, which made no attempt to allow respondents to view the

---

[3] One would think using an image of a man in one image and a woman in another image might skew the results based on the gender of the respondent answering the survey.

lettering on the Dooney & Bourke bag.").

Dr. Maronick's approach to the language used in the control and test groups was also flawed because rather than excluding the "FDA determined" language, he improperly made it a negative claim—"the FDA has not made a determination . . . ." ECF 256-1, pp. 10-11; *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 511 F. App'x 81, 85 (2d Cir. 2013) (holding district court did not err in identifying word "polo" as characteristic being assessed and requiring it to be excluded from control group to be reliable); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 590-591 (3d Cir. 2002) (using positive statements in both the test and control groups); *Procter & Gamble Pharms., Inc. v. Hoffmann-LaRoche Inc.*, No. 06-34, 2006 WL 2588002, at *24 and n.68 (S.D.N.Y. Sept. 6, 2006) (finding expert survey inadmissible in part because the expert used a negative claim in the test group); *see also Shari Seidman Diamond*, Reference Guide on Survey Research, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 359, 399 (Fed. Jud. Ctr. 3d ed. 2011) ("*Diamond*") ("In designing a survey-experiment, the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."). While these issues with the control and test groups may not warrant exclusion on their own,[4] they weigh in favor of exclusion when viewed in

---

[4] To be clear, if the only flaw here was that the test image used the positive language and the control used the negative language, the Court would conclude that this was more of a weight issue. Dr. Maronick would be free to argue that the negative language in the control group was neutral and explain why it was proper in the control, while Under Armour could cross-examine him on that. *See PNC Fin. Servs. Grp., Inc. v. Plaid Inc.*, No. 20-1977, 2024 WL 3691607, at *6 (W.D. Pa. Aug. 7, 2024) (Hornak, C.J.) (declining to exclude survey when a control contained a disclaimer that the test did not have); *Spangler Candy Co. v. Tootsie Roll Indus., LLC*, 372 F. Supp. 3d 588, 598 (N.D. Ohio 2019) (noting that "courts have been reluctant to exclude a survey based on inadequate controls alone" and instead "have simply chosen to give less weight to surveys using weak controls.").

combination with the other flaws in the survey.

Beyond the control issues, at least three of the other flaws Under Armour identified support exclusion. First, Dr. Manorick's failure to rotate answers. Typically, a failure to rotate answers, by itself, goes to the weight, not the admissibility of a survey. *Aberin v. Am. Honda Motor Co., Inc.*, No. 16-04384, 2021 WL 1320773, at *13 (N.D. Cal. Mar. 23, 2021). However, in connection with other flaws, a failure to rotate can support a finding that a survey is unreliable. *Procter & Gamble Pharms., Inc.*, 2006 WL 2588002 at *23 (failure to rotate questions "very likely contributed to biased and unreliable responses").

Second, Dr. Maronick did not take into account non-response. ECF 256-2, 8:23-9:25. "[A] reliable survey requires an analysis of whether the results were impacted by non-response bias, which occurs when the nonresponses to a survey are not random, but correlate to a trait the survey is intended to measure." *Hostetler v. Johnson Controls*, Inc., No. 15-226, 2016 WL 3662263, at *12 (N.D. Ind. July 11, 2016). While flaws in an expert's methodology usually go to the weight, and not to admissibility, a failure to address non-response can support exclusion in conjunction with other flaws. *Barry*, 2023 WL 4851411 at *8, *10.

Third, Dr. Maronick didn't identify the target population. Dr. Maronick did describe "a sampling frame and the respondents from the sampling frame," but did not otherwise describe the target population in his report. ECF 256-2, 37:17-41:3, 53:4-54:19; ECF 256-1, p. 5. "A survey report generally should provide in detail . . . [a] definition of the target population and a description of the sampling frame[.]" *Diamond* at 415. This flaw too supports exclusion. *See Parallel Networks Licensing, LLC v. Microsoft Corp.*, No. 13-2073, 2017 WL 11557655, at *5 (D. Del. Feb. 22, 2017) ("[The expert's] failure to identify the population from which the panel was drawn, and to consider whether there were any relevant differences between the survey's population frame and the target population, runs afoul of well established statistics

principles and renders the survey unreliable and inadmissible.").[5]

In sum, some of the flaws outlined above, standing alone, may have been technical ones that go more to the weight of the evidence. But sometimes the difference between weight and admissibility is a matter of degree. And the Court concludes that the flaws in Survey 1 are of such a degree that they have the cumulative effect of rendering Dr. Maronick's opinion unreliable under Rule 702. *See, e.g., Barry*, 2023 WL 4851411 at \*5 (excluding expert survey due to its numerous flaws).

