**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MULTIPLE ENERGY TECHNOLOGIES, LLC, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNDER ARMOUR, INC., )<br><br>Defendant. ) | 2:20-CV-664-NR |

## OPINION

**J. Nicholas Ranjan, United States District Judge**

Plaintiff Multiple Energy Technologies, LLC brings four claims against Defendant Under Armour, Inc.: violation of the Lanham Act, violation of the Sherman Act, misappropriation of trade secrets; breach of non-disclosure agreement; tortious interference with contract; tortious interference with prospective business expectancies; unjust enrichment; unfair competition; conversion; a claim for an accounting; and a claim for injunctive relief. Following discovery, Under Armour now moves to strike the supplemental report of Thomas J. Maronick (ECF 241), and MET moves to strike the expert testimony and parts of the expert reports of Jerome Schmitt and Kenneth Elzinga that rely on undisclosed documents and witnesses (ECF 263). After carefully considering the parties' submissions, the Court will: (1) deny Under Armour's motion to strike the supplemental report of Thomas J. Maronick; and (2) deny MET's motion to strike the expert testimony of Jerome Schmitt and Kenneth Elzinga. That said, and as discussed below, the Court will order a limited re-opening of discovery to cure the asserted prejudice to both parties.

## BACKGROUND

### I. Thomas J. Maronick's supplemental report.[1]

MET retained Dr. Thomas J. Maronick, who designed "a two-part online consumer study to determine consumers' perceptions of claims Under Armour [made] about Celliant on the landing pages of its website." ECF 267-1, p. 4. MET served Under Armour with Dr. Maronick's report on April 24, 2024. ECF 267, ¶ 2. Under Armour deposed Dr. Maronick on June 18, 2024. *Id.* at ¶ 3. At that deposition, Under Armour identified numerous purported flaws with Dr. Maronick's expert report. ECF 242, pp. 1-2.

After Dr. Maronick's expert deposition, and after the deadline for expert reports and rebuttal reports had passed, MET submitted a "supplemental report" from Dr. Maronick on July 9, 2024. ECF 267, ¶ 5; ECF 267-4. In the supplemental report, Dr. Maronick noted the flaws that Under Armour identified and "tailored the supplemental survey to address Under Armour's concerns—which confirmed the results of the original survey." ECF 242-2, pp. 3-4. In other words, Dr. Maronick "redid the survey[.]" *Id.* at 4.[2]

### II. Under Armour's experts' opinions.

MET seeks to strike portions of the expert reports and accompanying testimony of Kenneth Elzinga and Jerome Schmitt, Under Armour's antitrust and damages experts, respectively, based on Under Armour's failure to disclose, during fact discovery, the identities of four Under Armour employees that the experts spoke with and four spreadsheets that the experts reviewed in the course of preparing their reports. ECF 264, pp. 1-2.

---

[1] Unless otherwise noted, all citations to the record refer to the page number of the ECF filing stamp on the top of each page (rather than the native page number).

[2] Notably, Dr. Maronick only re-did Survey 1 from his original report. He did not re-do Survey 2.

As to the undisclosed witnesses, Mr. Schmitt's report repeatedly cites to conversations with Katherine Fink as one of the bases for his opinions, and Dr. Elzinga's report relies on conversations with Kelly Maher, Nick Blannin, and Lance Allega, all of whom are Under Armour employees. *Id.* at 4, 6. Under Armour did not identify these four witnesses in its Rule 26 disclosures, and MET claims that the first time it learned about them was when Mr. Schmitt's and Dr. Elzinga's reports were served on May 22, 2024, nearly five months after the close of fact discovery. *Id.* at 1-2.

As to the undisclosed documents, Mr. Schmitt's report relies on two spreadsheets containing information about Under Armour's financials, titled: "Summary of North American Selling, General and Administrative Costs for Fiscal 2018 through Fiscal 2024" and "Style Number Listing and Description of 'Other' Under Armour Sales[.]" ECF 264-1, ¶ 15. The first spreadsheet contains data "detailing various costs for Under Armour," and the second spreadsheet is "a listing of Under Armour product lines and their internal style numbers." *Id.* at ¶¶ 17-18. Dr. Elzinga's report relies on two spreadsheets labeled "FW20 ITP Model V31" and "FW22 Style Mapping Consolidated," which contain data on "pricing, cost, and markup information…as well as similar information about goods that Under Armour considers to be directly competitive with its products." ECF 264, p. 7. None of these spreadsheets were produced to MET during fact discovery, and so they were not available to MET's experts while they were preparing their reports. *Id.* at 5, 7.

