IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MULTIPLE ENERGY TECHNOLOGIES, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiff, | |
| v. | |
| UNDER ARMOUR, INC., | |
| Defendant. | |

2:20-CV-664-NR

## MEMORANDUM OPINION

### J. Nicholas Ranjan, United States District Judge

Plaintiff Multiple Energy Technologies, LLC brings various claims against Defendant Under Armour, Inc. for violation of the Lanham Act; violation of the Sherman Act; misappropriation of trade secrets; breach of non-disclosure agreement; tortious interference with contract; tortious interference with prospective business expectancies; unjust enrichment; unfair competition; conversion; a claim for an accounting; and a claim for injunctive relief. Following discovery, MET moved to exclude the expert testimony of Under Armour's consumer survey expert Hal Poret. ECF 259. No party requested an evidentiary hearing and the Court does not believe one is necessary. *See* Order, ECF 290 (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136, 154-55 (3d Cir. 2000)).[1] MET's motion is therefore ready for disposition.

After careful consideration, the Court will deny it.

---

[1] The Court finds that an evidentiary hearing is unnecessary, owing to the well-developed record, including the experts' reports, the deposition testimony, and extensive briefing.

## BACKGROUND[2,3]

Under Armour retained Hal Poret to rebut MET's survey expert Thomas J. Maronick and "to design and conduct a survey to test whether the relevant FDA claims influence consumer decisions to purchase Under Armour's products that contain Celliant." ECF 260-4, p. 4.

According to Mr. Poret, his "survey utilized a classic experimental design consisting of a Test Group and a Control Group, each consisting of 300 unique respondents." *Id.* at 7. Participants assigned to both groups viewed three Under Armour web pages. *Id.* at 8-14. The first two pages were identical between the groups. *Id.* On the third page, however, the Test Group was presented with the statement "Products powered by Celliant have been determined by the FDA to increase localized circulation, leading to faster recovery[,]" (*id.* at 8, 12), while the Control Group was presented with the statement "Products powered by Celliant can lead to faster recovery." *Id.* at 8, 13-14.

At the end of the survey, all respondents were asked two questions. First, respondents were asked "Based on the webpage you just reviewed, how likely or unlikely would you be to purchase apparel from the advertised product line?" *Id.* at 15. They were then presented with eight responses ranging from "extremely likely" to "extremely unlikely[,]" and ending with "don't know[,]" and the order of the responses (other than the "don't know" option) was flipped for 50% of respondents. *Id.* Second, respondents were asked an open-ended question: "Please tell us all the reasons why you would be _____ to purchase the product we showed you?" *Id.*

---

[2] The Court writes for the parties' benefit, who are familiar with the extensive factual and procedural background, as well as the allegations in the third amended complaint.

[3] Unless otherwise noted, all citations to the record refer to the page number of the ECF filing stamp on the top of each page (rather than the native page number).

at 16. Respondents were instructed to "be as specific and complete as possible" in answering. *Id.*

Based on the results of his survey, Mr. Poret concluded that the FDA claim had no statistically significant influence on consumer purchase decisions. *Id.* at 18-19, 53.

## **LEGAL STANDARD**

The Court serves as the "gatekeeper" of expert testimony. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). "As gatekeeper, a trial judge has three duties: (1) confirm the witness is a qualified expert; (2) check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is sufficiently tied to the facts of the case, so that it fits the dispute and will assist the trier of fact." *UGI Sunbury LLC v. A Permanent Easement*, 949 F.3d 825, 832 (3d Cir. 2020) (cleaned up).

"Qualification refers to the requirement that the witness possess specialized expertise." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). "[A] broad range of knowledge, skills, and training qualify an expert." *Id.* (citation omitted).

Reliability demands an expert's conclusions be "based on the methods and procedures of science, not on subjective belief and unsupported speculation." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80-81 (3d Cir. 2017) (citation omitted). In assessing this requirement, "the court looks to whether the expert's testimony is supported by 'good grounds.'" *Id.* (citation omitted). And whether "good grounds" exists generally entails consideration of several factors, including:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6)

the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*UGI Sunbury*, 949 F.3d at 834 (citation omitted). These factors are not, however, "exhaustive nor applicable in every case." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 248 (3d Cir. 2008). Rather, the Court's "gatekeeping inquiry must be tied to the particular facts" of the case. *Kumho Tire*, 526 U.S. at 138; *see also id.* at 153 (whether "specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine").

In particular, in the context of a survey, "an admissible survey must comport with the following criteria: (1) a proper universe must be examined and a representative sample must be chosen; (2) the persons conducting the survey must be experts; (3) the data must be properly gathered and accurately reported; (4) the sample design, the questionnaires, and the manner of interviewing must meet the standards of objective surveying and statistical techniques; (5) the survey must be conducted independently of the attorneys involved in the litigation; and (6) the sample designers should be trained and, ideally, unaware of the purposes of the survey or the litigation." *Barry v. DePuy Synthes Prod., Inc.*, No. 17-3003, 2023 WL 4851411, at *5 (E.D. Pa. July 28, 2023) (quoting *Pittsburgh Press Club v. United States*, 579 F.2d 751, 758 (3d Cir. 1978)). "Typically, a Court will not exclude a survey unless it is so flawed that it would be completely unhelpful or harmful to the trier of fact." *Merisant Co. v. McNeil Nutritionals, LLC*, 242 F.R.D. 315, 320 (E.D. Pa. 2007). This is because "mere technical flaws" go to a survey's weight, not its admissibility. *Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 121 (3d Cir. 2004).

