**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MULTIPLE ENERGY TECHNOLOGIES, LLC, | ) ) ) ) |
| Plaintiff, | ) |
| vs. | ) ) |
| UNDER ARMOUR, INC., | ) ) ) |
| Defendant. | ) ) |

2:20-cv-664

## OPINION

Plaintiff Multiple Energy Technologies, LLC brings a variety of claims against Defendant Under Armour, Inc., including violations of the Lanham Act and the Sherman Act. Under Armour moves to exclude Dr. Thomas J. Maronick's supplemental expert report (ECF 242-2) and Dr. John S. Hekman's expert report (ECF 258-1) and supplemental report (ECF 371-4). ECF 257; ECF 345; ECF 370. After carefully considering the parties' submissions, the Court will grant Under Armour's motions to exclude.

## BACKGROUND

MET produces and sells a bioceramic powder called Redwave. ECF 306 at 3. According to both parties, Redwave, like other bioceramic powders, can be infused into fabrics to improve the physical recovery of athletes and other consumers. *See* ECF 292 at 6; ECF 306 at 3. The parties refer to these products as "clothing containing recovery enhancing bioceramics," or "CCREB." ECF 306 at 3; *see* ECF 292 at 3–4, 30.

In 2014, MET began a partnership with Under Armour. ECF 307-2; ECF 307-3; *see* ECF 292 at 6; ECF 306 at 3–4. That partnership led Under Armour to incorporate Redwave into select clothing lines from January 2017 through August 20,

- 1 -

2017, when Under Armour ended its agreement with MET. *See* ECF 292 at 6; ECF 306 at 4–6, 35. MET appears to allege that Under Armour continued to sell Redwave products until 2023 on its website (https://www.underarmour.com/). *See* ECF 307-23 at 3.

Independently, on August 25, 2017, Under Armour began a partnership with one of MET's competitors, Hologenix, to potentially buy Hologenix's bioceramic powder and use that powder, branded Celliant, to create different CCREB products. ECF 306 at 6; ECF 308-15. Under Armour and Hologenix's initial agreement soon expanded into a full-scope license and supply agreement, finalized March 1, 2018. ECF 308-14. As part of this agreement, Under Armour sold both "Recover" and "Rush" lines infused with Celliant—promoting "Recover" "for use after training or competition" to improve athletes' recovery, and "Rush" "as apparel to be worn during exercise or competition in order to aid performance." ECF 292 at 8.

MET brought the present lawsuit against Under Armour, alleging several claims, including, specifically, claims under the Lanham Act and the Sherman Act. *See* ECF 77 at ¶¶ 97–126.

The gist of the Lanham Act claim is that Under Armour violated the statute when it falsely advertised its Celliant-branded line of "Recover" apparel as having some kind of FDA approval (*e.g.*, claiming this line was FDA-approved, and that "Products powered by Celliant have been determined by the FDA to increase localized circulation, leading to faster recovery."). ECF 256-1 at 8; ECF 77 at ¶¶ 97–112; *see* ECF 292 at 7–8. Dr. Maronick's expert opinion is intended to support this claim. ECF 242-2 at 3.

The gist of the Sherman Act claim is that Under Armour exercised monopoly power or attempted to do so by excluding MET from the "CCREB market" by directing

other potential partners in the market to not deal with MET.  ECF 77 at ¶¶ 113–126.
Dr. Hekman's expert opinion is intended to support this claim.

## I.       Dr. Maronick's supplemental survey and report.

At root of the relevant portion of its Lanham Act claim, MET alleges that Under Armour advertised Celliant-infused products with false FDA-related language, where similar webpages selling Redwave-infused products contained no such language.  Specifically, MET alleges that Under Armour made the false claim that, "Products powered by Celliant have been determined by the FDA to increase localized circulation, leading to faster recovery."  ECF 310-12 at 5 (advertisement webpage below).[1]  MET argues that this statement misrepresents a characteristic of those goods, and therefore violates Section 43(a)(1)(B) of the Lanham Act.

---

[1] At the time, the FDA had not determined that Celliant-powered products "increase[d] localized circulation, leading to faster recovery."  ECF 311-27 at 15:12–25.



ECF 310-12 at 5.

To prevail on this claim, MET must have standing and prove the five elements of a Lanham Act claim, including materiality. *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 198 (3d Cir. 2014). Constitutional and statutory standing require a causal connection between the defendant's conduct and the plaintiff's injuries, such that, respectively, those injuries are "fairly traceable to the challenged conduct of the defendant," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016),

- 4 -

*as revised* (May 24, 2016), and "proximately caused by defendant's violations of the [Lanham Act]," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129, 132 (2014).    Materiality similarly requires a showing "that defendant's misrepresentation is likely . . . to influence the purchasing decision" at issue.    *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922 (3d Cir. 1990) (cleaned up).

Here, MET has offered multiple surveys and reports by Dr. Thomas J. Maronick to show the influence of Under Armour's allegedly false statements on consumers' decisions to purchase Celliant-infused CCREB instead of Redwave-infused CCREB.    ECF 256-1 at 4; *see Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 229 (3d Cir. 1990) (finding that consumer surveys are "a common mode of proof" to show materiality); *see Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 644 (N.D. Cal. 2019) (finding that "[m]ateriality is typically proven through consumer surveys which provide direct evidence of a statement's impact").

