**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MULTIPLE ENERGY TECHNOLOGIES, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiff, | |
| v. | |
| UNDER ARMOUR, INC., | |
| Defendant. | |

2:20-CV-664

## <u>OPINION</u>

There is no material dispute that Tom Brady is the GOAT. Part of his unparalleled success was due to his well-known but rather alternative nutrition, fitness, and recovery methods, which he helped to market more broadly as part of his company, TB12. One of these methods involved bioceramic powder, which is a substance that is integrated into clothing, and, when worn, allegedly improves sleep and muscle recovery. This powder is what this case is about.

In 2014, Tom Brady introduced the parties in this case, MET and Under Armour. MET made a type of bioceramic powder called Redwave. Under Armour, of course, makes athletic apparel. They entered into essentially an exclusive supply agreement, and by early 2017, the parties launched their bioceramic sleepwear product at a consumer show, Tom Brady endorsed the product, and MET and Under Armour signed a short-term agreement to work to bring the product to market.

Then everything changed. The agreement ended. Under Armour changed course; it partnered with another producer of bioceramic powder, a company called Hologenix that made a bioceramic powder called Celliant. According to MET, Under Armour falsely marketed its new apparel containing Celliant as essentially being "FDA approved" when it wasn't, encouraged some of its manufacturing partners not to deal with MET, and used confidential information from MET all the while.

- 1 -

As a result, MET brought the present lawsuit against Under Armour, claiming violations of the Lanham Act and Sherman Act, as well as numerous state-law claims. The parties have filed competing summary-judgment motions, now before the Court.

On careful review, the facts and the law bear this out: at most, this is a tortious-interference case. MET has adduced sufficient disputed evidence that Under Armour may have interfered with its ability to partner with TB12 and a few other textile manufacturing partners. So the tortious-interference claims (Counts V and VI) may proceed to a jury. The rest of the claims are factually or legally deficient (or both), so the Court will enter judgment on them in Under Armour's favor.

## BACKGROUND

As noted above, this case concerns bioceramic powder. It's a substance integrated into clothing, and both MET and Under Armour claim that it improves sleep and muscle recovery. *See* ECF 292 at 6 (Under Armour); ECF 306 at 3 (MET). MET manufactures a bioceramic powder called Redwave, and MET sells its product to textile manufacturers that incorporate Redwave into select clothing items. ECF 293-6 at 8:3–9:22, 11:21–12:7. Under Armour doesn't make its own bioceramic powder, meaning that it has to contract out with suppliers to incorporate the powder into its clothing. *See* ECF 292 at 3. MET refers to the relevant market as "clothing containing recovery enhancing bioceramics," or "CCREB." ECF 306 at 3.

In 2014, MET and Under Armour explored a partnership, where Under Armour would incorporate Redwave into its clothing. ECF 310-23 at 5:3–7:9. The two companies were introduced by then-active NFL quarterback Tom Brady and his company, TB12. *Id.* Under Armour and TB12 agreed to use MET's Redwave, and Under Armour signed Mutual Non-Disclosure and Mutual Transfer Agreements with MET. ECF 307-2; ECF 307-3. Because of their partnership, MET shared with Under Armour its formula and process of manufacturing Redwave. ECF 310-25 at 6:2–10:20, 12:1–13:22, 16:8–19:25; 20:3–21:25.

- 2 -

MET represents that it spent the next several years developing a product line with Under Armour. *See* ECF 306 at 3–4. In January 2017, the parties launched their sleepwear product at the Consumer Electronics Show. *See* ECF 309-4; ECF 311-2 at 8:2–11; ECF 311-24 at 2. Tom Brady endorsed the product, and MET and Under Armour signed a short-term supply agreement to work together in the CCREB market. ECF 311-3 at 9:4–10:3; ECF 307-13. Part of the agreement was that Under Armour would work exclusively with MET in the CCREB market. ECF 307-13 at ¶ 3.

In August 2017, MET and Under Armour's partnership ended. Under Armour ended its exclusivity period with MET in line with the procedures in the short-term agreement. ECF 308-20.

But Under Armour did not exit the CCREB market. In August 2017, Under Armour launched its partnership with Hologenix, another producer of bioceramic powder. *See* ECF 308-15 at 2–4. Hologenix's product is called Celliant, and Under Armour released its first product line with Celliant in 2018. ECF 306 at 5–6; *see* ECF 308-14 at 2–22. After ending its relationship with MET, Under Armour encouraged TB12 and two other textile manufacturing partners (American Textile and Milliken) to use Celliant bioceramic powder, not MET's Redwave. ECF 311-4 at 15:6–18:4, 19:17–25, 31:23–35:9; ECF 311-1 at 5:7–6:18, 8:20–11:18, 12:1–12:24. As a result, those companies did not work with MET or use Redwave after Under Armour's request. ECF 311-4 at 18:5–23, 32:3–33:17, 45:6–19.

Under Armour promoted its new product line infused with Celliant. In doing so, Under Armour made several statements about the FDA's endorsement of Celliant that MET alleges amounts to false advertising. Under Armour promoted Celliant as "FDA approved" or "FDA designated" to TB12.[1] ECF 307-21 at 2, 4–8; ECF 310-19

---

[1] Hologenix—the maker of Celliant—isn't a party to this case. MET sued Hologenix and its CEO in other separate cases. *See* ECF 293-34; ECF 293-35.

at 19:12–21:13, 25:1–24; ECF 310-30 at 6:11–7:25; ECF 311-3 at 7:15–8:13. And Under Armour promoted on its website that the FDA determined that Celliant increases localized circulation, leading to faster recovery. *See* ECF 308-11 at 5; ECF 309-9 at 3; ECF 309-10 at 3; ECF 309-11 at 5; ECF 309-12 at 5; ECF 309-13 at 4; ECF 309-14 at 4; ECF 309-18 at 3; ECF 310-8 at 3; ECF 310-9; ECF 310-12 at 5; ECF 310-14 at 5; ECF 310-16 at 5; ECF 310-17 at 4; ECF 310-18 at 4. These statements were false. ECF 308-10; ECF 311-27 at 15:12–18.

As a result of Under Armour's actions, MET says that its business suffered. MET claims that Under Armour misused confidential information related to Redwave, that Under Armour wrongfully interfered with MET's efforts to do business in the CCREB market, and that Under Armour's false statements about Celliant directly harmed MET's business efforts. So this lawsuit ensued.

At Count I, MET alleges that Under Armour violated the Lanham Act by its false advertising. ECF 77 at ¶¶ 97–112. At Count II, MET alleges that Under Armour violated the Sherman Act through its unlawful monopolization or attempted monopolization. *Id.* at ¶¶ 113–126. At Counts III–XI, MET alleges a number of state-law torts. *Id.* at ¶¶ 127–190.

## STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the inquiry is whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). In making this determination, a court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

"[S]ummary judgment is essentially 'put up or shut up' time for the non-moving

party" and the non-moving party "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (cleaned up). Though the court must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor . . . to prevail on a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (cleaned up). "There must be evidence on which the jury could reasonably find for the non-movant." *Id.* (cleaned up). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## DISCUSSION & ANALYSIS

**I.    The Court will enter judgment in favor of Under Armour as to MET's Lanham Act claim (Count I).**

MET's first claim in this case is for violations of the Lanham Act. Specifically, MET argues that Under Armour engaged in false advertising by asserting that Celliant (the bioceramic powder made by MET's competitor, Hologenix) had some degree of FDA approval. MET argues that such statements were false commercial advertising under Section 43(a) of the Lanham Act. ECF 77 at ¶¶ 97–112.