## II.    Survey 2.

As to Survey 2, first, Under Armour states that Dr. Maronick admitted that this survey is not a "test/control" survey as he states in his expert report, but was instead two separate consumer perception surveys. ECF 256, pp. 15-18. Under Armour argues that because of this, any of Dr. Maronick's report and testimony that relate to Survey 2 should be excluded because experts cannot recharacterize or alter their opinions in a deposition. *Id.* at 18. Second, Under Armour argues that even if Survey 2 were two separate consumer perception surveys, Dr. Maronick's opinions on Survey 2 are still inadmissible because: (1) it was not a test/control survey, so Survey 2 "is not a survey capable of measuring any causal impact of any particular language[;]" and (2) the two purported surveys do not "fit" the case. *Id.* at 19-20.

In response, MET argues that Survey 2 was a consumer perception survey, not

---

[5] Under Armour also claims that certain questions were leading and that that flaw supports exclusion. ECF 256, pp. 14-15. *Johnson & Johnson-Merck Consumer Pharms. Co.*, 19 F.3d 125, 134 (3d Cir. 1994) ("A survey is not credible if it relies on leading questions which are inherently suggestive and invite guessing by those who did not get any clear message at all." (cleaned up)). While closed-ended questions can be misleading by suggesting an answer to the respondent, *Am. Home Prods. Corp. v. Johnson & Johnson*, 654 F. Supp. 568, 581-82 (S.D.N.Y. 1987), Under Armour does not identify a specific question as leading. *See* ECF 256, pp. 14-15. The Court finds that this purported flaw goes more to the weight than the admissibility of the evidence.

a test/control survey, so it should not be excluded because a control group is not necessary when the survey is not seeking to show causality. ECF 272, pp. 17-20.

Dr. Maronick claimed in his expert report that Survey 2 was a test/control survey. But at his deposition, he abandoned this opinion. ECF 256-2, 134:15-135:9. A court may exclude evidence if an expert's testimony differs from his opinion. *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 725 F.3d 1377, 1382 (Fed. Cir. 2013) (excluding expert witness when the expert's testimony at trial revealed that he used a different methodology than the methodology reflected in his report). Additionally, even if Survey 2 were still valid without a control, Dr. Maronick improperly drew the respondents' attention to the language in question by drawing a box around the language and asking the respondents "*What does the highlighted statement say or suggest about this product?*" (ECF 256-1, p. 14-16 (italics original)), which was inappropriate. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 280 (4th Cir. 2002) (finding "significant questions about" the relevance and reliability of a survey where respondents were only asked to review a portion of the product at issue). Even if the Court were to accept Dr. Manorick's purported explanation that Survey 2 was really two separate surveys, then each of those surveys also lack a control, which is a "fatal flaw[.]" *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, No. 01-2775, 2001 WL 588846, at *12 (S.D.N.Y. June 1, 2001), *aff'd*, 19 F. App'x 17 (2d Cir. 2001).

For these reasons, the Court finds that Dr. Maronick's testimony is not reliable. Thus, Dr. Maronick's testimony and report on consumer perceptions of Under Armour's claims do not pass muster under Rule 702. The Court will exclude Dr. Maronick's report, for purposes of both summary judgment and trial.

## CONCLUSION

For the reasons discussed above, the Court hereby grants Under Armour's motion to exclude Dr. Maronick's expert report. ECF 255.

DATED: December 23, 2024          BY THE COURT:

                                  /s/ *J. Nicholas Ranjan*
                                  United States District Judge