## LEGAL STANDARD

Under Rule 26(a)(2)(c), expert disclosures must be made within a certain time frame, and must be supplemented under Rule 26(e)(1) if a party learns that the material disclosure is incomplete or incorrect. Additionally, under Rule 26(e)(1), "[a] party is continually required to supplement or correct its initial discovery responses if the response is in any way incomplete or incorrect." *Steele v. Aramark Corp.*, No.

09-4340, 2012 WL 1067879, at *5 (D.N.J. Mar. 29, 2012) (cleaned up). "A party must correct a discovery response in a timely and formal manner unless the corrective information has otherwise been made known." *Id.* (cleaned up).

Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The non-producing party . . . has the burden of proving substantial justification or that its failure to produce was harmless." *Crouse v. Allegheny Cnty.*, No. 09-1221, 2016 WL 6086066, at *3 (W.D. Pa. Jan. 25, 2016) (Cercone, J.) (cleaned up); *Jerome v. Water Sports Adventure Rentals & Equip., Inc.*, No. 2009-092, 2013 WL 1499030, at *2 (D.V.I. Apr. 12, 2013) ("The party who fails to comply with Rule 26(a) bears the burden of demonstrating that the failure is substantially justified or harmless.").

In the Third Circuit, courts balance the following five factors in considering whether to exclude evidence as a discovery sanction: "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified or the excluded evidence would have been offered; (2) the ability of that party to cure the prejudice; (3) the extent to which allowing such witnesses or evidence would disrupt the orderly and efficient trial of the case or of other cases in the court; (4) any bad faith or willfulness in failing to comply with the court's order; and (5) the importance of the excluded evidence." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298 (3d Cir. 2012) (reviewing decision to exclude amended expert report for abuse of discretion) (cleaned up).

"The exclusion of critical evidence is an extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791-92 (3d Cir. 1994) (cleaned up). "Ultimately, the Court has broad discretion to

- 4 -

determine whether to exclude certain testimony for a discovery violation." *Frobe v. UPMC St. Margaret*, No. 20-957, 2023 WL 3740782, at *14 (W.D. Pa. May 31, 2023) (Wiegand, J.).

<strong><u>DISCUSSION & ANALYSIS</u></strong>

## I.    The Court will not strike Dr. Maronick's supplemental report.

The Court first turns to Under Armour's motion to strike Dr. Maronick's supplemental expert report.  ECF 241.  After careful consideration of the parties' arguments and the applicable law, the Court will not strike Dr. Maronick's supplemental report.

Under Armour makes two arguments in support of its motion.  First, Under Armour argues that Dr. Maronick's report is not a proper supplemental report under Rule 26(a) and (e) because Dr. Maronick conducted a new survey implementing changes that cured deficiencies that Under Armour identified at Dr. Maronick's deposition.  ECF 242, pp. 4-7.  Under Armour states that a supplemental report is not permissible to state additional opinions, strengthen or deepen opinions expressed in the original report, or remedy a deficient opening report.  ECF 268, p. 6.  Second, Under Armour argues that striking Dr. Maronick's supplemental report is a proper sanction because the report was untimely and allowing MET to present the report without allowing Under Armour to respond would be unfairly prejudicial.  ECF 242, pp. 7-10; ECF 268, pp. 8-10.

In response, MET first argues that the supplemental report is proper under the rules because it would be impossible for Dr. Maronick to correct the issues Under Armour raised without performing a second survey.  ECF 266, p. 6.  MET argues that Dr. Maronick was simply correcting errors/omissions that Under Armour raised at his deposition and ultimately concluded that these minor errors did not meaningfully impact the results of the consumer survey.  ECF 266, pp. 7-8.  Second, MET argues that the Court should not strike the supplemental report because there is no

contradiction between the original report and the supplemental report and there is no prejudice that cannot be cured.  ECF 266, pp. 8-10.