Finally, an expert's conclusions "fit" the case if they "will help the trier of fact to understand the evidence or to determine a fact in issue." *UGI Sunbury*, 949 F.3d at 835 (quoting Fed. R. Evid. 702(a)). "This condition goes primarily to relevance[,]" *Karlo*, 849 F.3d at 81, though it is "higher than bare relevance." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).

"[T]he burden of proof under FRE 702 is on the proponent of the expert testimony, not the party moving to exclude that testimony, to establish the admissibility of that testimony by a preponderance of the evidence." *PNC Fin. Servs. Grp., Inc. v. Plaid Inc.*, No. 20-1977, 2024 WL 3691607, at *3 (W.D. Pa. Aug. 7, 2024) (Hornak, C.J.).

## **DISCUSSION & ANALYSIS**

MET doesn't challenge Mr. Poret's qualifications.[4] Instead, it argues that Mr. Poret's opinions (1) are irrelevant and don't "fit" the case; (2) are unreliable; (3) use *ipse dixit* rather than a proper method; and (4) fail Rule 403 balancing, as any probative value is outweighed by the dangers of unfair prejudice and confusion. ECF 260. The Court addresses each argument, in turn.

### **I.  Mr. Poret's report and testimony are relevant and "fit" the case.**

MET argues that Mr. Poret's survey is irrelevant and doesn't "fit" because it neither tests whether the FDA claim misled or deceived customers, nor measures the impact of the claim on consumers. ECF 260, pp. 6-8.

Initially, whether Mr. Poret tested whether consumers are misled or deceived is itself irrelevant, given Under Armor's concession that Mr. Poret didn't test for deception but for the materiality of the FDA statements. ECF 269, pp. 11-13.

As for "fit" to the materiality element, MET's arguments lack support. Mr. Poret provided identical Under Armor advertisements to survey participants,

---

[4] And after review of the record, the Court concludes that he is qualified.

changing only the language of the allegedly false FDA claim. Since one could attribute any differences between survey groups to that lone variable, Mr. Poret's survey is "connected to the question at issue[,]" *In re Paoli*, 35 F.3d at 745 n.13, and will help the jury in deciding materiality. *See PNC Fin. Servs. Grp., Inc.*, 2024 WL 3691607, at *13 ("no issues of fit" where surveys relied upon by expert measured materiality (in trademark context), which went "to the heart of this case"). Any lingering issues with Mr. Poret's survey design—like the fact that what influenced survey participants could have been a reference to "recovery[,]" ECF 260, p. 8—are not grounds for exclusion but fodder for cross-examination.[5] *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (cleaned up)).

## II.     Mr. Poret's report and testimony are reliable.

MET argues that Mr. Poret's survey is unreliable, taking aim at certain alleged flaws in the survey design. The Court finds that MET's attacks on the survey design go more to the weight of the evidence.

***Control Group design.*** MET contends that the subject language presented to the Control Group, "Products powered by Celliant can lead to faster recovery[,]" was improper because it "removed the majority of the language contained in the FDA Claim"—including any reference to the FDA—"and substituted in a word not included in the original FDA Claim." ECF 260, pp. 9-10.

Recall that Mr. Poret's survey presented the Test Group with the following statement:

---

[5] MET also raises a few other arguments in its relevance/fit discussion, which the Court addresses in its discussion of reliability and Mr. Poret's methodology.



ECF 260-4, p. 7.  The Control Group saw this statement:



ECF 260-4, p. 8.

The control here was appropriate, and complies with the *Daubert* standard. The characteristic being assessed here is the statement that the FDA found the Celliant product benefitted the wearer.  Proper survey methodology is that the control "share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed[.]"  *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 511 F. App'x 81, 85 (2d Cir. 2013) (quoting in parenthetical Shari Seidman Diamond, *Reference Guide on Survey Research,* in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 229, 258 (Federal Judicial Center ed., 2d ed. 2000) (holding district court did not err in identifying word "polo" as characteristic being assessed and requiring it to be excluded from control group to be reliable)).  So, at the very least, it was not improper for Mr. Poret to remove the reference to the FDA in the Control Group.  *See U.S. Polo Ass'n, Inc.*, 511 F. App'x at 85; *see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 590-91 (3d Cir. 2002) (in survey testing materiality, test group language was "Mylanta Night Time Strength," and control group language was

"Mylanta Extra Strength," because question was the false implication that the medication was formulated for use at night) (cited as example of proper control in *D.H. Bernstein and B.P. Keller, Survey Evidence in False Advertising Cases,* in TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS, 187, 214-15 (Jerre B. Swann, & Shari Diamond eds., 2d ed. 2022)).[6]

Further, the Court doesn't find the additional wording changes to create a flaw in the design. The deletion of "to increase localized circulation" from the Control Group is defensible, as that language—stating what the FDA determined—was tied to the FDA claim in the test stimulus. ECF 260-4, p. 7. And using "can lead to faster recovery" in the Control Group rather than "leading to faster recovery" is not a material wording change. These challenges go more to the weight of the testimony, not its admissibility. *See PNC Fin. Servs. Grp., Inc.*, 2024 WL 3691607, at *6 (fact that control "could have been a closer replica" didn't "mandate exclusion").