On April 24, 2026, MET served Dr. Maronick's original survey and report on Under Armour.    ECF 267 at ¶ 2.    In the report, Dr. Maronick made two relevant findings.[2]    First, "a statistically higher percentage of respondents seeing the Under Armour webpage claiming that products 'Powered by Celliant have been determined by the FDA to increase localized circulation, leading to faster recovery' believe th[at] Under Armour products will provide the increased circulation and faster recovery

---

[2] Dr. Maronick's original report was based on two surveys—Survey 1, which was the original version of the supplemental survey at issue here, and Survey 2, which addressed a different page on Under Armour's website selling sleepware.    ECF 267-1 at 5–16.    Survey 2 is no longer at issue because the Court previously excluded it and MET didn't conduct a supplemental version (as it did for the original Survey 1).    *See* ECF 323 at 10–11.

benefits claimed than do respondents who saw language that 'the FDA had not made a determination whether products made with Celliant increase circulation and lead to faster recovery.'" ECF 242-1 at 19. Second, "Under Armour's claims about increased circulation and faster recovery are Important or Very Important in consumers' decision to buy Under Armour products with either Celliant or Redwave fabric." *Id.* at 20.

Under Armour exposed certain flaws contained in the survey during its first deposition of Dr. Maronick on June 18, 2024. ECF 267 at ¶ 3. In response to that deposition (though after the deadline for expert and rebuttal reports had passed), Dr. Maronick "redid the survey," creating the supplemental survey and report at issue. ECF 242-2 at 3–4 ("[I]n response to these critiques, I have tailored the supplemental survey to address Under Armour's concerns."). Dr. Maronick made the following changes: (1) matching the images and the font sizes and lengths of the "FDA determined/FDA has not determined" language shown to respondents across the test and control groups; and (2) rotating the positive and negative answers to both groups' question on the "importance of the claims in consumers' purchase decision." *Id.* at 3–5. MET served this supplemental survey and report on Under Armour on July 9, 2024. ECF 267 at ¶ 5.

The supplemental survey again showed the test group Under Armour's actual landing pages, including the page containing the statement, "Products powered by Celliant have been determined by the FDA to increase localized circulation, leading to faster recovery." ECF 346-5 at 7 (Q12), 9 (Q17). The control group was presented with landing pages that instead contained the statement, "The FDA has not made a determination about whether products powered by Celliant increase localized circulation leading to faster recovery." *Id.* at 12 (Q23), 14 (Q28).





ECF 346-5 at 7.                    ECF 346-5 at 12.

Q17

Here's the statement from one of the Under Armour web pages you just reviewed.  Note the statement about products "Powered by Celliant" at the bottom of the image.



ECF 346-5 at 9.

Q28

Below is a statement from one of the Under Armour web pages you just reviewed.  Note the statement at the bottom of the statement.

ECF 346-5 at 14.

In his supplemental report, Dr. Maronick found that the "design differences" between the original and supplemental surveys "had no effect on consumers'

perceptions of Under Armour's performance claims for its 'Celliant-Powered' products" and "played no role in assessing consumers' reactions to claims made by Under Armour."  ECF 242-2 at 8.  The Court therefore construes Dr. Maronick's conclusions to support the same findings that he made in his original report—that a greater percentage of respondents viewing the allegedly false FDA claim believed that Under Armour's clothing would increase circulation and accelerate recovery, and that the FDA claim was important or very important to consumers' decisions to purchase Celliant-powered or Redwave-powered CCREB.

On July 15, 2024, Under Armour moved to strike the supplemental survey and report under Federal Rules of Civil Procedure 26(a), 26(e), and 37(c)(1).  ECF 241, ECF 242.  On July 22, 2024, Under Armour moved to exclude Dr. Maronick's original survey and report based on its numerous flaws.  ECF 255, ECF 256.

After receiving briefing on both the motion to strike (ECF 266, ECF 268) and the motion to exclude (ECF 272, ECF 279), the Court denied the former (ECF 325) and granted the latter (ECF 323).  The Court found that the supplemental survey's procedural defects were outweighed by its importance to MET's Lanham Act claim and the Court's ability to cure any prejudice by reopening discovery.  ECF 324.  The Court reopened discovery, permitting Under Armour to again depose Dr. Maronick— this time about the supplemental survey and report.  ECF 325.  Regarding the motion to exclude the original report, the Court agreed with Under Armour that the underlying survey's flaws made it and its accompanying report so unreliable as to require exclusion.  ECF 323 at 7–10.

After completing its second deposition of Dr. Maronick, Under Armour moved to exclude the supplemental survey and report under grounds similar to its motion to exclude Dr. Maronick's original survey and report.  ECF 345, ECF 346.  Under

Armour argued that the survey was still unreliable because, though Dr. Maronick corrected several of the original survey's flaws, many others remained. ECF 346 at 4–5. Then the Court received briefing on the motion (ECF 354, ECF 360).