Some background about the relevant provision of the Act helps. Section 43(a) of the Lanham Act provides a cause of action for individuals and companies affected by false advertising to sue for injunctive relief and damages. 15 U.S.C. § 1125. MET alleges, under Section 43(a)(1)(B), that "Under Armour has made and, if not enjoined, will continue to make, false and misleading . . . representations of fact about the characteristics and qualities of Celliant and products containing Celliant in commercial advertising or promotion." ECF 77 at ¶ 99.

In enacting the Lanham Act, Congress aimed to "mak[e] actionable the deceptive and misleading use of [trade]marks in [interstate] commerce" and, among other purposes, "protect persons engaged in [interstate] commerce against unfair competition." 15 U.S.C. § 1127. Though the Act focuses on preventing trademark misuse, it "also creates a federal remedy 'that goes beyond trademark protection.' . . . The broader remedy is . . . a cause of action for unfair competition through misleading advertising[.]" *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014) (citation omitted). Section 43(a) authorizes civil actions by "any person who believes that he or she is or is likely to be damaged by" another's act, "on or in connection with any goods or services . . ., [to] use[] in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities. . . of his or her or another person's goods, services or commercial activities." § 1125.

Against this legal backdrop, the Court assesses the parties' arguments for summary judgment. On careful review, the Court finds as follows: (1) some of the allegedly false statements at issue are not actionable; (2) the only actionable statements are those that Under Armour made on its website in advertising its Celliant product; and, (3) with respect to the website statements, MET lacks statutory standing to assert the claims, and relatedly, cannot establish that the false statements were "material"—a necessary element of the claim. The Court will therefore enter judgment in favor of Under Armour as to the Lanham Act claim.

### A. Only one alleged false statement is actionable.

The first step in assessing a Lanham Act claim is to identify the false statements at issue. This is important because it ties to the other aspects of the claim, including aspects at issue here—*e.g.*, standing/causation, and materiality.

MET alleges that Under Armour made three types of false statements about its CCREB products containing Celliant.  ECF 306 at 8–9.  First, Under Armour allegedly promoted its products in conversations with business partners "using language such as 'FDA approved' or 'FDA designated.'"  *Id.* at 8.  Second, Under Armour allegedly claimed on its website that, "Products powered by Celliant have been determined by the FDA to increase localized circulation, leading to faster recovery."  *Id.* at 9 (incorrectly cited without the word "localized"); *see id.* at 37, 39.  Third, Under Armour made a similar claim in a media press release.  *Id.* at 8.

Only the second statement is actionable.

### 1.  The statements to business partners aren't actionable.

Starting with the statements that Under Armour made to three of its business partners, the statements Under Armour made to Milliken and American Textile are not actionable because there is insufficient evidence to support what was said about Celliant and any FDA approvals.  That is, there is no evidence that Under Armour ever made false statements about its FDA designation to American Textile or Milliken, much less that these false statements affected the companies' decisions to end their relationships with MET.  To the contrary, the evidence (construed in MET's best light) shows that American Textile and Milliken strategically chose to cut ties with MET.  This is so because Under Armour required the use of Celliant (and not Redwave) as a condition of its potential partnerships.  Based on this pressure, unrelated to any alleged false statements, American Textile and Milliken decided to partner with the globally recognized brand.  ECF 311-4 at 15:8–18:4, 19:17–25 (American Textile), 31:23–35:9 (Milliken).

The statements made to Tom Brady's company, TB12, are also not actionable, but for a different reason.  Unlike the evidence as to American Textile and  Milliken, there is evidence that Under Armour specifically made the FDA claims about Celliant to TB12.  *See, e.g.*, ECF 307-21 at 5–7 (powerpoint slides in pitch to TB12); ECF 310-

19 at 19:12–21:22; ECF 310-30 at 6:11–7:25; ECF 311-3 at 7:15–8:13 (deposition testimony). But these statements are not actionable, for a legal reason: they don't qualify as "commercial advertising or promotion" under the Lanham Act. *See* § 1125(a)(1)(B).

Recall, the Lanham Act regulates "commercial advertising and promotion." § 1125(a)(1)(B). Courts have consistently interpreted the phrase "commercial advertising or promotion" to require: "(1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy the defendants['] goods or services . . . (4) [that] must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *E.g.*, *In re SoClean, Inc., Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 2-mc-152, 2023 WL 8006602, at \*29 (W.D. Pa. Nov. 17, 2023) (Conti, J.) (quoting *Incarcerated Ent., LLC v. CNBC LLC*, 331 F. Supp. 3d 352, 358 (D. Del. 2018)) (quotations omitted); *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1536 (S.D.N.Y. 1994).

Under Armour argues that MET cannot prove the third or fourth elements, and it is right. ECF 312 at 8–9; *see* ECF 292 at 18–20.[2]

As to the third element, the statements to TB12 didn't intend to "influenc[e] consumers to buy [Under Armour's] goods." MET appears to allege that Under Armour's statements attempted to "poach[]" TB12 away from MET. ECF 306 at 16. But it's undisputed that TB12 wasn't an Under Armour consumer: TB12 was a branding partner working with Under Armour to sell products, including CCREB. And preventing TB12 from partnering with MET didn't otherwise affect consumers' decisions to buy Under Armour products.

---

[2] Under Armour couches part of its argument as more of an Article III standing problem as opposed to whether the statements are actionable (ECF 292 at 18–20), but the analysis is the same.

As to the fourth element, the Court finds that these statements weren't directed to the relevant purchasing public or sufficiently disseminated, so they fall outside the reach of the Lanham Act. The relevant consumer market consisted of individuals interested in purchasing articles of CCREB, not branding partners, so statements to TB12 weren't "'directed at the *purchasing public*.'" *See In re SoClean, Inc., Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2023 WL 8006602, at *43 (quoting *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1386 (5th Cir. 1996) (emphasis in original)).

And even if TB12 were a member of the relevant purchasing public, the market wasn't made up of a "'relatively limited'" number of potential purchasers, so statements to TB12 alone would not be "'disseminated sufficiently.'" *See id.* (quoting *Seven-Up Co*, 86 F.3d at 1385, for the finding that the "specifics of the industry," including the number of potential buyers, affect whether statements trigger the Lanham Act's protections). A single communication in the relevant CCREB market, "'privately addressed to a non-consuming [partner,] [does] not rise to the requisite level.'" *Id.* at *42 (quoting *American Needle & Novelty, Inc. v. Drew Pearson Mktg., Inc.*, 820 F. Supp. 1072, 1077–78 (N.D. Ill. 1993)); *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 334 (M.D. Pa. 2014), *aff'd*, 958 F.3d 168 (3d Cir. 2020) (collecting cases and finding that a "singular and private communication" between a defendant and third party was not publicly disseminated and therefore was not actionable).

In sum, the alleged statements that Under Armour made to its three business partners do not present actionable statements under the Lanham Act.

### 2. The website statements are actionable.

The statements about Celliant on Under Armour's website are actionable. The website included the following:

- 9 -

"Products powered by Celliant have been determined by the FDA to increase localized circulation, leading to faster recovery." *E.g.*, ECF 309-10 at 3; ECF 310-12 at 5.  Screenshots below:



ECF 310-12 at 5.



Case 2:20-cv-00664-NR    Document 309-13 *SEALED*    Filed 09/25/24    Page 3 of 6

ECF 309-13 at 3–4.

A jury could find that this is a false or misleading statement of a commercial nature and is consumer facing.