   To begin with, Under Armour is right about the nature of the report.  It is a new report, not a supplemental one.  The Court finds that Dr. Maronick's supplemental report does not fall within the parameters of supplementation under Rule 26(e).  "Rule 26(e) does not grant experts a second bite at the apple so they can deepen or strengthen existing opinions."  *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, No. 15-5477, 2019 WL 581544, at *4 (D.N.J. Feb. 13, 2019) (cleaned up).  MET acknowledges that Dr. Maronick "admitted to the errors" that Under Armour identified at his deposition.  ECF 266, p. 1.  However, MET asserts that the supplemental report addresses inadvertent errors or omissions such as: "(1) the difference in images used in test and control groups; (2) discrepancies in font size; (3) grammatical errors in two questions; and (4) the failure to rotate the order of choices when asking consumers if Under Armour's claims were 'very important' to 'not at all important.'"  ECF 266, p. 7.

   While grammatical and formatting issues, and indeed the failure to rotate questions, may be "inadvertent errors or omissions," the differences between the test and control images were a serious methodological mistake that warranted exclusion.  ECF 323 (memorandum order granting Under Armour's motion to exclude Dr. Maronick's testimony and opinion).  "Courts distinguish 'true supplementation' (*e.g.*, correcting inadvertent errors or omissions) from gamesmanship, and have therefore repeatedly rejected attempts to avert summary judgment by 'supplementing' an expert report with a 'new and improved' expert report."  *Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 631 (E.D.N.C. 2008) (citation omitted).  That is exactly what happened here.  After Dr. Maronick's deposition, when MET presumably realized that his surveys suffered from potentially fatal flaws, MET attempted a "do-over" by having Dr. Maronick conduct an entirely new survey with

proper test/control images.  Rule 26(e) is not for the benefit of the party who has the duty to supplement and "does not grant a license to supplement a previously filed expert report because a party wants to" do so.  *Lockhart v. Willingboro High Sch.*, No. 14-3701, 2017 WL 11465996, at *3 (D.N.J. May 3, 2017) (citation omitted).

Having found that Dr. Maronick's "supplemental" report was not a true supplement under the rules, the Court turns to whether exclusion is the proper sanction, examining each factor in turn.  First, prejudice.  Under Armour was certainly prejudiced because the supplemental report was disclosed after the deadline for submitting expert reports had passed.[3]  By its own admission, MET served the supplemental report after Under Armour had submitted its rebuttal report and after Dr. Maronick's deposition.  ECF 267, ¶¶ 3-5.  This factor weighs in favor of exclusion.

Second, it will be difficult for Under Armour to cure this prejudice because it has already taken Dr. Maronick's deposition and its expert has already submitted a rebuttal to Dr. Maronick's original expert report.  That said, difficult does not equal impossible.  The Court could, for example, allow Under Armour to re-depose Dr. Maronick and submit a second rebuttal report, which would cure much of the prejudice.  Therefore, this factor weighs against exclusion.

Third, while the parties' cross-motions for summary judgment are currently pending, the Court recently continued the trial to hold a *Daubert* hearing on a

---

[3] In the Court's second case management order, the deadline for rebuttal reports was June 5, 2024, and the overall deadline for expert discovery was June 18, 2024.  ECF 208.  On June 3, 2024, the parties filed a joint motion for an extension "from June 18, 2024 to July 12, 2024 to allow the parties to conduct all of the expert depositions[.]"  ECF 236.  The Court granted that motion on June 5, 2024.  ECF 237.  Neither the parties' motion nor the Court's order contemplated an extension of the time to file expert reports.  *See* ECF 236; ECF 237.  "It is fair to say that [the] parties agreed to extend the expert deposition deadline . . . with the understanding" that it was for depositions only, not rebuttal or new expert reports.  *Gautier-James v. Hovensa, L.L.C.*, No. 06-106, 2011 WL 4500153, at *9 n.9 (D.V.I. Sept. 27, 2011) (stating that "the Court will not allow [the late disclosing party] to benefit from an extended deadline not meant to cover its then undisclosed expert witnesses").

different motion.  ECF 322.  Because the Court has already continued the trial for its own reasons, re-opening expert discovery for the narrow purpose of allowing Under Armour to respond to Dr. Maronick's supplemental report would not cause further delay.  This factor weighs against exclusion.