***Funneling questions.*** MET also takes aim at Mr. Poret's decision to not use funneling questions[7] to confirm that the survey participants reviewed the FDA claim language, and specifically confirm that the FDA claim has a material impact on purchasing decisions. Adding funneling questions might have been better than just using an open-ended one—but that is not the kind of flaw that renders the survey unreliable. In fact, the open-ended question revealed that at least three respondents

---

[6] MET suggests that *Novartis* is inapposite because Mr. Poret's control "removed significantly more than the control in [that case] did." ECF 288, at p .4. The Court disagrees; the control in *Novartis* removed any reference to the target language—"Night Time"—and even added a word that wasn't present in the test group—"Extra[.]"

[7] MET describes a funneling method as following open-ended survey questions with narrower, more targeted questions (such as whether the respondent saw the FDA claim and whether it influenced their purchasing decision). ECF 260, p. 11; *see also* ECF 260-5, 28:15-21 (Mr. Poret described funneling as "the concept of starting broadly and progressively narrowing the focus").

viewed the FDA claim and found that it impacted their likelihood of purchase. ECF 260-4, pp. 18-19. If the absence of follow-up funneling questions was a flaw, it is of the kind and degree of a "technical flaw" that goes to the weight of Mr. Poret's testimony rather than reliability, and is better addressed on cross. *Citizens Fin. Grp., Inc.*, 383 F.3d at 121.

For these reasons, the Court finds Mr. Poret's survey opinions to be reliable.

### III.  Mr. Poret doesn't rely on *ipse dixit*.

MET argues that Mr. Poret's methodology is *ipse dixit* because he doesn't provide any methodology or calculations to support his opinion, and because he determined, without a method, that 20 survey respondents who were employees of companies making athletic apparel (including 5 of Under Armour) didn't affect the results of his survey. ECF 260, pp. 11-13.

Not so. As Under Armour notes and as is supported by the record before the Court, Mr. Poret (1) conducted a reliable survey; (2) analyzed data from that survey using a two-tailed independent samples t-test (a fundamental statistical test); (3) identified the confidence interval he used for that statistical test; (4) provided the underlying data he analyzed; and (5) based his opinion on the results of his analysis of that survey. ECF 269, pp. 13-17. This methodology is spelled out clearly in Mr. Poret's report. ECF 260-4, pp. 20-35.

Mr. Poret's "opinion evidence . . . is [therefore] connected to existing data . . . by [more than] *ipse dixit*[.]" *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Hartle v. FirstEnergy Generation Corp.*, No. 08-1019, 2014 WL 1317702, at *11 (W.D. Pa. Mar. 31, 2014) (Conti, C.J.) (expert testimony admissible where expert "thoroughly explained his methods and the relationship between the data and his conclusions"). And concerning MET's argument that Mr. Poret ignored the 20 respondents, that type of criticism again goes to the weight of his testimony, not its admissibility. *See Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir.

2002) ("[T]he burden of exploring the facts and assumptions underlying the testimony of an expert witness [is] on opposing counsel during cross-examination.").

**IV. The Court won't exclude Mr. Poret's report and testimony under Rule 403.**

Lastly, MET argues that, based on the purported deficiencies set forth above, any probative value a jury could glean from Mr. Poret's report and testimony is outweighed by the dangers of unfair prejudice, confusing the issues, or misleading the jury. ECF 260, at p. 13 (citing Fed. R. Evid. 403).

Balancing the probative value against the prejudice, the Court finds that the probative value is very high, as Mr. Poret's opinions go to a critical element of the Lanham Act claim. On the flip side, there is no danger of unfair prejudice; MET and its expert can certainly explain MET's issues with Mr. Poret's analysis and why its survey expert's opinion is better. And to the extent there might be some confusion, the Court is open to curative jury instructions to assist the jury.[8]

## CONCLUSION

For the reasons discussed above, the Court will deny MET's motion to exclude Mr. Poret's expert report and testimony. ECF 259. An appropriate order follows.

DATED: January 13, 2025                    BY THE COURT:

                                           /s/ *J. Nicholas Ranjan*
                                           United States District Judge

---

[8] In a related but distinct argument, MET suggests that if Mr. Poret is only opining on materiality, then using Mr. Poret's report to attack its own survey expert (Dr. Maronick) could confuse the jury about "the issues a consumer survey is meant to address[.]" ECF 288, p. 5. To the extent that appears to be a problem, this can be clarified with curative jury instructions.