## II.    Dr. Hekman's supplemental survey and report.

Dr. Hekman is MET's antitrust expert. *See* ECF 274 at 1. MET hired Dr. Hekman to assess "whether the actions of [Under Armour] in the market for clothing containing recovery enhancing bioceramics (CCREB) was an exercise of anticompetitive monopoly power." ECF 258-1 at 4.

Dr. Hekman concluded that: (1) the CCREB market is the appropriate market in this case (*i.e.*, clothing that contains "infrared material"); (2) Under Armour has market power in the CCREB market; (3) Under Armour excluded MET from the market; (4) those exclusionary actions had anticompetitive effects on the market; and (5) certain economic damage calculations by Mr. Wrobel qualified as antitrust damages. ECF 258-1 at 4. In his supplemental report, Dr. Hekman offered five supplemental opinions to add onto and support his original report based on previously undisclosed information. ECF 371-4 at 3. Dr. Hekman found that: (1) Under Armour charges significantly higher prices for its bioceramic-infused apparel than the closest substitute from the same Under Armour sports apparel; (2) Under Armour earned higher profits from its apparel compared to other products in its sports apparel; (3) the cross-elasticities between Under Armour's bioceramic-infused products and the closest competitors have a value of zero, indicating no substitution; (4) the SSNIP test shows that a monopolist of bioceramic apparel can establish and profitably maintain a higher price for the product; and (5) the elasticity of supply for products competing

with Under Armour's bioceramic-infused products is near zero, meaning other suppliers are not a constraint on Under Armour's monopoly power. *Id.*

## STANDARD OF REVIEW[3]

In considering Under Armour's motions to exclude Dr. Maronick and Dr. Hekman's expert opinions, the Court applies the following standard. An expert witness's testimony is admissible only if (1) the witness is qualified to testify as an expert; (2) the testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) the testimony is relevant to the facts of the case such that it will assist the trier of fact. *See UGI Sunbury LLC v. A Permanent Easement*, 949 F.3d 825, 832 (3d Cir. 2020); *see also Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). If any of these three requirements are not satisfied, the expert's testimony is inadmissible under Rule 702 of the Federal Rules of Evidence, and the Court, performing its role as "gatekeeper[,]" must exclude the evidence. *Daubert*, 509 U.S. at 597 (1993); *see also UGI Sunbury*, 949 F.3d at 832 (the Court's role includes duties

---

[3] The Court decides the motions to exclude on the record before it, without holding separate in-person *Daubert* hearings. The Court finds that no hearing is necessary because: (1) no party has requested one (and the Court previously expressly ordered any party to do so if it believed one was necessary, ECF 290); (2) the Court has before it extensive briefing, reports, supplemental reports, and deposition transcripts of the experts; and (3) the Court doesn't view any of the analysis here to turn on credibility determinations. At one point, the Court considered holding a hearing as to the motion to strike Dr. Hekman's report (ECF 322), but given the supplemental materials since submitted, the Court finds that no hearing is necessary. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 151–55 (3d Cir. 2000) ("trial courts retain significant discretion to determine in each instance the procedure it should follow in making preliminary determinations regarding admissibility of evidence.") (cleaned up); ECF 326; *cf.* ECF 323 (excluding Dr. Maronick's first report without a hearing after neither party requested one).

to "check the proposed testimony is reliable" and "ensure [it] is sufficiently tied to the facts of the case, so that it fits the dispute and will assist the trier of fact.") (cleaned up).  The proponent of expert testimony bears the burden to show by a preponderance of the evidence that their expert's opinion is reliable.  *Oddi*, 234 F.3d at 144.

To be sufficiently reliable, an expert's testimony need not have "the best foundation, or even . . . [be] supported by the best methodology or unassailable research."  *UGI Sunbury*, 949 F.3d at 834 (citation omitted).  Rather, the testimony must be supported by "good grounds," using a reliable methodology.  *See id.*  A court considers various factors to determine whether the testimony is supported by "good grounds," including: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.  *See id.*

### DISCUSSION & ANALYSIS

The Court first considers Dr. Maronick's survey and report and next looks to Dr. Hekman's reports.

### I.    Dr. Maronick's supplemental survey and report are inadmissible.

Under Armour moves to exclude Dr. Maronick's supplemental survey under Federal Rules of Evidence 702, 703, and 403.  ECF 345.  Specifically, among other

arguments,[4] Under Armour urges exclusion because the supplemental survey: (a) uses a fundamentally inadequate control; (b) materially distorts marketplace conditions; and (c) doesn't mitigate non-response bias or identify a target population. ECF 346 at 1–2. With slight variations across its counterarguments, MET responds that any flaws are insignificant and should go to weight rather than admissibility. ECF 345.

In its role as a "gatekeeper," the Court finds that flaws (a)–(c) are collectively fatal under Rule 702, and so must exclude the evidence. *See Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 121 (3d Cir. 2004); *Merisant Co. v. McNeil Nutritionals, LLC*, 242 F.R.D. 315, 320 (E.D. Pa. 2007) (finding that while "mere technical flaws" go to weight rather than admissibility, "fatal flaws" making a survey "so flawed that it would be completely unhelpful or harmful to the trier of fact" require exclusion).