### 3. The media statements aren't actionable.

MET has failed to provide facts to support its assertion that Under Armour made a false FDA claim in a press release. In support of this argument, MET provides two email threads between Hologenix and Under Armour. One includes a discussion about requiring a reporter to revise her original article, which mentioned Under Armour/Celliant-branded products' FDA approval. The reporter states that she "took [the FDA claim] from [Hologenix's] site." ECF 311-7 at 6. This doesn't prove that Under Armour made the false FDA claim in its press release. The second email thread discusses revisions to a press release announcing Under Armour's use of Celliant in its products, and includes a Celliant executive's statement to Under

Armour's counsel that "[y]our team drafted the release" that included the false FDA claims. ECF 311-32. But this thread discusses the press release before it was published. There is no evidence in the record that the release was ultimately published with the FDA claims included.

There is simply insufficient evidence here to proceed to a jury on a Lanham Act claim predicated on any press release.

For these reasons, the Court considers only the Under Armour website statements for purposes of the rest of the analysis.

## B. MET lacks statutory standing.

The Lanham Act is broad, but the Supreme Court has made clear that only a plaintiff in the "the zone of interests protected by the law invoked" whose "injuries are proximately caused by violations of the statute" can bring a claim. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129, 132 (2014). MET's interests as a bioceramic-powder supplier fall within the Lanham Act's zone of interests, but the harms it suffered due to Under Armour's actions were not proximately caused by violations of the Act. It therefore lacks statutory standing under *Lexmark*.

### 1. There's no causal link between Under Armour's website statements and lost royalties.

MET tries to link lost royalties to Under Armour's false statements, but the evidence is simply not there. That is, MET alleges that Under Armour's false claims about Celliant's FDA determination on its website proximately caused consumers to buy Under Armour's Celliant-branded products instead of Redwave-branded products. ECF 306 at 14, 16. MET's expert, Peter D. Wrobel, calculated MET's alleged lost royalties to be approximately $4.6 million. ECF 307-23 at 3–4.

The Court finds, however, that MET has failed to present sufficient evidence that Under Armour proximately caused this harm. As evidence of the causal

connection between Under Armour's false claims and the alleged royalties, MET offers only Dr. Maronick's supplemental survey (ECF 346-3) and expert report (ECF 346-5). But, based on the survey's lack of reliability, the Court by separate order granted Under Armour's motion to exclude the supplemental survey and report (ECF 345). ECF 387. Other than this, MET has not proffered evidence sufficient to show that Under Armour's false FDA-related statements affected the purchasing decisions of consumers viewing its website. Without this causal link, there is no proximate cause between Under Armour's false website statements and the alleged lost royalties.

### 2. There's no causal link more generally.

Even without its claim for lost royalties, to the extent that MET asserts any other sort of economic and reputational harm, it is simply too remote to establish a proximate causal link to the statements on the website.

*Lexmark* teaches that though there isn't a specific rule for proximate cause, there are some useful benchmarks. For example, proximate cause is more likely to be established where there is evidence of direct competition, reputational disparagement, or a "1:1 relationship" between the plaintiff's sales lost due to the false advertising and the defendant's gains. *See Lexmark*, 572 U.S. at 136–39. None of these circumstances apply here.

First, there is no triable dispute of fact that MET and Under Armour were direct competitors during the relevant time period (2017-2023). They weren't. MET points to its attempts to sell finished CCREB goods for a short time, but those sales pre-dated the website statements and were, at most, few and isolated. *See* ECF 292 at 6; ECF 306 at 4–6, 35; ECF 307-23 at 3.

In 2014, MET contracted with Court Casuals, Inc. (Sport Casuals International) to manufacture bioceramics apparel and accessories. ECF 293-17. Sport Casuals International was the only manufacturer that produced clothing for

MET, and it stopped manufacturing apparel for MET by 2016. ECF 293-6 at 8:3–10:25; ECF 293-15 at 13:8–14. Around 2014, MET made a business decision to focus on selling bioceramic powder and developing its partnership with Under Armour, rather than sell its own apparel. ECF 307-26 at 55–56; ECF 303-12 at 6:2–18. MET did continue to sell finished products to the public (*e.g.*, to healthcare providers), but the record suggests that these sales were few and isolated. ECF 307-6; ECF 307-7; ECF 307-8; ECF 307-9; ECF 307-11.

MET had a website through which it sold finished products to the public, but this website was shut down around 2014, when MET rebranded as Redwave. ECF 293-6 at 18:20–19:22. MET doesn't have a storefront for selling apparel (neither online nor brick and mortar) and doesn't advertise apparel products, and the clothing that Sport Casuals International manufactured currently sits in a container attached to a tractor-trailer. ECF 293-5 at 8:1–9:7; ECF 293-33 at 7:3–8:17. MET claims that bioceramics.com sells MET's finished products, but this website does not suggest that consumers could buy Redwave-branded bioceramics clothing through the website, and there have been no sales of Redwave-branded clothing products through this website. ECF 293-33 at 9:23–15:12, 16:2–23:10. The evidence doesn't raise a triable fact issue that MET directly competed with Under Armour.

Second, there is no evidence of disparagement of MET. *Lexmark* carves out an exception to the direct-competition requirement for a defendant who made false statements about the plaintiff's business (as opposed to its own). *Lexmark*, 572 U.S. at 138–39. But MET hasn't alleged that Under Armour made false statements about MET. Under Armour's false statements concerned only characteristics of its own Celliant-branded products, so there isn't proximate cause by disparagement.

Third, there is no evidence of a 1:1 relationship (*i.e.*, for every 1 sale lost by MET there is 1 sale gained by Under Armour). MET concedes this, but, relying on a Sixth Circuit case, argues that the spirit of the 1:1 concept is captured because "there

is unlikely to be a more directly injured commercial victim than" MET. *Campfield v. Safelite Grp., Inc.*, 91 F.4th 401, 412 (6th Cir. 2024) (citing *Lexmark*'s holding that the "more immediate victim" can satisfy proximate cause, *Lexmark*, 572 U.S. at 140).

Setting aside the many facts (including the unique market structure) that make *Campfield* distinguishable, there is nothing here to suggest that MET would be the most directly injured victim in the CCREB market. The most directly injured victims would be any other CCREB apparel manufacturer. After that, it would be the existing suppliers to Under Armour's direct competitors. *See ThermoLife Int'l, LLC v. BPI Sports, LLC*, No. 21-15339, 2022 WL 612669, at *2 (9th Cir. Mar. 2, 2022) (proximate cause exists "when 'there is likely to be something very close to a 1:1 relationship between' a plaintiff's lost sales" at one level of the supply chain and the sales diverted to a defendant" at a different level) (quoting *Lexmark*, 572 U.S. at 139). After that, it would likely be existing partners of Under Armour's competitors—say, those fulfilling roles in the market similar to TB12, Milliken, or American Textiles. Any harm to MET—whether reputational or economic—is simply too indirect and too remote from the website statements to establish a proximate causal link.

Absent proximate cause, MET lacks statutory standing to invoke the Lanham Act here.

### C. MET also can't prove materiality.

Even assuming MET has standing to bring a Lanham Act claim, the claim—for largely related reasons—also fails on the merits because there is insufficient evidence of materiality.

To bring a Lanham Act claim for damages, a plaintiff must prove materiality. Materiality requires a "show[ing] that defendant's misrepresentation . . . is likely to influence [a consumer's] purchasing decision." *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 922 (3d Cir. 1990) (cleaned up).