Fourth, although MET's actions may not rise to the level of bad faith, there was a bit of gamesmanship here.  And the Court may still exclude the evidence absent a finding of bad faith under the balancing test.  *Aetna Inc. v. Mednax, Inc.*, No. 18-2217, 2021 WL 949454, at *4 (E.D. Pa. Mar. 12, 2021) ("However, even if there is no evidence of bad faith, where an oversight is not rationally explained and is surely prejudicial, exclusion is appropriate." (cleaned up)); *Lockhart*, 2017 WL 11465996 at *6 (collecting cases).  This factor weighs in favor of exclusion.

So far, the first and fourth factors weigh in favor of exclusion while the second and third factors weigh against exclusion.  That leaves the fifth factor, importance, as the tie-breaker.

The fifth factor considers the importance of the evidence to the case.  According to the Third Circuit, "exclusion of critical evidence is an 'extreme' sanction, and thus, a district court's discretion is not unlimited."  *ZF Meritor*, 696 F.3d at 297 (citation omitted).  "The importance of the excluded evidence is often the most significant factor in the Rule 37 analysis."  *Walsh v. Fusion Japanese Steakhouse, Inc.*, 585 F. Supp. 3d 766, 788 (W.D. Pa. 2022) (Weigand, J.) (citing *ZF Meritor*, 696 F.3d at 298).

Here, the supplemental expert report is directly relevant to materiality, an element of MET's Lanham Act claim.  And, because the Court has concluded that Dr. Maronick's initial expert report should be excluded (ECF 323), if the Court also excludes his supplemental report, MET will be left without expert evidence for the materiality element.  This critical factor weighs against exclusion.  *Power v. Hewlett-Packard Co.*, No. 17-154, 2021 WL 1310422, at *6 (W.D. Pa. Apr. 8, 2021) (Hornak, C.J.) ("Even if the Court were to conclude that [defendant] had been unfairly

surprised and prejudiced by [plaintiff's] failure to amend or supplement discovery, the Third Circuit has made plain that exclusion of critical evidence is an extreme sanction, and thus, a district court's discretion is not unlimited." (cleaned up)).

The Court is ultimately constrained by the Third Circuit's admonition that exclusion of critical evidence is an "extreme sanction" and declines to issue a potentially dispositive evidentiary ruling after balancing all of the Third Circuit's factors. *ZF Meritor*, 696 F.3d at 297. Rather, the Court will re-open discovery to allow Under Armour to re-depose Dr. Maronick on his supplemental report, and to submit a rebuttal report to it, if it so desires.

## II. The Court will not strike the expert testimony of Mr. Schmitt and Dr. Elzinga that rely on undisclosed documents and witnesses.

Next, the Court turns to MET's motion to strike portions of the expert reports and accompanying testimony of Mr. Schmitt and Dr. Elzinga. ECF 263. The Court will address Mr. Schmitt and Dr. Elzinga separately, first deciding whether Under Armour was required to disclose the undisclosed witnesses and documents at issue during fact discovery, before balancing the factors discussed above.

### A. Mr. Schmitt's report.

*Failure to disclose Katherine Fink*. Mr. Schmitt's report relies on discussions with Katherine Fink to establish: (1) which overhead expenses to deduct from Under Armour's profits under the full absorption method; (2) sales of Under Armour's Recover products after 2021 as well as the marketing of the Recover and Rush product lines; and (3) the hypothetical royalty payment that is used to reduce Under Armour's profit under the "relief from royalty" method. ECF 264, p. 4; ECF 264-10, ¶¶ 22, 45-46, 63-64, 74.

The Court first finds that Under Armour was obligated to disclose Ms. Fink's identity under Rule 26, as she was an individual likely to have discoverable information that Under Armour may use to support its claims or defenses. Under

Armour contends that Mr. Schmitt did not know until MET served its expert reports what information he would need to rely on to form his opinions (ECF 270, p. 9), but Under Armour was on notice before then that Lanham Act damages was at issue in this case because MET sought Under Armour's profits in the Third Amended Complaint and in its initial disclosures. ECF 289, p. 7. *See Rodriguez v. Lab'y Corp. of Am.*, No. 21-0399, 2022 WL 18228250, at \*3-4 (C.D. Cal. Nov. 23, 2022) (finding that Rule 26 required plaintiff to disclose damages witnesses because it is "well established that the litmus test for disclosure of a witness under Rule 26 is whether the party may rely upon an individual on a motion or at trial" and collecting cases holding that "the identity of lay witnesses who will testify regarding damages is subject to Rule 26's disclosure requirements" (cleaned up)); *Info-Hold, Inc. v. Muzak LLC*, No. 11-283, 2013 WL 6008619, at \*2 (S.D. Ohio Nov. 13, 2013) (finding that lay witnesses could not "testify regarding the determination of a reasonable royalty because they were not properly disclosed as witnesses who would testify regarding damages").