## A. The supplemental survey uses an improper control.

The Court agrees with Under Armour that, despite certain modifications to Dr. Maronick's original survey, three problematic differences between the test and control surveys remain in the supplemental survey which requires its exclusion. ECF 346 at 10–11. These differences, which "artificially [drew respondents' attention] to the fine-print language at issue[,]" ECF 346 at 4, make it "impossible to determine [the cause of] any disparity between the respondents' reactions to them." *See In re Elysium Health-ChromaDex Litig.*, No. 17-7394, 2022 WL 421135, at *13 (S.D.N.Y.

---

[4] Under Armour also argues that the survey doesn't "fit" and is therefore not relevant, and would be so confusing and unfairly prejudicial to a jury that it must be excluded under Rule 403. ECF 346 at 17–20. Finding the survey unreliable under Rule 702, the Court need not address these alternative arguments.

Feb. 11, 2022); *Pa. State Univ. v. Vintage Brand, LLC*, 715 F. Supp. 3d 602, 628-29 (M.D. Pa. 2024), *clarified on denial of reconsideration*, No. 21-01091, 2024 WL 1416505 (M.D. Pa. Apr. 2, 2024).

First, in question 23, the control survey focused its respondents on the fine-print text addressing the FDA claim at issue by framing that text in a white box. ECF 346-5 at 12. No box surrounded the FDA-related text in the test group's same question (Q12), which contained the webpage viewed by Under Armour's actual consumers. *Id.* at 7.

 

ECF 346-5 at 7.                    ECF 346-5 at 12.

Similarly, for question 28, the control survey's direction to respondents to "[n]ote the statement about products 'Powered by Celliant' at the bottom of the statement[]" was underlined, increasing the likelihood respondents would read the fine-print statement explaining that the FDA had not yet determined whether Celliant improved athlete recovery. *Id.* at 14. By contrast, within the control survey's equivalent question (Q17), the same direction to "Note the statement about products

"Powered by Celliant" at the bottom of the image[]" was not underlined. *Id.* at 9. Both of these differences are significant flaws because they have the tendency to skew the effects the supplemental survey specifically intended to measure.

Q17

Here's the statement from one of the Under Armour web pages you just reviewed. Note the statement about products "Powered by Celliant" at the bottom of the image.



ECF 346-5 at 9.

Q28

Below is a statement from one of the Under Armour web pages you just reviewed. <u>Note the statement at the bottom of the statement.</u>



ECF 346-5 at 14.

Third, in all instances, the test survey used improper negative language—stating that "[t]he FDA *has not made* a determination about whether products powered by Celliant increase localized circulation leading to faster recovery." *See, e.g.*, ECF 346-5 at 14 (Q28, shown above) (emphasis added). The Court previously found such language flawed. ECF 323 at 8 (citing *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 511 F. App'x 81, 85 (2d Cir. 2013); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 590–591 (3d Cir. 2002); *Procter & Gamble Pharms., Inc. v. Hoffmann-LaRoche Inc.*, No. 06-34, 2006 WL 2588002, at *24 and n.68 (S.D.N.Y. Sept. 6, 2006), *Shari Seidman Diamond*,

- 14 -

Reference Guide on Survey Research, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 359, 399 (Fed. Jud. Ctr. 3d ed. 2011)).

In its ruling on Dr. Maronick's original survey, the Court informed the parties that, "if the [survey's] only flaw [] was that the test image used the positive language and the control used the negative language, the Court would conclude that this was more of a weight issue." ECF 323 at 8–9, n.4. But here, again, the negative language is not the only issue. The variations across questions 12, 17, and 28 amplify the negative language's skewing effects. Together, these differences make the control improper.

**B. The supplemental survey distorted marketplace conditions.**

The Court also agrees with Under Armour that Dr. Maronick's supplemental survey inappropriately distorted market conditions by flagging the variable about which the survey intended to ask respondents—the FDA claim—without having properly screened out respondents who otherwise would have "paid no attention" to the fine-print claim. ECF 346 at 11–13. MET's defenses—that the supplemental survey properly used funneling and replicated market conditions; that the law doesn't support Under Armour's argument; and alternatively, that the distortion only affected a small portion of the supplemental survey and should go to weight—are unpersuasive. ECF 354 at 10–11.

In the survey, Dr. Maronick first properly displayed test and control webpages that included the FDA claim in fine print. ECF 346-5 at 7 (Q12), 12 (Q23). After those webpages, he "funneled" respondents by asking questions about magnified pictures of the fine-print language. *Id.* at 9 (Q17), 14 (Q28). And in between, Dr. Maronick asked a question to screen out certain respondents—those who "[w]ere [not] able to see the images clearly." *Id.* at 7 (Q13), 12 (Q24). But this question didn't filter

- 15 -

out respondents who, while physically able to see the webpages, didn't notice or read the fine-print text.[5]  By failing to properly "screen[] out those respondents who d[id] not have an opinion on the issue under investigation before asking the [survey's core] question[s]" about the FDA claim, the survey materially distorted marketplace conditions.  *See Procter & Gamble*, No. 06-34, 2006 WL 2588002, at *23 n.65 (citing *Diamond*, Reference Guide on Survey Research, at 273); *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 134 (3d Cir. 1994) ("Rorer") ("A survey is not credible if it relies on leading questions which are 'inherently suggestive and invite guessing by those who did not get any clear message at all.'"); *Novartis*, 290 F.3d at 591 (considering "whether [a] survey is properly filtered to screen out those who got no message from the advertisement" and "whether the questions are leading or suggestive" as part of the reliability analysis).