- 15 -

One way to prove materiality is to point to consumer evidence—for example, that certain consumers specifically changed their purchasing decisions. *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648 (3d Cir. 1958); *see also Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997) (framing the test as requiring defendants to have "misrepresented an inherent quality or characteristic of the product" that affects consumer activity in some way (cleaned up)). But nothing in the record suggests that any specific consumers saw the false advertising on Under Armour's website and changed their purchasing decisions because of it. And, as noted above, to the extent that MET relies on the consumer-survey expert opinions of Dr. Maronick to establish materiality, those have been excluded. ECF 387.

Another way to prove materiality is "when the defendant and plaintiff are competitors in the same market and the falsity of the defendant's advertising is likely to lead consumers to prefer the defendant's product over the plaintiff[']s." *Newborn Bros. Co. v. Albion Eng'g Co.*, 481 F. Supp. 3d 312, 356 (D.N.J. 2020) (cleaned up). As discussed above, MET and Under Armour weren't direct competitors.

So the Lanham Act claim fails on the materiality element, too.[3]

---

[3] Materiality is only a required element where a plaintiff seeks monetary damages, not solely injunctive relief. *Newborn Bros. Co.*, 481 F. Supp. 3d at 356 ("For monetary relief (or its equivalent), regardless of whether a statement is literally false or misleading, a plaintiff must prove materiality."); *Mun. Revenue Serv., Inc. v. Xspand, Inc.*, 700 F. Supp. 2d 692, 716 (M.D. Pa. 2010) (collecting cases). But there doesn't seem to be any live injunctive claim here. Under Armour long ago removed the false statements from its website, and MET hasn't shown that injunctive relief is necessary to prevent future recurrences of the false statements. ECF 306 at 15 (citing *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)); *see* ECF 308-11 at 5; ECF 309-9 at 3; ECF 309-10 at 3; ECF 309-11 at 5; ECF 309-12 at 5; ECF 309-13 at 4; ECF 309-14 at 4; ECF 309-18 at 3; ECF 310-8 at 3; ECF 310-9; ECF 310-12 at 5; ECF 310-14 at 5; ECF 310-16 at 5; ECF 310-17 at 4; ECF 310-18 at 4 (no evidence of statements at issue made after 2021).

## II. The Court will enter judgment in Under Armour's favor as to MET's Sherman Act claim (Count II).

MET next brings a claim under Section 2 of the Sherman Act for monopolization and attempted monopolization. The crux of the claim is that Under Armour controlled the CCREB market and shut MET out by pressuring other companies not to deal with MET.[4] On careful review, the Court will enter judgment in Under Armour's favor on MET's the Sherman Act claim for two threshold reasons (lack of antitrust injury and lack of antitrust standing), and two merits-based reasons (failure to define a relevant product market and failure to provide sufficient evidence of market power through any exclusionary conduct).

### A. MET can't establish antitrust injury or antitrust standing.

Not anyone can bring an antitrust claim. A plaintiff must show the right kind of harm (antitrust injury), and that it is also the right kind of party to sue (antitrust standing).[5] MET has established neither.

For antitrust injury, the "injury [must be of the] type the antitrust laws were intended to prevent and that flows from that which makes defendant['s] acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). In other words, the conduct must harm

---

[4] The elements of a monopolization and attempted monopolization claim are largely the same, except that "[t]he level of market power required to support a finding of attempted monopolization is, in general, less than the level of market power required to support a finding of actual monopolization." *See In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 700 (E.D. Pa. 2007) (cleaned up).

[5] Unlike other components "to be factored in a standing analysis, [an antitrust injury] must be present in every case." *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1166 (3d Cir. 1993). So the Court considers antitrust injury separate from the rest of the antitrust standing analysis, which focuses on which plaintiff can allege the required antitrust injury.

competition, not simply a single competitor.  *See Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 250 (3d Cir. 2022).

For antitrust standing, there is some overlap with antitrust injury.  For example, a finding of antitrust injury is a necessary part of determining whether an antitrust plaintiff has standing to sue.  *Id.* at 249.  But beyond that, there are several non-exhaustive factors that courts analyze, and they all largely coalesce on a single guiding question: is the plaintiff's harm directly caused by the alleged antitrust violation?  *See id.*

So, together, antitrust injury ensures a more generalized harm to market competition, and antitrust standing ensures that the plaintiff (typically a competitor) is directly impacted by the anti-competitive conduct.

### 1.  MET doesn't have an antitrust injury.

Harm to competition requires MET to show that the "challenged conduct affected the prices, quantity, or quality of goods or services, not just the plaintiff's own welfare."  *Id.* at 250 (cleaned up); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) ("Predatory or exclusionary practices in themselves are not sufficient.  There must be proof that competition, not merely competitors, has been harmed.").  "Broadly speaking, a firm engages in anticompetitive conduct when it attempts to exclude rivals on some basis other than efficiency . . . or when it competes on some basis other than the merits[.]"  *W. Penn Allegheny Health Sys.*, 627 F.3d at 108 (cleaned up).  MET takes three approaches to showing antitrust injury; none work.

First, MET relies primarily on its expert, Dr. John Hekman, who "concludes that Under Armour's anticompetitive behavior in fact did have an impact on the price, quantity or quality of goods or services through its monopoly power," and that this creates a genuine dispute of material fact on the question of antitrust injury.  ECF 306 at 22 (citing ECF 307-1 at 13–14).  But Dr. Hekman's conclusion relies on Under

Armour holding monopoly power, and the Court by separate order held that Dr. Hekman's opinion on market power was inadmissible. ECF 387. So MET can't rely on his conclusion as to Under Armour's anticompetitive conduct and any alleged injury flowing from that.

Second, MET relies on a theory of "substantial foreclosure," to argue that Under Armour closed off the CCREB market for itself by pressuring companies to drop MET as a partner or supplier. ECF 306 at 27–28. "To demonstrate substantial foreclosure, a plaintiff must both define the relevant market and prove the degree of foreclosure. Although the test is not total foreclosure, the challenged practices must bar a substantial number of rivals or severely restrict the market's ambit. There is no fixed percentage at which foreclosure becomes 'substantial' and courts have varied widely in the degree of foreclosure they consider unlawful." *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403 (3d Cir. 2016) (cleaned up).[6]

As a factual matter, MET hasn't proffered sufficient evidence of substantial foreclosure. Regarding rivals in the market, there is simply nothing in the record to suggest that a "substantial number of rivals" were foreclosed from the market. And regarding MET itself, there is insufficient evidence in the record to show that MET was substantially foreclosed from the CCREB market.

MET argues that Under Armour pressured ATI, Milliken, and TB12 to use Celliant, and not Redwave. ECF 306 at 21–22. But MET hasn't shown why it couldn't work with the dozens and even hundreds of textile manufacturers if it wanted to make performance apparel. *See* ECF 293-6 at 6:24–7:18 (MET's CEO admitting that there are dozens or hundreds of other manufacturers of bedding products, but MET didn't approach them about the possibility of selling Redwave after American Textile

---

[6] Though the Third Circuit's discussion on foreclosure related to a Section 1 rule-of-reason analysis, as the Court noted, "[t]he applicable law is the same for each of [the plaintiff]'s four claims," which included a Section 2 claim. *See id.* at 402–03.

terminated its relationship with MET).  Moreover, MET has continued to engage in potential business discussions with at least one of the three companies even after the switch from Redwave to Celliant.  *See* ECF 302-8 at 33:18–25, 37:3–38:10; ECF 293-6 at 23:18–25.