Under Armour hasn't shown that its failure to disclose Ms. Fink was either substantially justified or harmless. "Substantial justification for the failure to make a required disclosure has been regarded as justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request." *Tolerico v. Home Depot*, 205 F.R.D. 169, 175 (M.D. Pa. 2002) (cleaned up); *see also Kacian v. Brennan*, No. 12-102, 2017 WL 933142, at \*3 (W.D. Pa. Mar. 8, 2017) (Gibson, J.) ("Substantial justification exists if there is a genuine dispute about whether the party was required to make the disclosure."). "A failure to disclose evidence is harmless if it involves an honest mistake, coupled with sufficient knowledge by the other party of the material that has not been produced." *United States v. Brace*, 334 F.R.D. 472, 478 (W.D. Pa. 2020) (Baxter, J.) (cleaned up); *see also Karakozova v. Trs. of Univ. of Pa.*, No. 09-02564,

2011 WL 1303128, at *1 (E.D. Pa. Mar. 24, 2011) ("A failure to disclose witness information is harmless if the other party was well aware of the identity of the undisclosed witnesses and the scope of the relevant knowledge well before trial." (cleaned up)).

Under Armour argues that MET was aware of Ms. Fink during fact discovery because Under Armour's Rule 30(b)(6) designee identified her as the Under Armour employee who prepared Under Armour's financial projections for products containing Celliant. ECF 270, p. 10. But the Court finds that these passing references were not sufficient to put MET on notice of the scope of her knowledge or the extent to which her testimony would be relied upon in Mr. Schmitt's report. *See Eli Lilly & Co. v. Actavis Elizabeth LLC*, No. 07-3770, 2010 WL 1849913, at *8-9 (D.N.J. May 7, 2010) (finding that "[s]poradic mentions in depositions are not a substitute for certified responses to discovery and do not satisfy [plaintiff's] discovery obligations" when "the *type* and *scope*" of testimony that undisclosed witness sought to provide at trial was never disclosed and could not be inferred from the deposition references). Neither were the references to Ms. Fink in "nearly 100 documents" produced during discovery, (ECF 270, p. 10), sufficient to put MET on notice that she possessed critical information. *See Fiumano v. Metro Diner Mgmt. LLC*, No. 17-465, 2022 WL 2541354, at *9 (E.D. Pa. July 7, 2022) ("A party may only avoid the obligation to supplement its disclosures if the information in question has *clearly and unambiguously* otherwise been made known during the discovery process." (cleaned up) (emphasis added)).

***Failure to disclose two spreadsheets***. Mr. Schmitt's report also relies on two spreadsheets that were not disclosed to MET during fact discovery, one of which detailed various costs for Under Armour and the other of which contained a listing of Under Armour's product lines and their internal style numbers. Mr. Schmitt used these spreadsheets to calculate Under Armour's expenses and to ascertain which

products are associated with the Rush and Recover product lines (and the resulting revenue).[4]  ECF 264, p. 5; ECF 264-10,  Exs. A, A.1, B, B.1, B.2, B.3, C.2, D, E.

As to the spreadsheet containing the list of Under Armour's product lines and their internal style numbers, the Court finds that Under Armour wasn't under any obligation to disclose it.  Mr. Schmitt used this list to determine which non-clothing products contained Celliant, and then excluded these products from revenue calculations.  ECF 264-10, Exs. A, A.1, B, B.1, B.2, B.3.  It appears that this list was created for the purposes of this litigation, and may even have been created after the close of fact discovery.  And the Court finds that this list of product lines does not appear responsive to any of the discovery requests that MET points out in its brief, which instead largely focus on Under Armour's financial documents.  ECF 264, p. 8.