MET attempts to distinguish Third Circuit precedent by pointing out that neither *Rorer* nor *Novartis* dealt with *Daubert* motions or admissibility.  Instead, these cases analyzed whether the surveys at issue "were sufficient to carry the

---

[5] There is no way to know what percent of the respondents fell into this category, but Dr. Maronick's explanation of why he later flagged the FDA claim is telling:

> *Deposition Question:* "So I think you said yes in that answer [] that you focused the respondents on a particular portion of the whole advertisement and the reason why you did that is because, absent you doing that, the respondents may not even have seen the FDA claim because it was buried in the Under Armour web pages?"
> *Dr. Maronick's Answer:* "This is correct . . . Because in my judgment you had – with all of that verbiage in there, I wanted them to focus. . . on that particular language."

ECF 364-4 at 12:3-14; *see also* ECF 364-4 at 12:3-13:4, 14:3-9, 15:5-14.

Without this funneling, the respondents who didn't notice the fine-print FDA language may have been unable to answer the survey's remaining questions.

plaintiff's burden of showing that the advertising in question was misleading" on the merits; applied here, any distortions should therefore go to weight, not admissibility. ECF 354 at 15–16.

True, these cases didn't create a bright-line rule that any survey-question spotlighting without filtering is inadmissible. But both cases support Under Armour's argument that Dr. Maronick's survey distorted marketplace conditions; and that distortion here is of such a kind and degree to warrant exclusion under Rule 702. *Rorer*, No. 91-7099, 1993 WL 21239, at \*11 (E.D. Pa. Jan. 29, 1993) (finding that a survey was "deficient" for failing to filter our respondents), *aff'd sub nom.* 19 F.3d at 132-36; *Novartis*, 290 F.3d at 591–93 (finding a general filter question proper only because it didn't flag the allegedly misleading message or otherwise lead respondents to a particular response); *see Parks, LLC v. Tyson Foods, Inc.*, 186 F. Supp. 3d 405, 418 (E.D. Pa. 2016) (applying *Rorer* and *Novartis* to hold that consumer false advertising survey was unreliable because it failed to filter out survey participants that didn't receive a message from the advertisement at issue), *judgment entered*, No. 15-946, 2016 WL 2646739 (E.D. Pa. May 10, 2016), *and aff'd sub nom.* 863 F.3d 220 (3d Cir. 2017).

Finally, though the Court agrees with MET that the questions before the portion of the survey magnifying the FDA claims remain unaffected, that portion of the survey still suffers from its improper control. And even if the Court were to permit that portion of the survey alone, it doesn't support the conclusions of Dr. Maronick's supplemental report, which rely primarily on comparisons of questions that came after the spotlighting. *See* ECF 242-2 at 5–8.

- 17 -

### C. The supplemental survey failed to account for non-response bias and identify a target population.

Under Armour provides two more reasons that the supplemental survey is inadmissible: it does not mitigate non-response bias or identify a target population in sufficient detail. ECF 346 at 2. MET responds by attempting to downplay the effects of these flaws, contending that Dr. Maronick "did not believe that non-response [bias] would have had any noticeable effect on his survey," and that the survey targeted "consumers in the market for performance-enhancing clothing." ECF 354 at 8, 14.

Just as with Dr. Maronick's first survey, ECF 323 at 9–10, the Court finds that these flaws continue to support Under Armour's case for excluding Dr. Maronick's report. Though, as argued by MET, the Court previously noted that "flaws in an expert's methodology [like those at issue] usually go to the weight, and not to admissibility," it stated, in the same sentence, that "a failure to address non-response [bias] can support exclusion in conjunction with other flaws," and, in the following paragraph, that Dr. Maronick's failure to adequately identify a target population "supports exclusion." ECF 323 at 9; *see Hostetler v. Johnson Controls*, Inc., No. 15-226, 2016 WL 3662263, at \*12 (N.D. Ind. July 11, 2016) (survey reliability as dependent on an analysis of non-response bias); *Parallel Networks Licensing, LLC v. Microsoft Corp.*, No. 13-2073, 2017 WL 11557655, at \*5 (D. Del. Feb. 22, 2017) (finding that a "failure to identify the population from which the panel was drawn, and to consider whether there were any relevant differences between the survey's population frame and the target population" affects reliability).

\*\*\*\*\*

Together, these flaws render Dr. Maronick's survey inadmissible under Rule 702. And because Dr. Maronick's survey is inadmissible, so too is his accompanying report. *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999) ("[I]f the data underlying

- 18 -

the expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded."). The Court therefore must exclude this evidence.

## II.    Dr. Hekman's expert opinions are inadmissible.

Under Armour argues that each of Dr. Hekman's opinions should be excluded. The Court agrees.