In response to Under Armour's argument that there is no evidence of substantial foreclosure, MET emphasizes that small businesses like MET face unique hurdles when competing in a nascent market.  ECF 306 at 27.  Yet even if the CCREB market is a nascent market, MET still must make some showing of the degree of foreclosure, which isn't discernible from the record.  *See United States v. Microsoft Corp.*, 253 F.3d 34, 69–70 (D.C. Cir. 2001) (noting that given the "commonplace" nature of exclusive contracts, a plaintiff must show foreclosure to the market, even if that foreclosure is less than what is required in a Section 1 claim).

Third, MET claims that its small market presence is due to Under Armour's false advertising of Celliant, which has made it difficult for MET to reach prospective customers.  ECF 306 at 21; ECF 293-6, 24:11–17.  In other words, the predicate for its Lanham Act claim establishes an antitrust injury.  This is a tough legal argument to win, and MET comes up short.  As the Third Circuit has stated, "[w]hile false or deceptive statements may violate the antitrust laws in rare circumstances, at minimum, a plaintiff must show that such statements induced or were likely to induce reasonable reliance by consumers."  *Eisai*, 821 F.3d at 407 n.40.

MET hasn't shown that its prospective customers relied on the alleged false advertising about Celliant, or that MET couldn't have corrected the misstatements by explaining to prospective customers that the FDA doesn't approve of these products.[7]  Indeed, MET's CEO said that, when a prospective customer asked about "the FDA claims that "[their] competitor, Hologenix, was making[,]" and "why was

---

[7] As discussed above and at ECF 386, the Court also excluded MET's survey expert's opinions, so the surveys cannot form the basis to support this claim.

[Hologenix's] product FDA approved and [MET's] wasn't[,]" MET explained that it didn't believe Hologenix's product was FDA-approved and that MET had "an incredible bioceramic formulation" that was backed up by scientific literature. ECF 302-8 at 49:13–50:13. The record doesn't reflect the notion that Under Armour's false advertising caused or was likely to cause anticompetitive effects in the relevant market, such as reducing the number of competitors in the CCREB market, creating barriers to entry to the CCREB market, or increasing the price of bioceramics clothing. *See also West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109 n.14 (3d Cir. 2010) (noting that, in some cases, making false statements about a rival "can give rise to antitrust liability, *especially when it is combined with other anticompetitive acts*" (emphasis added)).

In sum, MET has failed to proffer sufficient evidence to create a genuine dispute of fact of any antitrust injury.

### 2. MET doesn't have antitrust standing.

The Third Circuit uses a multi-factor test to decide whether a plaintiff has antitrust standing (which every plaintiff must prove): "(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages." *Ethypharm S.A. France v. Abbott Lab'ys*, 707 F.3d 223, 232–33 (3d Cir. 2013) (cleaned up). Based on a holistic view of these factors, the Court concludes that MET lacks antitrust standing.

To begin with, the Court's prior finding of no antitrust injury also means that there cannot be antitrust standing (*i.e.*, factor two). As the Third Circuit has stated, antitrust injury, is a "necessary but insufficient condition" of antitrust standing, so if it is lacking, that ends the inquiry. *Id.* at 233.

But beyond the question of antitrust injury, MET has problems with many of the other factors. Factors 1, 3, and 4 all go to the question of the causal link and direct impact of any harm, and so are here best evaluated together.[8] There is no causal link or directness with respect to the alleged anticompetitive conduct because MET isn't a competitor or consumer of bioceramic apparel.

The Third Circuit has held that, generally, antitrust injury is limited to consumers and competitors in the restrained market, and to those whose injuries "are the means by which the defendant seeks to achieve its anticompetitive ends." *Id.* (cleaned up). This latter exception to the plaintiff being a competitor or consumer recognizes that a plaintiff may still suffer antitrust injury if its injury was "inextricably intertwined" with the injury that the defendant sought to inflict in the relevant market. *Id.* at 237 n.21. In other words, "when the injury alleged is so integral an aspect of the alleged anticompetitive conduct that the loss was precisely the type of loss that the claimed violations would be likely to cause." *Id.* (cleaned up).

As noted above, MET didn't directly compete with Under Armour. MET's clothing sales were isolated, and MET never established why a customer would switch from Under Armour products to MET products if Under Armour raised its prices. *See Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 177

---

[8] Factor 6 (the potential for duplicative recovery or complex apportionment of damages) does not appear to be an issue. On one hand, this weighs in favor of MET. On the other, it's a bit of a tell that MET's antitrust claim is ill-fitting. That is, where no other consumers, competitors, or suppliers appear to even theoretically have damages claims, it is suggestive that the harm here isn't to competition. In any event, this factor alone isn't enough to create antitrust standing.

(3d Cir. 2015) (finding that where doubt arises about whether plaintiff and defendant are competitors, courts should turn to the "cross-elasticity of demand between the plaintiffs' offering and the defendants' offering") (cleaned up).  MET is no more a competitor with Under Armour than a pop-up lemonade stand with Minute Maid. Standing cannot rest on MET being a competitor of Under Armour.

MET tries two approaches to get around this fact, but neither are successful.

First, MET says Under Armour undertook exclusionary conduct to keep it out of this market, and so MET shouldn't be denied standing merely because it's not a viable competitor.  ECF 306 at 22.  Even if that were true, courts require some showing that the company would have entered the market absent the alleged antitrust violation.  *See Triangle Conduit & Cable Co. v. Nat'l Elec. Prods. Corp.*, 152 F.2d 398, 400 (3d Cir. 1945); *Cable Holdings of Georgia, Inc. v. Home Video, Inc.,* 825 F.2d 1559, 1562 (11th Cir. 1987).

Here, MET's argument is undermined by the fact that it hasn't pointed to any evidence in the record showing its intention to enter the CCREB market—before, during, or after its relationship with Under Armour.  To the contrary, in 2014, there was a shift in the business model to "focus solely on becoming an ingredient brand to exploit competitive advantages."  ECF 293-11 at 2.  And even after MET stopped working with Under Armour and sought new customers, it appears that it was trying to sell prospective customers its bioceramic powder—not bioceramic apparel.  *See* ECF 302-8 at 48:5–50:13.

Second, MET tries to rely on the "inextricably intertwined" exception, but that too is unsupported by the record.  The Third Circuit has held that a supplier can have antitrust standing to sue where its harm is "inextricably intertwined" with the object of the defendant's anticompetitive scheme.  *Abbott Lab'ys*, 707 F.3d at 237, 237 n.21 (3d Cir. 2013).  Importantly, imposing the harm on the supplier must be "an

- 23 -

indispensable aspect of the scheme." *Hanover 3201 Realty*, 806 F.3d at 173.[9]  Here, it was not.

Assuming Under Armour's alleged end goal was to maintain its monopoly in the CCREB market, it is unclear how or why eliminating MET as a bioceramic-powder supplier in the market would further the scheme, let alone be inextricably intertwined with it.  Indeed, as an economic matter, Under Armour should want more competition in the upstream market, because when there is more competition between input suppliers, Under Armour would be better able to negotiate lower input prices.  ECF 293-1 at 12.  If anything, any harm here to MET would be considered ancillary, not essential to a scheme to monopolize the CCREB market.  This means the "inextricably intertwined exception" cannot apply.  *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 320–21 (3d Cir. 2007) (alleged injury not inextricably intertwined with anticompetitive scheme, where plaintiff alleged that defendant's monopolization of one market caused plaintiff harm in a separate market, because the alleged harm crossed markets and was too attenuated from the anticompetitive conduct).