However, the Court finds that the spreadsheet titled "Summary of North American Selling, General and Administrative Costs for Fiscal 2018 through Fiscal 2024" is responsive to MET's discovery requests; in its Request for Production of Documents, MET requested "[a]ll of [Under Armour's] financial statements, general ledgers, periodic reports or other Documents sufficient to show [Under Amour's] total net revenues, net profits, and gross profits relating to sales" of Redwave, Celliant, and CCREB products.  ECF 264-3, pp. 15-16.  The undisclosed spreadsheet contains financial data on expenses that is directly relevant to Under Armour's revenues and profits, and should have been disclosed during fact discovery, notwithstanding Under Armour's argument that the spreadsheet is merely the "back-up detail for the SG&A

---

[4] MET also notes, in passing, that Mr. Schmitt relied on a document titled "Under Armour License and Distribution Agreement for Apparel and Accessories."  ECF 264, p. 5.  However, MET's briefing only focuses on Under Armour's failure to disclose the two spreadsheets, and it is not clear to the Court if MET is arguing that the portions of the opinion relying on this document should be stricken, so the Court will solely focus on the two spreadsheets at issue.

line item that Under Armour produced during fact discovery at UA0083040." ECF 270, p. 14.

Next, the Court finds that the failure to disclose this spreadsheet during fact discovery was neither substantially justified nor harmless. Under Armour hasn't provided a compelling reason as to why it did not either disclose the spreadsheet in response to MET's RFPs, or in its initial disclosures, particularly as Under Armour *did* disclose UA0083040, a document that identified its selling, general, and administrative expenses. Under Armour says that if MET wanted the information in the spreadsheet, it could have "easily and specifically asked for it." ECF 270, p. 14. But this inappropriately shifts the burden to MET, and would result in "chance disclosure" of documents or "the reading of tea leaves." *Eli Lilly & Co.*, 2010 WL 1849913, at *9 n.5 (cleaned up); *see also Estes Express Lines v. U.S.A Lamp & Ballast Recycling, Inc.*, No. 21-00609, 2023 WL 3766020, at *4 (W.D. Pa. June 1, 2023) (Stickman, J.) ("A vague or incomplete initial disclosure does not shift the burden to the party in receipt of the initial disclosure—especially where, as here, the initial disclosure was so deficient as to give no reasonable notice of a type of damages sought, much less a computation of the same."). And Under Armour's failure to disclose wasn't harmless because MET did not have sufficient knowledge of the data contained in the spreadsheet: while Under Armour provided MET with UA0083040, the undisclosed spreadsheet appears to provide much more detailed data than UA0083040. *See* ECF 264-1, ¶ 17 (the undisclosed spreadsheet contained "thousands of rows detailing various costs . . . whereas UA0083040 only provides a year-by-year summary").

***Balancing the factors***. After considering the Third Circuit's five-factor test, the Court will not exclude the portions of Mr. Schmitt's report relying on Ms. Fink's testimony or the one spreadsheet that should have been disclosed. Initially, the portions of the report based on Ms. Fink's testimony—which MET seeks to strike—

are critical to Under Armour's damages defense; the report prominently discusses information from Ms. Fink, and seems to exclusively cite to her for certain calculations for the disgorgement analysis. *See, e.g.*, 264-10, ¶ 74. Similarly, Mr. Schmitt's report relies heavily on the undisclosed spreadsheet for his disgorgement analysis. There is no evidence suggesting that Under Armour acted with bad faith. Both of these factors strongly militate against exclusion.

But there is some prejudice to MET because its damages expert, Peter Wrobel, did not have access to information from Ms. Fink when he prepared his report; nor did MET have the opportunity to depose Ms. Fink. Additionally, Mr. Wrobel did not have an opportunity to opine on the information in the spreadsheet. *See GlobespanVirata, Inc. v. Texas Instruments, Inc.*, No. 03-2854, 2005 WL 1638136, at *3 (D.N.J. July 12, 2005) (in assessing prejudice, courts "should not speculate on how the surprised party would have used the additional information disclosed; rather prejudice exists when the surprised party likely would have conducted discovery differently" (cleaned up)).

The Court, however, finds that any prejudice to MET can be cured by re-opening discovery on a limited basis. *See, e.g.*, *E.M. Sergeant Pulp & Chem. Co. v. Travelers Indem. Co.*, No. 12-1741, 2015 WL 9413094, at *6 (D.N.J. Dec. 22, 2015) (prejudice can be cured by re-opening discovery); *Fiumano*, 2022 WL 2541354 at *11 (same); *In re Mercedes-Benz*, No. 99-4311, 2006 WL 2129100, at *8 (D.N.J. July 26, 2006) (same). The Court will allow MET to depose Ms. Fink and to re-depose Mr. Schmitt; the depositions must be limited to the topics contained in Mr. Schmitt's report that involve the undisclosed information. Additionally, the Court will allow MET to submit a supplemental report based on any newly disclosed information from

Ms. Fink and from the spreadsheet titled "Summary of North American Selling, General and Administrative Costs for Fiscal 2018 through Fiscal 2024."