To begin with, some background is necessary as to Dr. Hekman's expert opinions. He served an original expert report, which essentially defined the relevant product market as the "CCREB market"—*i.e.*, apparel containing bioceramic powder. ECF 258-1 at 4. He also opined that Under Armour had monopoly power in this market. *Id.*

MET argued that Dr. Hekman didn't have certain Under Armour price and sales data when preparing his report, so the Court allowed Dr. Hekman to obtain that information and prepare a supplemental report. *See* ECF 325.

As part of the supplemental report, Dr. Hekman claimed no new opinions; rather, he stated that the "purpose of this supplemental report is to supplement my opinions with additional support from the new documents and testimony that was not previously available before I submitted my previous report, including further analysis of the cross elasticity estimates and SSNIP test." ECF 371-4 at 3. This is important, because Under Armour argues that it is somewhat unclear whether Dr. Hekman altered his definition of the product market in his supplemental report. ECF 371 at 17. Because of how MET and Dr. Hekman himself characterized the supplemental report, the Court considers the supplemental report as simply

- 19 -

additional explanation, and not new ultimate opinions as to the definition of the relevant market.

## A. Dr. Hekman's opinion about the relevant market is inadmissible.

As a threshold matter, to bring a Section 2 monopolization claim, a plaintiff has to define a relevant market. *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). The relevant market must be the relevant product market and have a geographical scope. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962). An expert opinion is often critical (though not always necessary) in defining the relevant market, because that usually can only be done quantitatively. *See Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 526 (W.D. Pa. 2019) (Cercone, J.) (noting that expert testimony is crucial for market analysis). That is, an expert's opinion on the relevant market must be "'determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" *See U.S. Horticultural Supply v. Scotts Co.*, 367 F. App'x 305, 309 (3d Cir. 2010) (quoting *Brown Shoe*, 370 U.S. at 325). An expert's opinion is "legally insufficient" where he defines a market without considering the "reasonable interchangeability and cross-elasticity of demand." *Id.* at 310 (cleaned up). Here, because Dr. Hekman's market analysis is so flawed, it is entirely unreliable.

To begin with, Dr. Hekman's original report only utilized qualitative *Brown Shoe*-type factors to define the market. *See* ECF 274 at 9. Dr. Hekman's methodology, in lieu of calculating cross-elasticity of demand, was to look "at whether the prices for bioceramic clothing are very close to their substitutes, which would be the same garment without bioceramic content"; "if the prices are not close, then they do not appear to be close substitutes." ECF 258-2 at 18:18–19:6. But looking just at the price differential between bioceramic clothing and non-bioceramic clothing is not

a reliable substitute for the cross-elasticity of demand, and to the extent that there's evidence of "distinct prices," this only goes to one of the *Brown Shoe* "practical indicia" factors. *See In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 993 (C.D. Cal. 2012) (finding that an expert's opinion on market definition was not reliable when it focused almost entirely on a single *Brown Shoe* factor). To the extent that he considered two other *Brown Shoe* factors—public recognition of the market and the peculiar characteristics of the market—the Court finds that this is unsupported speculation based on select price comparisons, a few web searches and articles, and opinion evidence from a couple of Under Armour employees. ECF 258-1 at 6–10. In sum, Dr. Hekman's analysis didn't reliably determine the "reasonable interchangeability and cross-elasticity of demand." *See U.S. Horticultural Supply*, 367 F. App'x at 309.

Dr. Hekman's supplemental report adds more quantitative muster to his analysis by considering the cross-elasticity of demand for Under Armour's bioceramic-infused products versus Under Armour's other, non-bioceramic-infused products and applying the SSNIP test to his proposed market. *See* 371-4 at 3. But the supplemental report does not save his conclusion on the relevant market because both analyses are unreliable.

The Court starts with the cross-elasticity of demand calculations. These calculations are meant to demonstrate which products are substitute goods with each other and included in the market, and which products are not reasonably interchangeable and excluded from the market. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). Dr. Hekman bases his analysis by comparing Under Armour's bioceramic-infused products with its other products without bioceramic powder. ECF 371-4 at 7–11; *see* ECF 371-1 at 35:1–39:11.

- 21 -

Importantly, Dr. Hekman did not consider any sales of any products, bioceramic or not, from any of Under Armour's competitors, even though the same pricing model that he used provided him with competitors' sales figures. ECF 371-1 at 35:1–39:11.

The Court finds that Dr. Hekman's cross-elasticity of demand analysis is unreliable, for at least two reasons.

First, to the extent that his analysis is meant to serve as a proxy for his CCREB market conclusion, Dr. Hekman never explains why internal comparisons of Under Armour own products is the appropriate proxy. Dr. Hekman does not opine on why comparing Under Armour clothing products with bioceramic powder with Under Armour clothing products without bioceramic power supports the conclusion that bioceramic clothing products, regardless of the manufacturer, are a distinct market. His opinion doesn't cite to any economic literature, theory, or studies that support this type of intra-firm analysis for a cross-elasticity of demand test.