For these reasons, MET does not have antitrust standing to sue here.

### B. MET can't establish market definition or market power.

Even if there were antitrust standing and injury, MET's claim fails on the merits.  It cannot define the relevant product market.  And it cannot prove up Under Armour's market power.

For either attempted or actual monopolization under Section 2, a plaintiff must establish: (1) the relevant market; and (2) that the defendant possessed a certain level

---

[9] The "inextricably intertwined" exception is usually discussed in the context of antitrust injury, but is also applied by courts in discussing antitrust standing, given that it concerns the directness/remoteness of the injury.  *See, e.g.*, *Hanover 3201 Realty*, 806 F.3d at 172.

of market power in the defined market.[10]  *Pastore v. Bell Tel. Co. of Pennsylvania*, 24 F.3d 508, 512 (3d Cir. 1994); *In re Mushroom*, 514 F. Supp. 2d at 700.

A market is the "area of effective competition" for a given good or set of products. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962).  In defining the relevant market, courts use a "pragmatic, factual approach" as opposed to a "formal, legalistic one."  *Id.* at 336.  "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *Id.* at 325.  Within the broader market, there may be smaller, well-defined submarkets that would also "constitute product markets for antitrust purposes."  *Id.*  A plaintiff will often need admissible expert testimony to establish the outer boundaries of the relevant market.  *See Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 526 (W.D. Pa. 2019) (Cercone, J.) (noting the critical nature of expert testimony in construing the relevant market).  But courts may turn to "practical indicia" in determining the boundaries of a relevant submarket.  *Brown Shoe*, 370 U.S. at 325.  The practical indicia include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."  *Id.*

The term "market power" refers to a firm's ability to "raise prices above those that would otherwise prevail in a competitive market."  *FTC v. AbbVie Inc*, 976 F.3d

---

[10] These aren't the only requirements to proceed with a Section 2 claim.  "To support a claim for actual monopolization, a party must prove: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.  By contrast, to succeed on a claim of attempted monopolization under § 2, a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 433 (3d Cir. 2016) (cleaned up).

327, 371 (3d Cir. 2020).  To have monopoly power, a firm must have market power and there must be barriers to entry in the given market.  *AbbVie Inc*, 976 F.3d at 371.[11]  When evaluating a firm's power in the market, courts consider factors such as the "size and strength of competing firms, freedom of entry, pricing trends, . . . substitute comparable goods, . . . regulatory requirements, [and] high capital costs." *Id.* at 371–72.[12]  Proof of market power often relies on the evidence for the defined market.  *See Warner Chilcott*, 838 F.3d at 435; *FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 539 (E.D. Pa. 2020).

### 1.  MET hasn't properly defined a relevant market.

MET has failed to sufficiently prove up its proposed CCREB market.  MET largely relies on the opinions of its antitrust expert, Dr. Hekman, to establish the relevant market.  *See* ECF 306 at 25–26; ECF 377 at 12–17.  But because the Court excluded Dr. Hekman's reports, MET cannot rely on his analysis to prove the proposed market.  *See* ECF 387.

---

[11] Plaintiffs often must rely on indirect evidence of monopoly power because direct evidence is "rarely available."  *Warner Chilcott*, 838 F.3d at 434 (cleaned up).  MET doesn't allege that it has established the "rarely available" evidence of monopoly power here, so the Court focuses on the indirect-evidence requirements.  *See generally* ECF 306.

[12] The terms "market power" and "monopoly power" are closely related and hard to distinguish.  Sometimes, courts use the terms interchangeably.  *Compare Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (finding that direct evidence of "market power" requires proof of "restricted output and supracompetitive prices"); *with Warner Chilcott*, 838 F.3d at 434 (finding that direct evidence of "monopoly power" requires proof of "supracompetitive prices and restricted output").  Other times, courts have used the term "market power" as an element of "monopoly power."  *See, e.g.*, *AbbVie*, 976 F.3d at 371 (requiring proof of market power *and* barriers to entry to establish monopoly power).  But consistently, courts have found that barriers to entry are a relevant factor when considering market power.  *See id.* (finding that "freedom of entry" is a relevant factor for determining market power); *Dentsply*, 399 F.3d at 187 (same).  So the Court considers the barriers to entry in this case when it analyzes market power rather than treat the two as separate concepts.

MET also relies on certain qualitative evidence to support its market claim. *See* ECF 306 at 24–27; ECF 377 at 13–15.  This isn't enough, either.  Though qualitative evidence may act as practical indicia of a relevant market, MET still must have evidence of the "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *See Brown Shoe*, 370 U.S. at 325.  MET's qualitative evidence consists of: (1) certain Under Armour employees opining that the CCREB market is its own market (ECF 377 at 13–14); and (2) several articles advertising Under Armour and Tom Brady's recovery sleepwear (ECF 306 at 25 (citing ECF 300-2 at 2, ECF 300-4 at 2, ECF 300-5 at 2, and ECF 300-6 at 2)). These pieces of evidence don't define the outer boundaries of the market with "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *See Brown Shoe*, 370 U.S. at 325.  Nor does MET explain how its qualitative evidence establishes as much.  A few opinions from Under Armour employees about a market definition and a few articles on Under Armour's product do not adequately serve as practical indicia that define the boundaries of the relevant market.  *See id.*; *Premier Comp Sols.*, 377 F. Supp. 3d at 527.

MET hasn't sufficiently proven its proposed CCREB market to proceed with its antitrust claim.

### 2.  MET hasn't proven Under Armour's market power.

MET's evidence on market power falls short for three primary reasons.  First, evidence of market power is tied to evidence of the relevant market, and MET hasn't sufficiently proven the relevant market.  *See Warner Chilcott*, 838 F.3d at 435.  So too market power.  Second, MET hasn't proven sufficient barriers to entry such that Under Armour could have possessed the requisite market power in this case.  *See AbbVie*, 976 F.3d at 371.  "Entry barriers must be significant" for Under Armour to have "the power to control prices."  *See Rebel Oil Co.*, 51 F.3d at 1439 (cleaned up).

MET hasn't shown that to be the case. There's no evidence why Under Armour's competitors, like Nike, Adidas, or Lululemon were restricted from entering the bioceramic apparel market if they so desired. *See* ECF 306 at 22 (listing these companies as competitors of Under Armour). Third, MET never offered competent evidence of Under Armour's market share in its proposed market. *See* ECF 258-2 at 15:3–21. That is, MET never counted the total number of participants in its proposed market and offered what portion of that market Under Armour occupied. "The size of that portion is a primary factor in determining whether power exists." *Dentsply*, 399 F.3d at 187 (cleaned up). MET hasn't proven the requisite market power for its antitrust claim.

In sum, MET doesn't have a viable antitrust claim. It hasn't alleged the right kind of harm (antitrust injury), or that it's the right party to sue (antitrust standing) to bring a claim. And then on the merits, MET hasn't met its burden to properly define the relevant market or to establish market power. Under Armour is therefore entitled to summary judgment on Count II.

### III. MET's tortious-interference claims survive (Counts V and VI), but judgment will be entered on the remaining claims in Under Armour's favor (Counts III-IV, VII-XI).

In addition to its two federal claims under the Lanham Act and Sherman Act, MET brings a number of state-law claims. As discussed below, the Court finds that there are genuine disputes of material fact for MET to proceed to a jury on Counts V and VI, its tortious-interference claims. But the remaining state-law claims fail.