Lastly, as discussed above with respect to Dr. Maronick's report, allowing Mr. Schmitt's testimony based on the undisclosed witness and spreadsheets and re-opening discovery on a limited basis will not cause further disruption of court proceedings because the Court has already continued the trial for other reasons.

Accordingly, balancing all the factors, the Court finds that exclusion is not warranted. *See In re Joy Glob., Inc.*, 423 B.R. 445, 450 (D. Del. 2010) ("Generally, courts within the Third Circuit have been reluctant to exclude otherwise admissible evidence in the absence of extreme neglect or bad faith on the part of the proponent of the testimony. This reluctance is magnified where a party has an opportunity to cure the prejudice it might otherwise suffer from another party's failure to disclose." (cleaned up)).

### B.  Dr. Elzinga's report.

***Failure to disclose Kelly Maher, Nick Blannin, and Lance Allega***.  Dr. Elzinga referenced his interviews with Ms. Maher, Mr. Blannin, and Mr. Allega, three Under Armour marketing executives, when he opined on Under Armour's familiarity and recognition of a CCREB market. ECF 264-14, ¶¶ 42, 60. Based on Dr. Elzinga's notes, his conversation with these individuals mostly involved the topics of Under Armour's competitors; Under Armour's brand positioning; how Under Armour competes in innovation; how Under Armour monitors competitors' innovation, prices and market shares, and press coverage; how Under Armour creates product sales forecasts for Recover and Rush products; and how under Armour prices products. *See* ECF 264-15.

The Court finds that Under Armour was obligated to disclose Ms. Maher, Mr. Blannin, and Mr. Allega under Rule 26, as they were individuals likely to have discoverable information that Under Armour may use to support its claims or

defenses. Indeed, Dr. Elzinga testified that the purpose of his discussion with them was "to understand from their perspective what their products compete against." ECF 270-3, 196: 12-21. He said that Under Armour's internal characterization was "one of the factors" that he considered in defining a relevant antitrust market. *Id.* at 198:16-21. Therefore, the information these witnesses provided go to a key issue in the case, *e.g.*, the relevant antitrust market.

Under Armour hasn't shown that its failure to disclose the three witnesses was substantially justified or harmless. It argues that these witnesses were necessitated by MET's and Dr. Hekman's contentions about the alleged relevant antitrust market, but given the nature of this case and the allegations in the complaint, Under Armour should have known during fact discovery that these witnesses may have relevant information on a known key issue in the case—especially as Under Armour did disclose, as part of its initial disclosures, that Mat Trexler (one of the four Under Armour employees that Dr. Elzinga interviewed, along with Ms. Maher, Mr. Blannin, and Mr. Allega) had information related to Under Armour's production and marketing of bioceramic products. ECF 264-2, p. 2. Under Armour further contends that the information that Ms. Maher, Mr. Blannin, and Mr. Allega provided to Dr. Elzinga "corroborated previously disclosed information about Under Armour's competitors and products that compete with Under Armour's bioceramic containing-products." ECF 270, p. 12. This is true for some of the information that they provided. However, the Court finds that Dr. Elzinga's interviews with the three witnesses went beyond identifying competitors or competing products—notably, Dr. Elzinga's report relies on his interviews with Ms. Maher and Mr. Blannin, and the information they provided about Under Armour's process for pricing products, to opine on how Under Armour thinks about which products are reasonably interchangeable. ECF 264-14, ¶ 60. Moreover, Dr. Elzinga testified that he "do[es] put some weight on the interviews that [he] had with the four executives" with regards to how they described

the market that Under Armour competes in.  ECF 264-19, 237:11-238:21.