Second, his cross-elasticity of demand analysis is flawed on its own. Dr. Hekman failed to consider the available data of Under Armour's competitors, instead only using intra-firm pricing data. Dr. Hekman failed to explain why he excluded competitor products from his analysis—his supplemental report doesn't mention competitor products at all. *Compare Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, No. 20-2274, 2022 WL 3225366, at \*6 (M.D. Fla. Aug. 10, 2022) (expert's opinion accepted after explaining why certain substitute products were excluded), *with In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-1628RMBMHD, 2009 WL 3241401, at \*7 (S.D.N.Y. Sept. 30, 2009) (expert's opinion rejected after failing to consider meaningful substitute products). There's also evidence that Dr. Hekman assumed that his underlying data (a pricing model from Under Armour) captured cross-price effects, when in fact, the data did not. *See* ECF 371-3 at 17; ECF 376-6 at

- 22 -

22:15–25, 23:1–13.  In sum, Dr. Hekman's cross-elasticity of demand analysis is too unreliable to support his market opinion or stand on its own.

Turning to Dr. Hekman's SSNIP analysis, the Court finds that it, too, is unreliable.  The hypothetical monopolist test is "[a] common method employed by courts and the FTC to determine the relevant geographic market." *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016).  The test asks whether a hypothetical monopolist "could [profitably] impose a small but significant non-transitory increase in price ("SSNIP") in the proposed market." *Id.*  If the monopolist can profitably increase the price of the monopolized product, not just his own product, then the market is properly defined.  *Id.*  But if the SSNIP, typically about a 5% increase, would cause consumers to switch to different products outside the proposed market, then the proposed market is insufficient because it's too narrow.  *Id.*  The SSNIP test is another tool to define a market.

To begin with, Dr. Hekman's SSNIP test is incomplete—that is, it doesn't measure the change that happens to bioceramic-infused products based on an increase in price.  ECF 380-1 at 31:10–11, 34:7–14.  As Dr. Hekman acknowledged, a reliable SSNIP test should focus on whether a hypothetical monopolist in the proposed market could increase the price of the market product and increase his profits.  *Id.* at 15:17–25.  It would answer the question: if Under Armour raised the price of bioceramic products, could Under Armour profitably maintain that higher price, or would it lose sales such that the price increase would be unprofitable?  The SSNIP test in the report doesn't answer this question.

More fundamentally, the methodology to reach his (incomplete) opinion is entirely unsupported.  Again, the method focuses narrowly and too basically on observing that there was a price premium for the Under Armour's bioceramic-infused

products.  The fact that these products are more profitable than Under Armour's products without bioceramic powder doesn't reveal anything about the revenue trade-off that the SSNIP test is designed to capture.  A proper SSNIP analysis is simply more economically rigorous, generally relying on things like market studies, consumer patterns, and economic modeling.  *See, e.g., Sumotext Corp. v. Zoove, Inc*, No. 16-CV-01370-BLF, 2020 WL 6544410, at *7, *9 (N.D. Cal. Nov. 6, 2020), *aff'd sub nom. Sumotext Corp. v. Zoove, Inc.*, No. 20-17245, 2021 WL 4988024 (9th Cir. Oct. 27, 2021) (finding that the expert's SSNIP test was unreliable where he based his conclusion on just looking at the actual prices of different goods and how far apart the prices were).  The Court finds that Dr. Hekman's SSNIP test lacks any such rigor, is unreliable, and cannot support Dr. Hekman's market conclusion.[6]

In sum, Dr. Hekman has not supported his CCREB market opinion with a reliable basis.  Dr. Hekman's market opinion is inadmissible.

### B. Dr. Hekman's opinions about market power are inadmissible.

Under Armour argues that Dr. Hekman's original report on market power is similarly flawed.  ECF 258 at 11–12.  According to Under Armour, Dr. Hekman's lack of mathematical calculations and lack of understanding of competitors' market shares make his opinions unreliable.  *Id.*  Further, Under Armour argues that the market

---

[6] The Court finds that Dr. Hekman's analysis from his supplemental report on the pricing and profit margins of Under Armour's bioceramic-infused products compared to its other products is credible.  *See* ECF 371-4 at 3–9.  But conclusions about intra-firm pricings and profit margins aren't themselves enough to reliably establish a market here.  *See also id.* at 46:21–47:1.  In other words, Dr. Hekman's opinion on intra-firm pricing, standing alone, would have no material effect on the antitrust claims here.

power opinions are unreliable because they fail to consider the barriers to entry in the market. *Id.*

MET argues that strict data is not necessary to support an opinion on market power. ECF 274 at 22. MET believes that Dr. Hekman provided a reliable opinion focusing on the most significant competitors and overall landscape, like barriers to entry. *Id.*

The Court agrees with Under Armour that Dr. Hekman's market power opinions are unreliable. An expert's opinion on market power is tied to the support for the relevant market. *See FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 539 (E.D. Pa. 2020). And as the Court has found, Dr. Hekman's opinion on the relevant market is unreliable. So too here.

Dr. Hekman's original report was devoid of any quantitative or economic analysis to support his conclusion that Under Armour possessed market power. He acknowledged that he couldn't conclude "with any specificity" how many participants are in the market, or how many sales other bioceramic clothing sellers make. ECF 258-2 at 15:3–21. He also gave varying estimates of Under Armour's market share— from "nearly 100 percent" to "over 90 percent" to "over 70 percent." *Id.* at 52:7–53:16, 192:3-25. Without accounting more precisely for who the other players in the market are and their approximate market shares, the conclusion that Under Armour has a predominant market share is unreliable. *See Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222, 1240–42 (N.D. Ala. 2000) (expert's opinion on market power unreliable when he made no effort to determine market shares, and his market power analysis was otherwise illogical and inconsistent), *aff'd*, 284 F.3d 1237 (11th Cir. 2002).