### A. The Court will enter judgment in Under Armour's favor as to MET's trade-secret claim (Count III) because MET has failed to prove the existence of a trade secret.

MET claims that Under Armour misappropriated four trade secrets—(1) its bioceramic formula, (2) application process, (3) its marketing lexicon, and (4) its manufacturing process. ECF 77 at ¶¶ 127–140, ECF 306 at 7. Thus, it brings a state-

law trade-secret claim under the Pennsylvania Uniform Trade Secrets Act ("PUTSA"). On careful review, this claim fails at the outset, because MET fails to provide sufficient evidence for a jury to find that these are actually trade secrets under Pennsylvania law.

To bring a claim under PUTSA, the plaintiff must identify the trade secret. *See Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109–10 (3d Cir. 2010). "Pennsylvania courts look to the following factors to determine whether information is protected as a trade secret: (1) the extent to which the information is known outside of the company's business; (2) the extent to which the information is known by employees and others involved in the company's business; (3) the extent of the measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money the company spent in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated legitimately by others." *Id.* at 109 (citing *Crum v. Bridgestone/Firestone N. Am. Tire, LLC*, 907 A.2d 578, 585 (Pa. Super. Ct. 2006)).

MET's three asserted trade secrets are not sufficiently defined based on these criteria. For example, there isn't anything in the record as to the specifics of the bioceramic formula that was disclosed to Under Armour, how that formula compares with industry knowledge, or the value of the formula. The same goes with MET's marketing lexicon and manufacturing processes.

Trade-secret claims are often supported by expert testimony, where the specifics of the formulas and plans are identified with particularity; they are benchmarked against industry standards and knowledge; and then they are traced and compared to the defendant's use. *See, e.g.*, *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 382, 387 (3d Cir. 2021) ("[T]he subject matter of the trade secret must be described with sufficient particularity to separate it from matters of general

knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies."). All of this information is critical. None of it is in the record. There is insufficient evidence for MET to get to the jury on its trade-secret claim.

**B. The Court will enter judgment in Under Armour's favor as to MET's claim for breach of the non-disclosure agreement (Count IV) because there is insufficient evidence of breach.**

At Count IV, MET alleges that Under Armour breached a 2014 non-disclosure agreement (NDA) (ECF 297-2) by disclosing confidential information to third parties. ECF 77 at ¶¶ 141–145.[13] To prevail on its breach-of-contract claim, MET must prove the existence of a contract, including the contract's essential terms, and that Under Armour breached the contract resulting in damages to MET. *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003).[14]

MET's claim fails because it hasn't sufficiently proven a breach. That is, it hasn't created a dispute of fact that Under Armour disseminated or misappropriated any confidential information. The NDA broadly defines "Confidential Information" as basically everything that MET shared with Under Armour and forbids Under

---

[13] The terms of the NDA were incorporated into subsequent agreements between the parties. MET argues that some of the provisions in other agreements separate from the NDA terms were also breached (*e.g.*, the exclusivity provision in a separate supply agreement (ECF of supply agreement)). ECF 306 at 30–31. But that isn't pled. ECF 77 at ¶¶ 141–145. Count IV only concerns breach of the NDA through unauthorized disclosure of confidential information.

[14] The NDA is governed by California law, ECF 297-2; but since neither party notes any material legal differences between California and Pennsylvania law and both parties cite Pennsylvania law, the Court finds that a choice-of-law analysis isn't necessary. *See, e.g.*, *Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 180 (3d Cir. 1995) ("[L]ike a plaintiff's need to prove one or more of the specific statutory elements of his or her claims, choice of law issues may be waived."); *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1005 n.1 (3d Cir. 1980) ("At this time we will consider the parties to have waived any objection to the application of Pennsylvania law.").

Armour from disclosing it. ECF 297-3 at 2. But the NDA also explicitly carves out from its scope the following that was not subject to the NDA: (1) any information publicly known or made generally available without a duty of confidentiality before the time of the disclosure to Under Armour by MET; (2) any information that became publicly available without a duty of confidentiality after disclosure to Under Armour by MET; and (3) any information in Under Armour's possession without confidentiality restrictions, at the time of disclosure by MET as shown by Under Armour's "then-contemporaneous written records kept in the ordinary course of business." *Id.*

This is significant because, similar to its trade-secret claim, MET doesn't prove up what confidential information is at issue, whether it fits within the definition of "confidential information," (*i.e.*, isn't captured by the NDA carve-out), or how the information was misappropriated by Under Armour.

MET's arguments over potential misappropriation are all based on speculation, as even its own CEO appears to concede.[15] MET has failed to present sufficient evidence to create a dispute of fact and present this claim to the jury.

### C. MET's claims for tortious interference with existing contract (Count V) and prospective business expectancies (Count VI) survive because MET has pointed to sufficient evidence of Under Armour's interference.

With respect to MET's state-law tortious interference claims at Count V and Count VI, MET has produced sufficient evidence to create a dispute of fact and get to a jury, for the reasons below.

MET alleges that Under Armour interfered with its existing contract with

---

[15] Dr. Alan Letton, MET's CEO, did not identify any specific examples of Under Armour sharing trade-secret information. *See* ECF 293-12 at 15:25–19:6. For example, when asked, "Who at Under Armour shared the emulsion formula that you described with Hologenix?" he replied, "I can't tell you who did that." When asked, "How was it shared?" he replied, "I can't answer that." *Id.* at 17:3–7.

American Textile (Count V) and prospective business expectancies with TB12 and Milliken (Count VI).  ECF 77 at ¶¶ 146–159.  To proceed with a claim for tortious interference with an existing contract or prospective business expectancies, a plaintiff must demonstrate: "(1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference." *Acumed LLC v. Advanced Surgical Servs.*, 561 F.3d 199, 212 (3d Cir. 2009).

Here, there is no dispute that elements one, three, and four are met.  Under Armour does not address those elements in its brief (ECF 292) or reply (ECF 312), so the Court cabins its analysis to the elements Under Armour does challenge: elements two and five.[16]  Based on the record, the Court finds that there are genuine disputes

---

[16] The third element—absence of justification or privilege—is notable.  At first glance, there may seem to be tension between the third element and the Court's ruling on the Lanham Act.  For example, the Court found that Under Armour's discussions with American Textile didn't amount to "commercial speech," because it was basically business partners talking about what supplier to use.  Could these discussions then be "justified" for purposes of a tortious-interference claim?  Not necessarily.  *See, e.g.*, *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48 (2d Cir. 2002) (affirming district court's dismissal of plaintiff's Lanham Act claim in finding that speech was not "commercial" but allowing state-law tort claim—slander—to survive, based on the same conduct).  Justification under state law and commercial speech under federal law are different concepts, and justification involves a balancing of a number of factually disputed factors.  *See Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1184 (1978) (lack of justification based on: "(a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the [party with whom] the actor's conduct interferes; (d) the interests the actor [seeks to advance]; (e) the proximity or remoteness of the actor's conduct to the interference; and (f) the relations between the parties") (cleaned up).

of facts bearing on these elements.

Beginning with Count V and the American Textile relationship, MET has produced sufficient evidence that Under Armour purposefully intended to harm MET's relationship with American Textile.

Under Armour employee Kyle Blakely testified that Under Armour told American Textile that it wanted them to switch from using MET's Redwave to using Hologenix's Celliant.[17]  American Textile Executive Vice President Blake Ruttenberg testified that it would have kept using MET, but that it would follow Under Armour's direction.  *See* ECF 302-3 at 10:4-12 ("No.  We had no reason.  We were—we were—Under Armour was sort of—we were fond—what Under Armour wanted to do is what we were going to do.")  And Under Armour introduced a term sheet and license agreement from 2017 that showed what could be construed as exclusivity provisions.  ECF 298-7.