    ***Failure to disclose two spreadsheets***.  Dr. Elzinga's report relies on two spreadsheets titled "FW20 ITP Model V31" and "FW22 Style Mapping Consolidated[.]"  ECF 264, p. 7.  The first spreadsheet has pricing, cost, and markup data for Under Armour (and similar data for competitors' products), and the second spreadsheet similarly compares Under Armour's products to competitors' products.  *Id.*; ECF 270, p. 5.  Dr. Elzinga used these spreadsheets to opine that CCREB is not a relevant antitrust market; as part of Under Armour's process for setting prices, the spreadsheets were used by Under Armour to conduct a pricing analysis that involved identifying, for each item, "other options that consumers might consider purchasing instead of the Under Armour item in question."  ECF 264-14, ¶¶ 12-13, 69-74, 76, 143; Exs. 4, 7.

    Both spreadsheets are responsive to MET's discovery requests, which included requests for production of "[d]ocuments sufficient to show the competitors in the market for the sale of CCREB products" and "[d]ocuments that report, describe, summarize, analyze, discuss or comment on competition from, or the marketing or sales strategies, market shares of projected market shares, market conditions or the profitability of, any company, including [Under Armour], in the sale of CCREB products."  ECF 264-3, p. 17.

    Under Armour hasn't shown that its failure to disclose the spreadsheets was substantially justified or harmless.  Under Armour contends that the spreadsheets were given to Dr. Elzinga "to provide context and to rebut [Mr.] Wrobel's findings[,]" but in an antitrust case where the relevant product market is a key issue, Under Armour should have known during fact discovery that pricing data and data about competitors' products would be used as part of its defense.  ECF 270, p. 16.  And the Court is persuaded that MET did not otherwise have sufficient knowledge of the detailed information contained in the two spreadsheets, particularly as the data

therein was sufficient for Dr. Hekman to conduct an analysis of cross-elasticity of demand, which was not done in Dr. Hekman's report because he lacked the data to do so.  ECF 274-1; ECF 274, p. 8.

*Balancing the factors*.  After considering the Third Circuit's five-factor test, the Court will not exclude the portions of Dr. Elzinga's report relying on the testimony of the undisclosed witnesses or the spreadsheets.  First, as to the importance of the evidence, MET seeks to exclude portions of the report that are integral to Under Armour's defense that CCREB is not a relevant antitrust market.  ECF 264-14, ¶¶ 12-13, 42-44, 58-61, 69-74, 76, 142-43.  One paragraph in the report cites exclusively to an interview with Ms. Maher and Mr. Blannin to opine on their understanding of what products are reasonably interchangeable.  *Id*. at ¶ 60.  Several paragraphs and tables discuss in-depth the information in the spreadsheets.  *Id*. at ¶¶ 69-74.  There is no evidence suggesting that Under Armour acted with bad faith.  As with Mr. Schmitt's report, both of these factors strongly militate against exclusion.

There is some prejudice to MET because its antitrust expert, Dr. Hekman, did not have access to the information when he was preparing his report—the prejudice from not having the data to calculate the cross-elasticity of demand is much more pronounced than the prejudice resulting from not having information from the undisclosed witnesses about how Under Armour views the market that it competes in.  But, as with Mr. Schmitt's report, the Court finds that any prejudice to MET can be cured by re-opening discovery on a limited basis, to allow MET to depose Ms. Maher, Mr. Blannin, and Mr. Allega, and to re-depose Dr. Elzinga.  Additionally, the Court will allow MET to submit a supplemental report based on any newly disclosed information from the three witnesses and the two spreadsheets.

Lastly, as discussed above with respect to Dr. Maronick's and Mr. Schmitt's reports, allowing Dr. Elzinga's testimony based on the undisclosed witnesses and spreadsheets and re-opening discovery on a limited basis will not cause further

disruption of court proceedings because the Court has already continued the trial for other reasons.

Accordingly, balancing all the factors, the Court finds that exclusion is not warranted.

## **CONCLUSION**

For the reasons discussed above, the Court will deny Under Armour's motion to strike Dr. Maronick's supplemental report (ECF 241), and deny MET's motion to strike the expert testimony and parts of the expert reports of Mr. Schmitt and Dr. Elzinga that rely on undisclosed documents and witnesses (ECF 263). The Court will issue a separate order setting forth the limitations and deadlines for the limited reopening of expert discovery as it relates to these motions.

DATED: December 23, 2024                    BY THE COURT:

                                            _/s/ J. Nicholas Ranjan_____
                                            United States District Judge

- 19 -