In his supplemental report, Dr. Hekman attempted to cure his lack of economic analysis by opining that "the elasticity of supply for products competing with Under

- 25 -

Armour's [bioceramic-infused] products is low or zero." ECF 371-4 at 3. But, again, Dr. Hekman never conducted any calculations to support this claim.

Dr. Hekman's biggest problem for his opinions on market power is his lack of analysis and opinion as to barriers to entry. Dr. Hekman conceded that barriers to entry "are important . . . in terms of the ability to monopolize a market." ECF 380-2 at 3:23–4:10; *see Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 526 (W.D. Pa. 2019) (Cercone, J.) (noting the importance of barriers to entry when considering monopoly power); *Barr Lab'ys, Inc. v. Abbott Lab'ys*, 978 F.2d 98, 113 (3d Cir. 1992) (noting the lack of barriers to entry in the relevant market when finding that defendant didn't and couldn't monopolize the market).

But then Dr. Hekman agreed that he "[didn't] know what the barriers to entry are other than being able to access bioceramic powder and . . . know[ing] the technology for printing it on clothing." ECF 380-2 at 4:22–25. He never opined on how high these barriers would be. Other than relying on Under Armour's representation that the other players in the CCREB market are *de minimis*, he never looked at the market shares of those smaller players and couldn't say how much sales those smaller players are making, or the ability of newer, smaller firms to ramp up their production of CCREB clothing in response to a price increase in Under Armour's bioceramic-infused products. ECF 380-1 at 142:1; s*ee PennPac Int'l, Inc. v. Rotonics Mfg., Inc.*, No. 99-2890, 2001 WL 569264, at *5 (E.D. Pa. May 25, 2001) (granting summary judgment where plaintiff failed to produce evidence to determine defendant's market share, despite arguing that the market is dominated by four major suppliers).

Also, as to barriers to entry, Dr. Hekman could not say: (1) what machinery is necessary to make bioceramics clothing, (2) whether there is anything unique about

facilities that are needed to make bioceramics clothing relative to facilities used to make clothing without bioceramics, and (3) whether Under Armour's competitors (like Nike) and their manufacturers would be able to use the same facilities and equipment to make apparel with and without bioceramics. ECF 380-1, 92:18–97:5. Dr. Hekman never explained why Under Armour's competitors couldn't partner with bioceramic powder suppliers to sell their own bioceramic apparel, notwithstanding Under Armour's exclusive contract with Celliant. In sum, Dr. Hekman's analysis is too deficient and untethered to any sound economic methodology to reliably establish market power.

### C. Dr. Hekman's opinions about exclusionary conduct and anticompetitive behavior are inadmissible.

Dr. Hekman concluded that Under Armour engaged in exclusionary conduct and anticompetitive behavior because it used its "significant monopoly power" "in the CCREB market." ECF 258-1 at 13. Because this opinion relies on Dr. Hekman's previous opinions on market and market power, the Court finds that this opinion to be unreliable consistent with its reasoning above.[7]

### D. Dr. Hekman's opinion about antitrust damages is inadmissible.

Dr. Hekman opined that Mr. Wrobel's calculations (a separate expert, *see* ECF 330) of Lanham Act damages "can also be characterized as antitrust damages." ECF 258-1 at 14. There is no reliable method put forth by Dr. Hekman on this.

---

[7] Dr. Hekman also mentions Under Armour's "false advertising of Celliant" as being anticompetitive behavior. ECF 258-1 at 13. But Dr. Hekman neither provides the relevant facts, data, method, nor application of a method for the Court to assess the validity of this basis. Because nothing in Dr. Hekman's supplemental report saves his conclusion either, Dr. Hekman's opinion cannot reliably be based on this reasoning, either.

Dr. Hekman never offers why the two damage estimations are the same and why Mr. Wrobel's damage calculations can also serve as antitrust damage calculations.  *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012) ("[A]n expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable.").  The same issue is true in his supplemental report.  *See* ECF 371-4 at 14.

Dr. Hekman's opinion about antitrust damages must be excluded because it fails to establish a connection between Under Armour's allegedly anticompetitive conduct and the calculations that Mr. Wrobel made with respect to the Lanham Act claim.

*****

In sum, each of Dr. Hekman's opinions are unreliable.  Dr. Hekman's original report and supplemental report are inadmissible.

## CONCLUSION

For these reasons, the Court will grant Under Armour's motion to exclude Dr. Maronick's supplemental survey and report (ECF 345) and Under Armour's motions to exclude Dr. Hekman's report (ECF 257) and supplemental report (ECF 370).[8]  A separate order follows.

DATED this 13th day of July, 2026.

BY THE COURT:

/s/ J. Nicholas Ranjan
United States District Judge

---

[8] Because the Court is excluding Dr. Hekman's supplemental report, Under Armour's motion to strike (ECF 355) will be denied as moot.

- 28 -