So, altogether, MET has presented evidence that Under Armour directed American Textile to switch to Hologenix, American Textile did so at Under Armour's direction, and American Textile ended up entering into an exclusive license for the Hologenix product.  This is sufficient evidence, along with reasonable inferences, for MET to present a tortious interference claim to the jury.

The same is true of Count VI, and the Milliken and TB12 relationships.  As with American Textile, MET cites deposition testimony by various employees that shows Under Armour exerting significant influence over Milliken and TB12.  For example, Shannon Vissman, MET co-founder and chairman, testified that Under Armour told Milliken that Milliken could no longer work with Under Armour if Milliken continued working with MET.  ECF 311-23 at 13:6–14:4, 15:4–15:20.  As to

---

[17] When asked whether Under Armour wanted American Textile to switch over and start using Hologenix's product rather than Redwave, Mr. Blakely replied, "At a point in time, we communicated that to them, yes."  ECF 310-19 at 15:19–24.

TB12, Michael Beck, TB12's designee, testified that Under Armour held significant influence over TB12: "If I start trying to make Under Armour's apparel decisions, I wouldn't be a partner of Under Armour's for very long." ECF 311-1 at 12:4–8.

And as previously noted, deposition testimony shows that Under Armour led all three companies away from MET and toward Hologenix. ECF 311-1 at 8:20–10:25, 11:2–11:18; ECF 311-4 at 44:21–45:19; ECF 311-16 (TB12) ("I cut the term [of the MET contract] down to 1 year, though there's not really any reason for a term at all (other than ensuring MET isn't in our lives forever)."); ECF 311-4 at 15:6–18:4, 19:17–25 (American Textile), ECF 311-4 at 31:4–35:9 (Milliken).

Under Armour argues that "MET has no evidence of prospective contracts beyond MET's own mere hope." ECF 292 at 38. MET has, however, established that MET and American Textile had existing contracts and it was developing relationships with TB12 and Milliken. ECF 307-14 (American Textile); ECF 308-2 (American Textile); ECF 308-3 (American Textile); ECF 308-4 (TB12); ECF 308-5 (Milliken); ECF 308-6 at 23:4–25, 23:1–5. (Milliken).

Viewing this evidence in the light most favorable to MET, the Court finds that MET has pointed to sufficient evidence in the record proving that Under Armour engaged in purposeful action with the intent to harm MET's relationships with American Textile, Milliken, and TB12. MET has presented sufficient evidence on Counts V and VI to proceed to a jury.[18]

---

[18] Under Armour raises a statute-of-limitations defense to these claims. But that fails. The statute of limitations is two years and begins to run when each of the four elements are present, including damages, and the injured party learns of the injury. 42 Pa. Cons. Stat. § 5524(3); *Fine v. Checcio*, 870 A.2d 850, 859 (Pa. 2005). As to Count V, MET alleges that it learned of American Textile terminating its contract with MET on July 31, 2018. ECF 311-9. As to Count VI, MET alleges that it learned of damages resulting from Under Armour's interference with MET's relationship with Milliken and TB12 after August 2018. ECF 308-6 at 55:18-56:14; ECF 311-17. MET filed suit on May 5, 2020. ECF 1. So these claims are within the limitations period.

**D. The Court will enter judgment in Under Armour's favor as to MET's claim for unjust enrichment (Count VII), as this is derivative of the trade-secret claim.**

MET's unjust-enrichment claim arises from "Under Armour's use of MET's trade secrets to launch its products with Celliant that it then falsely advertised increasing its sales and causing harm to MET in the market." ECF 306 at 30. As previously noted, MET has failed to prove up the existence of any trade secrets. Therefore, MET cannot show that Under Armour was unjustly enriched and MET's claim at Count VII fails.

**E. The Court will enter judgment in Under Armour's favor as to MET's claim for unfair competition (Count VIII) because MET is not a direct competitor of Under Armour.**

MET's unfair-competition claim fails because it wasn't a direct competitor with Under Armour. To state a viable state-law claim for unfair competition, MET would have to be competitors with Under Armour. *See Giordano v. Claudio*, 714 F. Supp. 2d 508, 523 (E.D. Pa. 2010). As discussed above regarding the federal claims, MET cannot prove direct competition in the alleged CCREB market so MET's claim at Count VIII for unfair competition fails.

**F. The Court will enter judgment in Under Armour's favor as to MET's claim for conversion (Count IX) because MET has identified no evidence in the record that Under Armour converted MET's property.**

MET brings a claim for conversion, alleging that Under Armour converted its trade secrets and confidential information. ECF 77 at ¶¶ 169–74. This claim fails for at least three reasons.

First, to the extent that MET cabins its claim to only information that qualifies as "trade secrets" and "confidential information," the claim fails for the reasons noted above—there is insufficient evidence that the information at issue constitutes trade secrets or confidential information.

Second, it is not entirely clear that a plaintiff can bring a claim for conversion

of essentially intangible information (*e.g.*, like using someone else's ideas). This would be like a patent or copyright holder bringing a claim for conversion under state law, instead of a claim for infringement under the Patent Act or Copyright Act. It is ill fitting. *See, e.g.*, *BearBox LLC v. Lancium LLC*, 125 F.4th 1101, 1111–14 (Fed. Cir. 2025) (affirming the district court's summary judgment that plaintiff's Louisiana conversion claim was preempted by federal patent law); *Tegg Corp. v. Beckstrom Elec. Co.*, 650 F. Supp. 2d 413, 432 (W.D. Pa. 2008) (Fisher, J.) ("District courts within the Third Circuit have found that the Copyright Act preempts state law conversion claims regarding copyrighted property" and because "[software] is intangible property, [it] is generally not subject to a conversion claim"); *but see Peirson v. Clemens, Inc.*, 2005 WL 681309, at *3 (D. Del. 2005) (holding that conversion of the *physical* embodiment of a copyright work was not preempted by the Copyright Act) (emphasis added).

Third, even if MET could bring such a claim, it still fails for lack of evidence. Under Pennsylvania law, conversion is the "deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification." *Universal Premium Acceptance Corp. v. York Bank & Tr. Co.*, 69 F.3d 695, 704 (3d Cir. 1995). MET hasn't pointed to any evidence in the record that Under Armour deprived MET of any right to its own information, or otherwise interfered with MET's ability to use its own information. Without any evidence that Under Armour actually *converted* any of MET's property (*i.e.*, took it and deprived MET of its use), the conversion claim cannot proceed.

## G. The Court will enter judgment in Under Armour's favor as to MET's claims for accounting and injunctive relief (Counts X and XI), as they are derivative of other deficient claims.

In Counts X and XI, MET seeks an accounting and injunctive relief, respectively. These aren't exactly claims; they are forms of relief. In any event, the Court rejects these "claims" on the merits. As MET concedes, its request for an

accounting springs from Count IV for breach of the non-disclosure agreement, which, as noted above, fails.  ECF 306 at 36.  And its request for injunctive relief is tied to claims that the Court has also ruled are deficient (Counts I-III, VIII).

## CONCLUSION

For the above reasons, the Court will grant summary judgment in Under Armour's favor on all claims, except the tortious-interference claims at Counts V and VI.  A separate order follows.

DATED this 13th day of July, 2026.

BY THE COURT:

/s/ J. Nicholas Ranjan
United States District Judge